IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
Western DIVISION

FILED
JAN 18 2024
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

| | | |
|---|---|---|
| Ronald S. Lasorsa | ) | COMPLAINT |
| Plaintiff, | ) | |
| v. | ) | 5:24-CV-00031-BO |
| | ) | |
| J. Edward Bell III, Esq. | ) | |
| Defendant. | ) | |

Pro Se Plaintiff, as and for his Complaint, respectfully alleges, upon information and belief:

1. Pro Se Plaintiff, RONALD S. LASORSA, at all times hereinafter mentioned was and still is a United States citizen currently residing at 121 Sharpsburg Road, Sharpsburg, KY 40374.

2. Defendant, J. EDWARD BELL III, ESQ, is principal attorney at Bell Legal Group, LLC located at 219 Ridge St. Georgetown, SC 29440.

3. Defendant is an attorney admitted to practice law *pro hac vice* in the Eastern District of North Carolina.

4. Defendant is presently litigating a case before this Honorable Court, No. 7:23-CV-897.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States.

6. The issues raised in this Complaint involve a dispute among residents of different states, with an amount in controversy exceeding $75,000, and as such, this Court has jurisdiction over this matter by 28 U.S.C. Sec. 1332.

7. Venue is proper because the subject matter of the events that gives rise to Plaintiff's claims has occurred, and will occur, in this district.

8. Venue is proper because the issues of this matter rise from litigation presently before this Honorable Court.

## FACTUAL ALLEGATIONS

9. Marine Corps Base Camp Lejeune ("Camp Lejeune") is a military installation operated by the United States, located in Onslow County in southeastern North Carolina, approximately 156,000 acres in size, and supporting approximately 170,000 people.

10. In relation to the instant action, Camp Lejeune is the subject of litigation, stemming from exposure of the people living and assigned there within a specific time period, to the contaminated water located thereon.

11. The specifics of the water situation have been described by scientists as the worst public drinking water contamination crisis in our Nation's history.

12. Defendant has publicly stated on multiple occasions that he has personally advocated and fought for the passage of Federal relief on this matter for over fifteen (15) years.

13. Defendant has publicly stated on multiple occasions that he personally authored the legislation known as the Camp Lejeune Justice Act.

14. On August 10, 2022, President Joseph Biden signed into law the Honoring Our Promise to Address Comprehensive Toxics ("PACT") Act of 2022.

15. Section 804 of this law is the Camp Lejeune Justice Act ("CLJA") of 2022.

16. CLJA allows all people, including Veterans and their family members, who were exposed to contaminated water at Camp Lejeune to file a claim with the Department of the Navy.

17. CLJA also created a federal cause of action relating to the water contamination issue, and pursuant thereto, the United States has waived its sovereign immunity.

18. CLJA Section 804(d) directs that the United States District Court for the Eastern District of North Carolina shall have exclusive jurisdiction over any claim arising therefrom and shall be the exclusive venue for such action.

19. This matter has been entitled Camp Lejeune Water Litigation, No. 7:23-CV-897. ("CLWL")

20. CLJA did not define a maximum number of claimants that could seek relief; just that any person who believes they qualify for relief under the CLJA must first submit a claim to the Department of the Navy before filing a lawsuit.

21. Eligibility to file a claim is based upon several factors.

22. If a person worked, lived, or was otherwise exposed to contaminated water at Camp Lejeune for thirty (30) days or more; between August 1, 1953, and December 31, 1987; and was exposed to water at Camp Lejeune that was supplied by the United States or on its behalf; and was harmed therefrom, that person may seek appropriate relief.

23. All potential claimants only have a two-year window within which to file a claim in the CLWL.

24. CLJA allows the Veteran's Administration ("VA") to offset any award to plaintiffs of the CLWL, against the value of that Veteran's health care costs for services from the VA.

25. The Government intends to claw back these monies paid to plaintiffs through the VA.

26. Law firms representing these plaintiffs have sought to retain 40% or more of all settlement awards plus various additional expenses, despite a 25% fee cap mandated by the Federal Tort Claims Act.

27. Consequently, the injured plaintiffs that do receive an award will only actually retain a minority percentage, less than 50%, of the legal awards they are due.

## AS AND FOR A FIRST CAUSE OF ACTION IN NEGLIGENCE
## DEFENDANT HAS A DUTY TO PLAINTIFF

28. Plaintiff incorporates by reference the facts alleged in paragraphs 1 - 27.

29. By an Order of this Honorable Court, Defendant has been appointed as Lead Counsel of the Leadership Group directing the prosecution of CLWL, and as the Chair of Plaintiffs' Executive Committee, also tasked with coordinating and conducting the proceedings related thereto.

30. That Order charged the Executive Committee with forming and populating subcommittees to carry out a comprehensive Litigation plan and ensure proper oversight, accountability, and coordination.

31. The Executive Committee was also mandated to coordinate and oversee the activities of plaintiffs' counsel during the CLWL, as well as monitor and ensure that work conducted by CLWL plaintiffs' counsel is reasonably necessary and avoids unnecessary costs and duplication of effort.

32. The members of the Executive Committee also serve as members of the Steering Committee and have a number of responsibilities. Among other duties, they must

4

develop and propose procedures for the screening of plaintiffs; develop and propose resolution strategies; perform any other task deemed necessary and proper for the Steering Committee to accomplish its responsibilities as defined by the Court's orders.

33. All of these appointments to the committees are of a personal nature. As per this Court, each appointee must assume personal responsibility for the performance of his or her duties.

34. Defendant has provided much of the common benefit effort and has personally advanced considerable funding for the common CLWL Litigation, in an amount exceeding one million dollars ($1M).

35. In the Master Complaint of the CLWL, Defendant painstakingly and specifically described the details of his investigation behind the CLWL.

36. Defendant provided valuable illustrations to simplify the complex system and tests conducted thereof.

37. Defendant clearly articulated month to month, and year to year events and milestones throughout the CLWL history.

38. Defendant has appeared to leave no stone unturned in providing information to support and bolster the case and position of the veterans and civilians who have been harmed by the conditions present on Camp Lejeune.

39. As Lead counsel in the CLWL, Defendant has a duty to these injured parties, and a responsibility to put forth a complaint that represents all of them.

40. Plaintiff has been personally exposed to the contaminated water on Camp Lejeune.

41. Defendant owes Plaintiff a duty to represent him in the CLWL to the best of his ability.

## DEFENDANT HAS BREACHED HIS DUTY

42. In his Master Complaint in the CLWL action, Defendant described that it is estimated that as many as one million people or more may have been exposed to the toxic water on Camp Lejeune, between at least 1953 and 1987.

43. When Defendant personally wrote the CLJA, as he has publicly stated on multiple occasions, he defined the class of potential claimant, and he set the timeframe and conditions within which exposure to the contaminated water must have occurred.

44. Defendant never justified the time frame he personally decided upon.

45. Defendant describes massive instances of contamination to Camp Lejeune that predate the "opening date" of 1953, codified in the CLJA. [CLWL Master Complaint]

46. Camp Lejeune was constructed between 1941 and 1943.

47. In 1941, the Hadnot Point Water Treatment Plant, along with many of the source wells providing the water to the plant, were constructed on Camp Lejeune.

48. Also in 1941, the Hadnot Point Fuel Farm was built in close proximity to a number of important supply wells, including within 1200 feet of one such well.

49. This fuel farm held one 600,000 gallon above-ground fuel tank, six 12,000-gallon underground tanks, and eight 15,000-gallon underground tanks, combining to hold up to 792,000 gallons of fuel.

50. Two other water treatment facilities - Holcomb Boulevard and Tarawa Terrace are also subjects of the CLWL.

51. Both of these facilities were constructed after the Hadnot Point plant.

52. Both of these facilities were also periodically supplied with water from the Hadnot Point plant.

53. Defendant describes in detail, in the Master Complaint, the location of supply wells for these facilities being located close to other blatantly dangerous areas on Camp Lejeune, such as a junkyard, solvent disposal area, the base dump, a former fuel tank sludge dumping area, an industrial fly-ash dump, a former transformer storage lot, an open storage pit, and the Hadnot Point Landfill Area.

54. According to information discovered and presented by Defendant and agreed to accurate by the United States as defendant in the CLWL, the true level of toxicity at play in the CLWL cannot be accurately known.

55. There is no way to know, beyond the shadow of a doubt, when the contamination started; how many people were affected; when the contamination ended - if ever; and what the true damages are as a result.

56. To that end, when Defendant personally crafted a timeframe of only two years by which to classify the potential plaintiffs in the CLWL, he did so in an arbitrary and capricious manner, and thus breached his duty to the very same people for whom he has a duty to fight.

57. Plaintiff is a Marine Infantry Officer and combat veteran, and as such, was held to a very high standard of performance by the United States Marine Corp during combat that instilled the concept that Plaintiff had a duty to ALL of his Marines, not just some.

58. No less standard should be expected from Defendant in his critical role as lead counsel and Defendant should be held to the same level of accountability as the community he seeks to serve.

59. Every one of the individuals exposed to the toxins on Camp Lejeune is due some measure of relief from the injuries they suffered...not just those Defendant arbitrarily and capriciously deems worthy.

60. At the first moment toxins were introduced into the water supply, the people exposed to those toxins had a right to relief.

61. Any toxic conditions resulting from the vast, unchecked contamination that took place on Camp Lejeune were present in 1987, existed there long past 1987, and a reasonable person would conclude that these toxins are more than likely still present on Camp Lejeune today.

62. Defendant has unintentionally breached his duty to Plaintiff by arbitrarily and capriciously choosing a two-year time frame for the CLWL, and his actions excluded real people from seeking relief, including Plaintiff.

63. When Defendant was chosen for the role of Lead Counsel in the CLWL, he was obligated with among other responsibilities, "...ensuring oversight, accountability, and coordination of the litigation; [to] develop and propose procedures for the screening of plaintiffs; and protects against and "avoids unnecessary costs and duplication of effort."

64. Defendant has unintentionally breached his duty to Plaintiff by failing to provide adequate oversight to the numerous law firms "collecting" plaintiffs for the CLWL.

65. Defendant has unintentionally breached his duty by failing to develop effective procedures for screening plaintiffs.

66. Defendant has unintentional breached his duty by permitting unnecessary costs to the CLWL by ignoring the rampant intake fraud and identity theft that is currently being perpetrated by some firms collecting and assembling claims for the CLWL.

67. Defendant should have known about the rampant intake fraud and identity theft that currently exists in Mass Tort third party litigation finance.

68. Plaintiff attempted to speak with Defendant in October 2022 to warn Defendant about potential intake fraud and identity theft, however Plaintiff was prevented from doing so by Defendant's financier.

69. Plaintiff has unmatched personal experience and expertise in the dark arts of intake fraud and identity theft and had developed a proprietary strategy to cure those issues, however the financier was unable to comprehend the process and refused to allow Plaintiff to speak to Defendant.

70. Thus, Defendant has unintentionally allowed thousands of fraudulent claimants to be a part of the CLWL, while excluding the Plaintiff herein.

71. Defendant should have known about the potential conflict of interests that third-party litigation finance companies can expose law firms to in mass torts because Plaintiff tried to warn him as a current SEC Whistleblower but was blocked from doing so by Defendant's financier.

72. As a result of the considerable third-party financial investments being made to Defendant's firm, to support his efforts in the CLWL matter, Defendant is unintentionally working for his financier and not on behalf of Plaintiff or those other claimants who were injured at Camp Lejeune.

73. Defendant has unintentionally created a clear personal financial conflict of interest for himself in the CLWL matter, and in so doing, has breached his duty to the individuals injured by the subject matter of the CLWL.

74. Defendant's arbitrary and capricious decisions and actions, and his personal allegiance to his financier over the plaintiffs in the CLWL have breached his duty to the Plaintiff herein.

## DEFENDANT'S BREACH OF DUTY CAUSED PLAINTIFF'S DAMAGES

75. Defendant was a driving force behind CLJA.

76. Defendant has publicly stated on multiple occasions that he personally authored the text that was signed into law on August 10, 2022, which is now known as the Camp Lejeune Justice Act of 2022.

77. Defendant's decision to limit the potential claimants to the years between 1953 and 1987 has caused damages to Plaintiff.

78. Defendant's unintentional action has directly harmed countless other people who were exposed to the conditions that he described in his Master Complaint.

79. But for Defendant's unintentional decision to limit the class of plaintiffs as being those contained within 1953 and 1987, Plaintiff and countless others would be able to seek relief for the pain and suffering due to the conditions at Camp Lejeune.

80. But for the Defendant's unintentional failure to provide adequate oversight to the law firms involved with "collecting" plaintiffs, then 10% or more of the current docket as reported in the Joint Status Report on December 19th, 2023, would not consists of fraudulent claims currently filed with the Navy in the CLWL matter.

81. But for the Defendant's unintentional failure to develop effective procedures for screening plaintiffs, the class of plaintiffs in the CLWL matter would not be tainted by

the same fraud that is currently rampant in the broader Mass Tort litigation area of practice.

## AS AND FOR A SECOND CAUSE OF ACTION

## DEFENDANT VIOLATED THE PLAINTIFF'S DUE PROCESS RIGHTS

82. Plaintiff incorporates by reference the facts alleged in paragraphs 1 - 81.

83. Defendant has publicly stated on multiple occasions that he personally wrote the legislation that became known as the Camp Lejeune Justice Act of 2022.

84. In so doing, Defendant acted as agent of the U.S. Government.

85. As an agent of the U.S. Government, Defendant and his actions are subject to the same scrutiny as the U.S. Government.

86. Defendant's actions as an agent of the U.S. Government in defining the class of CLWL plaintiffs as being between 1953 and 1987 were arbitrary and capricious and have denied the Plaintiff herein, his Due Process rights under the 14th Amendment.

87. As a result of Defendant's actions, Plaintiff herein, and millions of other potential plaintiffs were excluded from the unique and historic relief provided under the CLJA and in the CLWL.

88. Defendant did not provide Plaintiff any advanced notice that Plaintiff would be excluded from the CLWL.

89. Being excluded from the CLWL has deprived Plaintiff of his rights under the 14th Amendment.

90. Defendant gave a presentation at a Harris Martin conference in New York City on December 8th, 2022.

91. Plaintiff attended that conference and personally asked Defendant about the two-year eligibility cut off for all potential plaintiffs being mandated at the year 1987.

92. Defendant flippantly responded to Plaintiff that he had to cut off the class somewhere.

93. Defendant's arbitrary and capricious decision has prevented Plaintiff from having an opportunity to be heard on this matter.

94. Plaintiff herein has exhausted every remedy at his disposal, to address the actions of Defendant.

95. Mandating only two-years within which to file a claim in the CLWL inequitably limits the options of Plaintiff and other injured parties who have been excluded from the CLWL, from being heard on these issues before the Court, prior to that window closing.

96. This action has violated the Due Process rights of Plaintiff and all other claimants from seeking relief for their injuries.

97. Defendant is now personally aware of the ongoing rampant fraud that exists in Mass Tort Litigation.

98. Defendant has still not taken any steps to eliminate this fraud.

99. Defendant is now personally aware of independent systems that exist, which if implemented, would have drastically mitigated - if not completely eliminated - fraudulent claims being included as part of the CLWL.

100. The rules governing the drafting of the CLJA and the actions of Defendant in the CLWL since the law has been passed have not been fair and equitable.

101. As a result, Defendant has violated Plaintiff's 14th Amendment rights.

## PLAINTIFF'S DAMAGES

102. Plaintiff graduated from the United States Naval Academy in 1989.

103. Plaintiff is a United States Marine Corps combat veteran.

104. Plaintiff served as an Infantry Officer and was stationed at Camp Lejeune in 1990 where he lived with family until 1994.

105. Plaintiff was awarded the Combat Action Medal for his role as an infantry platoon commander in Kuwait, during Operation Desert Storm from 1990 to 1992.

106. Plaintiff then served as a company commander at the School of Infantry at Camp Geiger (a satellite training camp attached to Camp Lejeune).

107. Through his own personal knowledge and first-hand experience, the water conditions on Camp Lejeune in general, and specifically in Plaintiff's home, were just as described in Defendant's Master Complaint.

108. In 1992, Plaintiff wrote a complaint to the Base Inspector General about his experience with the water conditions, which prompted Plaintiff's promotion to the role of Aide-de-Camp for Brigadier General Larry Livingston, then Base Commanding General of Camp Lejeune.

109. Plaintiff served as General Livingston's Aide-de-Camp from 1992 to 1994 and in this capacity witnessed first-hand, the smell, condition, and color of the water that all the Marines and the families living on Camp Lejeune under General Livingston's command were exposed to.

110. Plaintiff and his family consumed food that was prepared with this water.

111. Plaintiff's then-wife drank this water during her pregnancy with two of their children.

112. Plaintiff and his then-wife mixed this water in the baby formula that they fed to their new-born children.

113. Their children drank this contaminated water throughout their early childhoods.

114. Both of the Plaintiffs sons were subsequently diagnosed with neurobehavioral issues now linked to their consumption of the contaminated water on Camp Lejeune.

115. The pressures of the injuries sustained as a result of their son's neurobehavioral issues, that were then diagnosed as various mental illnesses, were too much for Plaintiff's marriage, resulting in its dissolution and divorce.

116. As a result of his neurobehavioral injuries, now suspected to be sustained by his exposure to the contaminated water at Camp Lejeune, Plaintiff's youngest son, Jacob C. Lasorsa died from an accidental drug overdose on October 14th, 2016.

117. Plaintiff has sustained damages in the form of the life-altering neurobehavioral injuries to both his sons.

118. Plaintiff has sustained damages in the form of divorce from his wife.

119. Plaintiff has sustained damages from the loss of his youngest son's life.

120. Plaintiff has sustained damages from the arbitrary and capricious time frame that Defendant chose, to define the class of plaintiffs in the CLWL matter.

121. Plaintiff has been prevented from seeking justice for the damage and pain that his family has endured, because he arrived at Camp Lejeune in 1990, only three years after Defendant's arbitrary and capricious cut-off date of 1987.

122. Solely due to the Defendant's negligence, breach of duty and arbitrary and capricious nature of the Defendant's unintentional actions, Plaintiff sustained injuries greater than $75,000.00, and is entitled to damages and relief.

WHEREFORE, Plaintiff respectfully demands judgment against Defendant,

1. Ordering J. Edward Bell III, Esq. to step down as Lead-Counsel in the CLWL matter; Concurrent with Defendant stepping down, or in the alternative:

2. Restating the parameters defining the class of plaintiffs in the CLWL to include all persons exposed to the toxic conditions on Camp Lejeune;

3. Eliminating the two-year window within which potential plaintiffs can file a claim in the CLWL;

4. Ordering the implementation of a process specifically developed by Plaintiff based on unmatched experience and expertise with intake fraud and identity theft, that will cure the unknown number of fraudulent claims already present in the existing docket by "knocking them out" through Plaintiff's program;

5. Ordering the implementation of a variation of same said program to optimize the identification, selection, organization, and mass matrix settlement of all valid claims in the 41 different injury categories currently being litigated in the CLWL on behalf of the EDNC, qualified plaintiffs and American taxpayers.

6. Awarding damages in an amount exceeding the monetary limits of this Court, together with the interest and the costs and disbursements of this action, and such other and further relief as this Court deems just and proper.

DATED: January 18th, 2024

*[signature]*