---

# AFFIDAVIT OF RONALD S. LASORSA
---

Dalimonte Rueb Litigation Group, LLP   )
-vs-
Ronald S. Lasorsa, Pro Se              )

BEFORE ME, the undersigned authority, Ronald S. Lasorsa, who, after being duly sworn, deposes and says:

(1) I declare under penalty of perjury that the foregoing is true and correct and based on my personal knowledge.

(2) I am NOT an Attorney, and I am acting as Pro Se in this matter. District of Columbia Rules of Professional Conduct, designate Attorney Rueb, as the sole party ethically responsible for our joint actions when I developed our IVC and Hernia Mesh dockets. *See Exhibit 1: Alpha Law Legal Opinion – page 2: Professional Independence of a Lawyer and page 3: Rights, Powers and Responsibilities of the Managing Partners.*

(3) Mass tort litigation finance is an obscure and opaque asset class where identity theft is rampant and easy to hide from those unfamiliar with the origination of mass tort cases. It has taken me over a decade of being deeply immersed in this asset class to develop the skills necessary to forensically identify the sophisticated type of fraud I am about to describe.

(4) Before I unintentionally became a subject matter expert in litigation finance, I served my country.

(5) I graduated from the United States Naval Academy and was commissioned as a 2nd Lieutenant in the Marine Corps in 1989.

(6) After graduation, I was stationed at Camp Lejeune, NC, where I served two tours of duty in Kuwait during Operation Desert Storm from 1990-1992 as an infantry platoon commander. As a result, I was awarded a Combat Action Ribbon.

(7) After I returned to Camp Lejeune, I was assigned to the School of Infantry at Camp Geiger (a satellite training camp) as a company commander, and that is when I first encountered the water contamination currently being litigated as a result of the recently passed "CLJA" - Camp Lejeune for Justice Act.

(8) My family lived on base during both deployments and while I was serving as the Base Commanding General's Aide-de-Camp. I received my MSBA in Finance from Boston University while serving as Aide to the General from 1992 to 1994. It was as Aide that I first became personally aware of the water issues at the base, but I had no idea of the long-term consequences the problem would have.

(9) In 1994 I left active duty to become a derivatives trader at JP Morgan. Throughout my 12-year career in finance, I was responsible for generating hundreds of millions of dollars in trading commissions, and I was placed in significant positions of responsibility in a highly regulated industry.

(10) In 2006, I left my career in finance to earn an online paralegal certificate from Boston University to represent myself during an adversarial divorce. By that time, my wife and I had two sons conceived after she was exposed to the contaminated water at Camp Lejeune.

(11) Unfortunately, both boys, Jarred and Jacob, were born with neurobehavioral effects now linked with exposure to water contamination. Mentally ill children require specialized care, and I chose to leave

the Marine Corps to pursue a career on Wall Street. I intended to make enough money to pay for my sons' special needs because their well-being was my primary concern.

(12) Ultimately, the pressure of having two sons with mental illness proved too much for my marriage, and we ultimately divorced in 2006. We differed on how best to help them, so I took custody of my oldest son Jarred and my ex-wife took custody of my youngest son Jacob. Unfortunately, Jacob, my youngest son passed away in 2016 and his death is relevant to this matter.

(13) In 2010, I was accepted to the Massachusetts School of Law. However, I didn't even complete the first semester before I realized I didn't have the temperament to practice and thought I would prefer the business of law instead. I have since specialized in all aspects of litigation finance and my unmatched experience and expertise are described in this sworn statement.

**Statement of Facts:**

(14) Attorney Greg Rueb is deliberately concealing the fact that he employed the case management system I developed and then utilized the vendors and methodologies I suggested to secure his position on four separate plaintiff steering committees; Bard IVC, Bard Hernia Mesh, Cook IVC, and Cordis IVC. *See Website: https://drlawllp.com/greg-rueb/ - Plaintiff Steering Committees.*

(15) When I agreed to the terms of our verbal contract to help him secure those positions, I was incompetent due to the recent death of my youngest son Jacob and thus incapable of understanding the limitations of that type of agreement. It is now clear to me why Attorney Rueb insisted I remain his off-the-books "consultant," and not become his official partner.

(16) Absent my diminished capacity, I would have demanded our contract be in writing. *See Hauer v. Union State Bank – 192 Wis. 2d 576, 532 N.W.2d 456. "The Court, in interpreting the implied obligation of good faith that is read into all contracts, stated that where a contract is fairly entered into, and neither party knows of the other's incapacity, the contract is not voidable if the parties cannot be restored to their previous positions. However, if one party knows or has reason to know of the other party's incompetence, the contract may be voided, and the consideration that was given need not be restored." See Website: https://casetext.com/case/hauer-v-union-state-bank-of-wautoma*

(17) The ugly truth is that I compromised my integrity to become the architect of Attorney Rueb's current Hernia Mesh and IVC dockets. My motive was to assist Attorney Rueb so that he could secure positions on multiple Plaintiff Steering Committees, and I could then maximize my profits from my relationship with "Waterfall." At the time, I felt I needed the money to help my crumbling family as much as I could. I now realize this was a mistake and I regret many of the decisions I made while I was incompetent.

(18) Waterfall Asset Management is a global alternative investment manager focused on specialty finance opportunities within asset-backed credit, whole loans, real assets, and private equity. *See Exhibit 2: Waterfall $25MM - 500MM.*

(19) In exchange for my services, Attorney Rueb agreed to pay me 50% of the net legal fees generated by his "DC" District of Columbia law firm through a "verbal contract,"

(20) I have never received any legal fees from Attorney Rueb.

**Description of Rueb Conspiracy:**

(21) From June 2014 until November 2015, I witnessed convicted felons develop an illegal and unethical business model that utilized "DC" - District of Columbia law firms. I was one of several non-attorney minority shareholders of one of those law firms involved, Alpha Law.

(22) I also participated in a 40-million-dollar exit of four individual law firms that became notoriously called the "Alpha Law" transaction and have personal knowledge of previously concealed information. *See Website: The Lucrative Mass Torts Scam That Wasn't -* *https://www.litigationandtrial.com/2015/11/articles/product-liability-2/lucrative-mass-torts-scam/*

(23) I was then induced by verbal contract to share 50% of the net revenue when I emulated and enhanced that business model for Attorney Greg Rueb as his "consultant." Attorney Rueb specifically sought me out and engaged me in order to circumvent two convicted felons' exclusive access to an offshore identity theft ring because he knew I had the skillset to assist him.

(24) For the record, I know that identity theft was used to curate Attorney Rueb's IVC and Hernia Mesh dockets because I witnessed their genesis.

(25) Attorney Rueb's docket was curated based on the same methodology I witnessed two convicted felons, Vincent Chhabra and John Spicer, (also known as John Ray. John Ray is an alias for John Spicer, a convicted felon for armed robbery) employ to develop the Sigma Law and Alpha Law dockets.

(26) After the Alpha Law transaction closed, I learned that the amount of identity theft committed by Chhabra and Ray to facilitate those 1,444 false claims was capped at 10% of our legitimate clients to conceal the conspiracy. *See Exhibit 3 – Document: Akin Mears Arbitration Demand Letter*

(27) When I confronted Chhabra, he was unrepentant and said anything more would have been too noticeable. And in fact, he was correct, as it took the firm's co-founder, Attorney Truett Akin, Senior Partner at AkinMears, almost two years to audit his docket sufficiently to recognize his losses.

(28) I say this again for emphasis, Truett Akin has over 20 years of experience representing injured individuals against multi-national corporations, big pharma and large insurance companies thus he should be considered a subject matter expert. And it took him almost two years to audit his docket sufficiently to recognize his losses. Most trial lawyers with less experience would never detect that level of fraud.

(29) Chhabra and Ray combined their resources to perfect this docket curation methodology using offshore call centers based in India at the time, to steal the identities of American citizens who previously had received specific medical procedures.

(30) Their motive was to file false legal claims on their behalf using overseas bad actors to participate in specific "Mass Tort" multi-district litigations. This was a simple variation of traditional credit card identity theft where third party bad actors apply for credit in someone else's name.

(31) More than ten call centers based in India, whose main task was to service American health insurance companies, stole the health care information of some their American clients.

(32) Specifically, they stole the information from the clients that had procedures that the Chhabra-related call centers knew to be potentially the most profitable for future mass-tort action. They then sold that stolen information to India-based Chhabra-related call centers doing legal case intake for the transvaginal mesh multidistrict litigation during the years 2014 and 2015.

(33) The conspiracy worked like this; first, Ray identified the diagnosis and treatment codes associated with the highest value cases as part of his Mass Tort Nexus consulting business. Transvaginal mesh was the first campaign, followed by IVC, then hernia mesh.

(34) Ray used his Mass Tort Nexus consulting business as a front to cultivate a small network of co-conspirator trial lawyers. *See Website: YouTube Video of Attorneys Dalimonte and Rueb in their own words - https://www.youtube.com/watch?v=97UH49u8wkU*

(35) The original genesis of this scheme happened when on a trip home to India, Chhabra discovered that identity theft of American citizen health care information was rampant, and he could easily purchase stolen information.

(36) Ray was the one to suggest filing a small number of false claims in specific mass torts where he had entered into "verbal contracts" with certain co-conspirator trial lawyers. Ray's motivation was to help the co-conspirator trial lawyers gain leadership on as many plaintiffs steering committees (PSC) as possible to better facilitate the fraud as an "inside job."

(37) Ray was especially happy to be working with Attorney Rueb because they had agreed to share Attorney Rueb's participation in the steering committee fees, which were usually between 3-7% of the gross legal fees for the entire MDL.

(38) Those fees are "earned" based on their billable hours working in the various bellwether trial roles. Ray intended to participate in those fees as Rueb's "no-show-consultant," meaning Ray would produce invoices for billable hour compensation on Rueb's behalf, without providing any actual work product.

(39) Chhabra cultivated relationships with carefully selected India-based call centers where Chhabra had secured employment for some members of his extended family to induce the call center managers to become co-conspirators. Chhabra would then communicate Ray's diagnosis and treatment codes to those co-conspirator India-based call centers.

(40) Once the call centers had the patient data, there were three ways to curate "tainted" cases. I characterize cases as being "tainted" if they have a chance of being "knocked-out" by defense counsel if the case origination process were known thus resulting in a diminished award for the plaintiff through no fault of their own. *See Website: The Lucrative Mass Torts Scam That Wasn't - https://www.litigationandtrial.com/2015/11/articles/product-liability-2/lucrative-mass-torts-scam/*

(41) The first was by "Barratry." Chhabra call center agents would make outbound calls to women whose data he had bought and then lied when they explained that the woman must have filled out an "online opt-in form" asking for more information on the tort. *See Website: - What Is Barratry? - https://www.investopedia.com/terms/b/barratry.asp*

(42) A Chhabra/Ray agent would then coach the woman through the qualifying questions to retain the case. A more updated version of this method is illustrated in a recent article where notorious Texas trial lawyer Mikal Watts used a network of paid non-attorney marketers to solicit clients. *See Website: - $10,000 and a new truck: 8th Circuit sheds light on Watts Guerra's tactics to entice clients - https://www.reuters.com/legal/litigation/10000-new-truck-8th-circuit-sheds-light-watts-guerras-tactics-entice-clients-2023-03-24/*

(43) The second way to curate tainted cases was to commit actual fraud. That is where claims are filed under names like "Mickey Mouse" or "Donald Duck." The details described in Exhibit 3 are factual. Specifically, 1,444 of the 14,453 clients transferred in the Alpha Law transaction (approximately 10%) never existed. *See Exhibit 3 – Document: Akin Mears Arbitration Demand Letter - page 10, section 26.*

(44) Here is an example of the same notorious Texas trial lawyer, Attorney Watts, using the second technique. *See Website:* - https://www.justice.gov/usao-sdms/pr/seven-individuals-indicted-conspiracy-mail-and-wire-fraud-and-identity-theft-connection

(45) The third type of tainted case is more insidious and difficult to detect; identity theft. For example, if there were a name on the list for a high-value legal award that a Chhabra/Ray agent could not reach, they would have one of their India-based agents call a US-based agent and act as that prospective client to ensure they "qualified" for the claim and retain on behalf of the "Alpha" and "Sigma" law firms.

(46) Since all of Chhabra's call center representatives were compensated based on the number of clients, they "retained," Chhabra's call center management team actively encouraged third-party overseas agents to file false claims. I have no idea how many of our clients were real or fake, and I am sure Truett Akin doesn't, either. This is risk I am attempting to shield American taxpayers and injured veterans from in the CLJA litigation.

(47) Goutam Jain, listed as my partner in Alpha Law, was Chhabra's call center partner based in the U.S. to coordinate the operations between their multiple call center co-conspirators. *See Exhibit 1 - Document: Alpha Law Legal Opinion - page 3, section 13, para 4.*

(48) I only became aware of this aspect of Chhabra's business model after the Alpha Law transaction closed, and I was able to forensically audit the financials. Because of my long career in finance, I realized there had to be serious flaws in the valuation of the docket.

(49) I was amazed at how profitable this transaction was in such a short period of time. I was curious to see if it was legitimate and if so, how quickly I could reverse-engineer the process for my own understanding away from Chhabra and Ray.

(50) I also became fascinated by how Chhabra and Ray used medical codes to originate our TVM docket so quickly. Because of my long career in legal lead generation, I quickly concluded that this methodology would be, if legitimate, substantially more profitable than the direct response advertising process I was familiar with.

(51) Once I realized the fraud, I promptly resigned from Chhabra's holding company. In addition, I demanded that Chhabra indemnify and release me from all liability for his business activities during our association, which he did. *See Exhibit 4 – Document: Excelium Separation Agreement - page 2, section 4 Indemnification and page 4, section 5 Mutual Release.*

(52) After the Alpha Law transaction, I was approached by S.E.C. Bad Actor Howard Berger to consult with his team at Legal Recovery Associates on how they could replicate the model with an Attorney named John Dalimonte and an accredited investor named Gary Podell. At that time, I had no idea Berger was considered a "Bad Actor." Berger has an S.E.C. lifetime ban from participating in any securities transactions based on previous bad behavior while he was a stockbroker. Berger begged me to teach him what we had done at Alpha Law, and I agreed.

(53) In the interest of transparency, my motivation for moving from one unscrupulous group of partners to another was my desire to make money. I prayed it would allow me to take better care of my special needs children and I now see this was a mistake. *See Exhibit 5 – Document: DRLG Demand Letter; See Exhibit 6 - Document: Lasorsa S.E.C. Qui Tam Claim*

## Credibility of the Counterparties:

(54) Attorney Rueb commits numerous lies of omission when describing our business relationship in his sworn statement. It would be difficult to address each in detail however there are two that are most egregious.

(55) The first is the submission of only one set on bank statements which I can only assume was meant to imply that was the only account Attorney Rueb paid me from. In fact, I had been paid from numerous banks accounts, too many in fact that I cannot recall an exact number.

(56) ***The second example is Attorney Rueb's description of our meeting. I dispute Attorney Rueb's version of events and state unequivocally, under penalty of perjury, that Attorney Rueb is lying. Berger, Goldberg and Podell attended that meeting, not Attorney Rueb.***

(57) I suggest the Arbitrator compel both Greg Goldberg and Gary Podell, who Attorney Rueb swears were both present as witnesses, to file sworn statements to describe the true nature of the conversation that day. Goldberg and Podell are Attorney Rueb's equity partners; Berger is the "consultant."

(58) I am confident both will admit that Berger attended the meeting and negotiated the terms on behalf of the group, not Attorney Rueb. *See Exhibit 7 – Document: Declaration of Gregory Rueb*

## Statement of Law:

(59) Attorney Rueb induced me to sign an illegitimate agreement to achieve unjust enrichment at my expense thus I believe I am entitled to restitution by disgorgement of up to 100% of our net profit.
   a. Diminished Capacity
   b. Unjust Enrichment
   c. Disgorgement

## Diminished Capacity:

(60) In NY State, a contract is voidable if one of the two parties of the agreement is mentally ill. *See Hauer v. Union State Bank – 192 Wis. 2d 576, 532 N.W.2d 456.* *"The Court, in interpreting the implied obligation of good faith that is read into all contracts, stated that where a contract is fairly entered into, and neither party knows of the other's incapacity, the contract is not voidable if the parties cannot be restored to their previous positions. However, if one party knows or has reason to know of the other party's incompetence, the contract may be voided, and the consideration that was given need not be restored."* *See Website:* https://casetext.com/case/hauer-v-union-state-bank-of-wautoma

(61) Further clarification says - *"The requirements for formation of an enforceable contract are: (1) at least two parties with legal capacity to contract; (2) mutual assent to the terms of an agreement with reasonably certain terms; and (3) consideration (i.e., payment). See – "(4 NY Prac., Com. Litig. in New York State Courts 59:12 [2d ed.], quoting Cobble Hill Nursing Home, Inc. v Henry and Warren Corp., 74 NY2d 475, 482 [1989])."* *See Website:* https://www.jonathancooperlaw.com/blog/at-what-point-does-a-contract-become-enforceable-under-ny-law-its-not-what-you-think.cfm

(62) During the entire time I was a consultant for Attorney Rueb, I was struggling with severe emotional distress brought on by the death of my son, Jacob Christian Lasorsa. Jacob was only 20 years old when he passed in 2016 and it continues to impact my entire family until this day. *See Exhibit 8 – Document: Jacob Lasorsa death certificate.*

(63) It was through this period of mourning and separation that I gained clarity and understood how uncomfortable I felt about our business practices. I then expressed my reservations about the continuation of the flawed model being practiced.

(64) The reason for my abrupt change of heart was that I had been told that more than one woman had died due to the unethical business practices being conducted in the Alpha Law project with our co-counsel, Attorney Rhett McSweeny. All without my knowledge.

(65) Attorney Rueb was aware of what had happened with Attorney McSweeny but did not share my concerns. My resulting anxiety manifested in public anger and uncontrolled screaming, which Attorney Rueb later stigmatized me for as being "difficult" to work with. *See Exhibit 7 – Document: Declaration of Gregory Rueb – page 2; section 6.*

(66) I was horrified when I was named in a 2018 lawsuit against most of the people involved in the Alpha Law transaction; however, I contacted Plaintiff's counsel and told them how the Chhabra/Ray/Attorney McSweeny scheme worked so they could more effectively represent their client, and they agreed to withdraw my name from the complaint. *See **Plummer v. McSweeney, 941 F.3d 341 (8th Cir. 2019)** – alleging "a deep running conspiracy to turn a potentially defective medical product into a cash cow for a wide range of people including lawyers, doctors, and investors, but not for the women who had the potentially defective medical product installed in their bodies." See Exhibit 4 – Excelium Separation Agreement – page 2; section 4 - Indemnification; page 4; section 5 - Mutual Release; See Exhibit 9 – Plummer v McSweeny 2018 Lasorsa Release.*

(67) As a Marine, I was intentionally desensitized to death because I was trained that it was justified to take a life to defend our country. However, after burying my son, death became very personal. The fact that women were dying so we could make money was too much for me, and I snapped.

(68) After seeking care, it became obvious to everyone that knew me that I was struggling with not only the trauma and PTSD from my son's death, and the guilt of those women's deaths, but also from my time in the Marines during combat that it was discovered how I continued to suffer from complex trauma. I am currently receiving treatment for this condition. *See Website: https://www.tandfonline.com/doi/full/10.1080/20008198.2017.1418103 ;See Website: https://psychcentral.com/ptsd ;See Website: https://psychcentral.com/ptsd/complex-trauma-a-step-by-step-description-of-how-it-develops*

(69) Attorney Rueb holds himself out as trial lawyer competent enough to serve on four plaintiff steering committees. Based on my obvious public symptoms and his first-hand knowledge of complex medical conditions, Attorney Rueb knew or had reason to know, I would still be grieving my son and the implications that might have on my ability to think rationally as we negotiated our business divorce. It is now obvious to me, that he intentionally preyed upon my diminished capacity and induced me to sign an illegitimate non-disclosure agreement he never intended to honor. *See Website: https://drlawllp.com/greg-rueb/ - Plaintiff Steering Committees.*

(70) As hard evidence that Attorney Rueb unscrupulously took advantage of my diminished capacity; I only recently discovered that he intentionally drafted our settlement agreement with a slight disparity between all beneficiaries listed at the beginning of the agreement and another section at the end of the agreement listing all the parties being bound by the agreement.

(71) **The net effect of this intentional omission left <u>Barbara Capasso</u> as an unbound agent with all of the protections of the agreement without any of the responsibilities. *See Exhibit 10 – Document: DRLG 2019 Settlement Agreement – Rueb Signature, page 3 section 7 – "Intended Third-Party Beneficiaries." pages 6 &7 section 25 – "Binding Effect."; See Exhibit 7 – Document: Declaration of Gregory Rueb – page 9 section 25. – "In 2019, when we settled with Mr. Lasorsa, I believed his***

*threats were at the level of extortion, but I had hoped that by paying him and locking him into a well-drafted settlement agreement, future misconduct could be avoided."*

**Element 1:** I did not understand the nature and consequences of the contract when I signed it. It wasn't until sometime during 2021, almost five years after my son's death, that I could eventually identify Attorney Rueb's intentional misrepresentation through omission between sections 7 and 25 of the illegitimate agreement.

**Element 2:** I could not realistically weigh the consequences of entering the contract when I signed it. In addition to actively grieving my son, Attorney Rueb knew that I was experiencing significant financial pressure to pay employee payroll and office rent because of the Waterfall fiasco so he had Berger pressure me to agree with only one hour to consider my options. Berger was the one who threatened to ruin my reputation and crush me in legal expenses; Attorney Rueb lied in his sworn statement; he did not attend that meeting.

**Element 3:** Attorney Rueb knew or had reason to know I was actively suffering from grief after losing my son. Rueb is a father; we had numerous conversations about my son. It is beyond belief that he could claim he did not or should not have known that I was incompetent due to my grief after losing my son.

(72) Attorney Rueb knew or had reason to know that I was incompetent at the time I signed this contract due to the death of my child. This contract must be deemed illegitimate in N.Y. State and voided. *See Hauer v. Union State Bank – 192 Wis. 2d 576, 532 N.W.2d 456. "The Court, in interpreting the implied obligation of good faith that is read into all contracts, stated that where a contract is fairly entered into, and neither party knows of the other's incapacity, the contract is not voidable if the parties cannot be restored to their previous positions. However, if one party knows or has reason to know of the other party's incompetence, the contract may be voided, and the consideration that was given need not be restored." See Website:* https://www.lexisnexis.com/community/casebrief/p/casebrief-hauer-v-union-state-bank

**Unjust Enrichment:**

(73) In New York, the elements of an unjust enrichment claim are "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Importantly, the doctrine of unjust enrichment is available whether the defendant has obtained the money by wrongdoing, illegality, or mere mistake. *See, e.g., Parsa v. State of New York, 474 N.E.2d 235, 237-38 (N.Y. 1984). See Website:* https://www.jonathancooperlaw.com/library/how-to-prove-unjust-enrichment-claim-under-ny-law.cfm

**Element 1:** Attorney Rueb benefitted from our business arrangement.

(74) Attorney Rueb is currently a member of four separate plaintiff steering committees and advertising on his website that he has $24MM in settled mass tort legal fees with another $225MM in process. I am, without question, partially responsible for those fees; equity and good conscience require disgorgement. *See - Website:* https://lawrsd.com/

(75) Exhibits 2 and 5 documents the close working relationship between Attorney Rueb and myself to refute any representation by Attorney Rueb that our relationship was "too attenuated" to support my claim. *See Sperry v. Crompton Corp., 8 N.Y.3d 204, 215, 831 N.Y.S.2d 760, 863 N.E.2d 1012 [2007]; See Exhibit 2 – Document: Waterfall $25MM - 500MM Term Sheet, page 1, Advisor section. Attorney Dalimonte was listed as my advisor on page 1 of the document. See Exhibit 5 – Document: DRLG Demand Letter - This document summarizes my business dispute with Attorney Rueb; See Website:* https://casetext.com/case/sperry-v-crompton-corp-5/analysis?sort=relevance&resultsNav=false&q=&citingPage=1

**Element 2:** Rueb's benefit came at my expense. *See Exhibit 11 – Document: Lasorsa blackball evidence* - I submit these emails as evidence that the combination of Attorney Rueb's illegitimate agreement and subsequent disparagement by his unbound agent **Barbara Capasso** has effectively ended my ability to earn a living in mass tort litigation finance.

### Unjust Reliance or Inducement

(76) In addition to our well-documented contractual relationship, Attorney Rueb induced me to enter a verbal contract for a 50% share of the revenue from our own (Rueb & Lasorsa) D.C. law firm.

(77) Attorney Rueb promised to maximize my profits from the potentially significant relationship with Waterfall. Now with introspection, I realize that Rueb only entered into our verbal contract to surreptitiously acquire information on my ethical alternative to the illegal data case origination strategy. *See " Xaleron Pharms., Inc. v. Actavis, Inc., INDEX NO. 150587/2016, 8 (N.Y. Sup. Ct. 2016)* - "Use of unjustly received information that creates an unjust benefit" (see M.O.L. in opposition at 25)." Xaleron Pharms., Inc. v. Actavis, Inc., INDEX NO. 150587/2016, 8 (N.Y. Sup. Ct. 2016); See Website:* https://casetext.com/case/xaleron-pharms-inc-v-actavis-inc

### Element 3- Equity and good conscience require disgorgement:

(78) After the death of his brother, my surviving son, Jarred, fell into drug addiction to deal with his pain. Now he is in jail, and my grandsons', Logan and Jacob, ages 10 and 2, are in foster care in New York.

(79) The irony is that I've made hundreds of millions of dollars for Attorney Rueb and his former partner Attorney Dalimonte, yet I now need help to afford a $10,000 retainer for a family law attorney.

(80) To leave no shadow of doubt about the fundamental inequity of this matter, Attorney Dalimonte's son committed suicide on January 19th, 2019. As a result of Attorney Dalimonte's diminished capacity; I suspect that Attorney Rueb forced him to retire from their practice and Attorney Rueb then started a new practice with two other Attorneys. *See Website: https://lawrsd.com/about/*

(81) In contrast, it continues to trigger my PTSD when I am asked for proof that MY SON's death is justification for MY diminished capacity while I watch Attorney Dalimonte retire after HIS SON's death to enjoys the fruits of MY labor. *See Website: Mathew Dalimonte Obituary -* https://www.contefuneralhomes.com/obituaries/Matthew-Dalimonte?obId=9337806; *See - Razzak v. Juno, Inc., 194 A.D.3d 555, 2021 N.Y. Slip Op. 3153, 143 N.Y.S.3d 878 (N.Y. App. Div. 2021) Justice Ostrager concluded that "it is highly unlikely and illogical to conclude that plaintiffs are entitled to no benefit for the services they provided...." See Website:* https://casetext.com/case/razzak-v-juno-inc-1

(82) Disgorgement of improper profits is an equitable restitutionary remedy that is appropriate where there has been a showing of unjust enrichment. *See - New York City Economic Dev. Corp. v. T.C. Foods Import & Export Co., Inc., 2006 N.Y. Slip Op 50754(U) (N.Y. 4/17/2006), 2006 N.Y. Slip Op 50754 (N.Y. 2006); See Website:* https://www.alexsei.com/sample-memo/63-When-is-disgorgement-an-appropriate-remedy-under-New-York-law *; See - People v. Ernst & Young, LLP, 980 N.Y.S.2d 456 (N.Y. Sup. Ct. 2014). "the remedy of disgorgement does not require a showing or allegation of direct losses to consumers or the public; the source of the ill-gotten gains is immaterial."; See Website:* https://casetext.com/case/people-v-ernst-young-1

### Disgorgement:

(83) The economic and reputational damage I have suffered from Attorney Rueb's actions since 2019 is immeasurable. There is no way of telling how many people I could have helped had Attorney Rueb not unjustly enriched himself at my expense.

(84) I've since come to realize that the New York General Obligations Law (the "Statute of Frauds") lists the types of agreements that must be in writing. Some examples are:

   a. the sale of an interest in real property,
   b. the sale of goods for $500 or more (under the U.C.C.),
   c. a contract that cannot be performed within one year,
   d. contracts of suretyship (a guarantee)

(85) When I agreed to the terms of my verbal contract with Attorney Rueb, I was in a diminished capacity and incapable of understanding the limitations of that type of agreement. Absent my diminished capacity, I would have demanded our contract be in writing because it is now clear that Attorney Rueb never intended to honor it.

(86) In *Liu v. SEC*, 591 U.S. (June 23, 2020), the Supreme Court ruled that the SEC can continue to seek disgorgement from wrongdoers, while narrowing the remedy to net profits that are returned to victims.

(87) In the Supreme Court, defendants argued that disgorgement could not qualify as equitable relief under 15 U.S.C. § 78u(d)(5), given the Court's holding in *Kokesh v. SEC*, 581 U.S. (2017), that disgorgement is a penalty for purposes of 28 U.S.C. § 2462's statute of limitations, and the principle that equity is not punitive. The Court disagreed and held that a disgorgement award could be an equitable remedy if the award comported with traditional equitable principles, including the principle that an award cannot exceed a defendant's net profits. *See - Website: https://www.jonesday.com/en/insights/2020/06/us-supreme-court-allows-profitsbased-sec-disgorgement-awards*

(88) Fortunately, Attorney Rueb demonstrates the ability to pay a net disgorgement award of at least $100 million by publicly advertising $224 million in future mass tort legal claims on his website. *See Website: - https://drlawllp.com/results/*.

(89) The death of my son was and still is one of the most challenging things I've ever experienced, but it also gave me a lot of clarity about what I must do in order for his death to have meaning. I've finally started to accept the trauma I've been through, so I am no longer ashamed to show how I was taken advantage of in my diminished state of mind in a deliberate way.

(90) My son Jacob loved that I am and will always be a United States Marine Infantry Officer, a simple "grunt." So, I intend to honor his memory by adopting the credo, "No Better Advocate, No Worse Adversary, Let Justice Be Done," because I will never compromise my values again.

(91) The connection between the loss of my son and my intention to destigmatize PTSD, especially in suicide prevention for "Patriots," is relevant here because we are all conditioned to "tough it out" to get the job done. This leads to a mentality and behavior where it's expected of Marines to pretend to "be okay" in order to finish the mission at hand, which is exactly what was happening during my business arrangement with Attorney Rueb.

(92) Fortunately, after I was blackballed from mass tort litigation finance, I went back to my roots in the veteran community, and it was there that I began to heal. I will never leave my tribe again.

(93) In retrospect, I am grateful that Attorney Rueb took advantage of me when I was at my most vulnerable. As a result of his actions, I have chosen to dedicate my life to sharing my experience, strength and hope with the "Patriot Community" consisting of Veterans, Law Enforcement and First Responders." I solemnly swear to serve those that protect others. So, help me GOD.