November 5, 2020

Mr. Alex Barlow, Esq.
Justin Shrader & Associates, LLP
Houston, Texas

Re: Ethics Opinion Regarding UPDATED Ron Lasorsa Litigation Lending/Client Origination Proposal.

Dear Mr. Barlow:

Your firm has retained me as an expert in Texas legal ethics to review a new proposal by a non-lawyer named Ron Lasorsa regarding his business concept for litigation-related lending and client origination to law firms. This opinion letter is directed only to your firm and is not advice to any other individual and/or entity for their reliance or otherwise. Your letter to me dated October 7, 2020 and a separate "Contemplated Structure" diagram described your then understanding of the Lasorsa concept ("**Lasorsa Concept**"). After I produced some initial draft opinions, we have discussed an updated proposed arrangement and alternatives further. The latest version of the Lasorsa Concept is discussed in this opinion letter.

In considering the "Lasorsa Concept," as I have summarized it below, I am not concerned with business relationships between/among the non-lawyer entities described or whether the overall business concept, on business terms alone, is prudent, feasible, or complies with regulations or other law pertaining to non-lawyer entities such as these. My focus is solely on the legal ethics considerations for the law firms and their relationships with their clients and the non-lawyer entities proposed here.

As background to my opinions, I have been licensed to practice law since 1984 and have practiced law continuously since that time. I am the former General Counsel and Chief Disciplinary Counsel of the State Bar of Texas (1991-1996). As Chief Disciplinary Counsel, I served as the chief legal ethics enforcement officer of the Texas attorney discipline and disability system.

I am also a past Chairman of the Texas Center for Legal Ethics and Professionalism (now called the Texas Center for Legal Ethics); the current Editor-in-Chief of the *EthicsExchange* (online legal ethics articles and resources) of the Texas Center for Legal Ethics, a former member of the State Bar's Texas Disciplinary Rules of Professional Conduct Committee; an adjunct professor of law at the University of Texas School of Law (where I taught legal ethics and the law governing lawyers previously and, more recently, other law school courses); and a former managing attorney for civil litigation in the Travis County Attorney's Office in Austin.

Since 2015, I have also served, by appointment of the Supreme Court of Texas, as a member of the Professional Ethics Committee. That Committee writes formal opinions on legal ethics questions for the guidance of Texas lawyers, which are then published in the *Texas Bar Journal*. The Court reappointed me to a new three-year term in 2018.

I serve as legal ethics counsel for lawyers and law firms and occasionally defend lawyers in grievance complaints and other matters. I also occasionally represent complainants against lawyers in the State Bar grievance system and advise persons with claims against lawyers. I have served as an expert witness in cases involving legal ethics, legal malpractice, breach of fiduciary duty, legal practice, and similar issues arising out of litigation and transactional matters.

In preparing my opinions in this matter, I have applied my education, training, and experience as a Texas lawyer for the past 36 years, including, but not limited to, my experience in public and private practice, as an attorney on both sides of the civil and disciplinary docket, as an outside corporate counsel, a former general counsel and legal advisor, as an expert witness in legal ethics and legal malpractice-related litigation, as a teacher and lecturer on legal ethics and malpractice issues, and as ethics and malpractice counsel to lawyers and law firms.

## Summary of Proposal

The current "**Lasorsa Concept**," is an updated version of your October 7, 2020 letter to me (which was, in turn, an updated version from that addressed in my June 2020 opinion letter).

The latest version of the Lasorsa Concept contemplates, initially, the creation by Mr. Lasorsa of a Clearinghouse entity. Prior versions included other related entities that may or may not be formed subsequently.[1]

The purpose of the Clearinghouse would be to "*purchase medical receivables and data (properly protected under HIPAA by Business Administrative Agreements, 'BAAs') from health care payors*" in a "factoring" arrangement. Under a "factoring" arrangement, Clearinghouse hopes to acquire medical receivables at a negotiated lower price from medical providers and then collect that debt from patients or third parties at a profitable higher rate. After acquiring these medical receivables, the Clearinghouse would engage the services of a debt collection law firm or company that employs attorneys to help the Clearinghouse monetize the debt/receivable to which the Clearinghouse has purchased the rights.

Clearinghouse (in consultation with its counsel) would place the medical receivables into one of three "buckets" based on data from the health care payors and case criteria supplied to it by law firms or other sources. "Bucket 1" refers to patients from whom it may be possible to pursue successful collections efforts. "Bucket 2" refers to patients who have potentially viable legal claims that they are already pursuing through counsel against third parties--and Clearinghouse hopes to be able to collect some or all of its purchased medical receivables based on whatever recovery those patients and their existing legal counsel are able to recover. "Bucket 3" refers to patients who have potentially viable legal claims and who have not yet hired legal counsel to pursue those claims.

Clearinghouse would contact all of the patients—probably by phone--to determine in which bucket each patient may belong. If the patient has already retained counsel for claims related to the medical receivables (i.e., Bucket 2), then the collection agency or law firm doing collections work will assist the Clearinghouse in perfecting its subrogation lien.

---

[1] If other related entities are added to the Concept subsequently, we may need to re-evaluate the Lasorsa Concept at that time.

2

If the patient has not already retained counsel (i.e., Bucket 3), then the Clearinghouse would **not** communicate anything to the patient about possible legal representation by phone; instead, the Clearinghouse would subsequently inform those patients, **in a written communication (email or letter and not a text message)**, that their medical records "*fit the profile of someone who may have a claim*" and ask for the patient's written waiver of HIPPA protections regarding their medical profile so that those profiles could be shared with or sold to a law firm or law firms that handle potential cases like the patient may have. Further, the Clearinghouse would, also **in writing only**, ask the patient for written authorization for a law firm or law firms to contact the patients directly about potential legal representation. If the patient agreed to these two written authorizations, the Clearinghouse would handle the logistics of acquiring these written authorizations and transmitting those to the law firm or law firms. Clearinghouse has an interest in patients with qualifying legal claims pursuing legal claims because any recoveries by these patients would further Clearinghouse's medical receivables factoring business (i.e., it purchases medical receivables from medical providers at a significant discount and hopes to make money by recovering more money than it paid to acquire the receivables originally).

Upon authorized receipt of the patients' medical profiles and written permission for law firms to contact the patients, the law firms would evaluate this information and decide whether they wish to contact the patients directly, through written solicitations, regarding possible legal representation. In connection with the contacts with patients, the law firms would reference in those written communications the prior contact by Clearinghouse and the written authorizations provided by the patients to Clearinghouse. Any initial contact by the law firm with a potential client must comply with the lawyer advertising requirements for written solicitations under the Texas Disciplinary Rules of Professional Conduct, including the content and filing requirements. For example, each written solicitation template must be submitted with the required advertising review application to the State Bar of Texas Advertising Review Department no later than the date that the written solicitation is transmitted, by mail or email, to the recipients.[2] Recall also that written solicitations by attorneys to potential clients must disclose the source from which the law firm acquired the recipients' contact information (for example, "*Your contact information was acquired from Clearinghouse after it contacted you about your medical records and only after you provided written authorization for the release of your medical records and for law firms to contact you*"). There are other content requirements as well for written solicitations to potential clients under the Texas lawyer advertising provisions in Section VII of the Texas Disciplinary Rules of Professional Conduct.

---

[2] Alternatively, a lawyer may submit any advertising or written solicitation to the State Bar of Texas Advertising Review Department for "pre-approval"—which means **not** using the advertising or written solicitation until the submission is formally approved by the Department. This typically involves a wait of approximately two to three weeks from the time of submission; however, the advantage to seeking "pre-approval" *versus* simply filing only is that an advertisement or written solicitation that is pre-approved provides protection against potential grievances (unless there is a violation in the ad or written solicitation that the Department could not detect from the face of that submission, e.g., something that is deceptive or misleading in the content). An advertising submission that is simply filed with the Department contemporaneously with its first use or publication has no such protection if the advertisement or written solicitation violates any disciplinary rules.

3

You also asked whether it is permissible for the participating law firms to purchase the medical profile and/or medical information from the Clearinghouse.

Further, you have also asked whether this latest Lasorsa Concept implicates Texas attorney compliance with the Texas Disciplinary Rules of Professional Conduct as well as Texas Penal Code Section 38.12 (the Texas barratry statute).

Finally, you asked about whether there are unauthorized practice of law implications where the Clearinghouse or its non-lawyer agents (e.g., non-lawyer collections agencies) inform patients that they may have a legal claim and whether this can be remedied if an attorney for the Clearinghouse is involved in that process.

With respect to your questions, I have the following opinions:

1. As you and I discussed, Texas Penal Code Section 38.12 (the Texas barratry statute) is broadly worded. The text of Section 38.12 is attached.

2. Given the breadth of Section 38.12's potential application, there is a risk that a motivated prosecutor could attempt to apply this provision to the latest Lasorsa Concept since it does involve a person or person contacting potential clients, which, **in a very roundabout way**, could result in those persons being contacted by law firms about potential legal representation; however, Section 38.12 does **not** appear to apply, on its face, to this concept. First, there is **no prohibited in-person or telephone contact** by Clearinghouse with patients in which Clearinghouse or its agents attempt to persuade those patients to engage any law firm. In fact, in this setting, Clearinghouse and its agents do **not** mention legal representation to the patients or even the possibility of legal claims or the identity of any law firms in their fact-finding calls to patients to determine in which category those patients fit—other than asking the patients whether they are already represented by counsel. Clearinghouse's only contact with patients about the possibility of legal claims and potential legal representation would be in writing and would not attempt to persuade any patient to engage a particular law firm; instead, the written communication would only alert the patients that they *might* have a legal claim and ask them if they wish to authorize the release of their medical records and contact information to law firms and, further, wish to authorize law firms to contact them in writing.

3. While it is defensible for the Shrader Law Firm to pay the Clearinghouse for patient medical records and/or patient contact information—just as law firms do with marketing companies or other lead generators—care should be taken to avoid any implication that the Firm is paying Clearinghouse to make contacts on behalf of the Firm with potential clients in any prohibited or regulated way. The Firm making payments to the Clearinghouse, while defensible, may raise questions about improper solicitation. By "defensible," I do not mean that there is no risk. I use the word "defensible" to mean only that the purchase of patient/potential client contact information has an objectively legitimate purpose, but there is risk that a motivated criminal prosecutor or the State Bar might take a different view of this arrangement. It is my understanding that the Shrader Firm would simply be receiving HIPPA-released patient diagnoses and contact information and then, if it wishes, contacting patients

4

who have pre-authorized, in writing, those written contacts by law firms. Naturally, before attempting to contact patients/potential clients, the Shrader Firm must receive a copy of the patients' written authorization to waive HIPPA confidentiality of their medical records as well as the patients' written authorization for law firms to contact the patients about potential legal representation.

4. Further, it would be important for the Shrader Firm to provide and/or approve the exact script that the Clearinghouse would use in contacting patients and to receive assurances that whomever is making those phone or mail contacts with patients agrees not to stray from the script (the script may include answers to "frequently asked questions" by the patients so that the Clearinghouse callers are less likely to diverge from the script). Additionally, the Shrader Firm may wish to provide a copy of the HIPPA release and authorization for law firms to contact a patient to those patients by email or mail in connection with those contacts so that the patients are reminded that they have provided these prior written authorizations. Nevertheless, there will be some patients or their family members who will not recall providing these authorizations and there is a risk of grievances based on allegedly improper solicitation. These authorizations are more persuasive evidence of the patients' consent if the patients actually sign the HIPPA waiver and contact authorization, instead of these "docu-signed" executed documents only; however, which option to adopt depends on the law firms' confidence and risk sensitivity in electronic *versus* actual signatures as evidence that the potential clients executed these authorizations.

5. I agree that the Lasorsa Concept detailed here is **not** the sort of arrangement contemplated by the Texas barratry statute. I do not believe that the cautious nature of Clearinghouse writing to certain patients to ask their permission to provide their medical profiles and/or records to law firms and seek their written permission for law firms to contact them constitutes barratry—nor do I believe that this approach violates Rule 7.03, Texas Disciplinary Rules of Professional Conduct for the law firms. A motivated criminal or State Bar prosecutor might try to apply the barratry statute or Texas Rule 7.03 to some aspects of this version of the Lasorsa Concept on the theory that this is an extremely indirect version of barratry. I would argue that any alleged barratry-financial connections are far more attenuated than what the barratry statute is intended to proscribe and that there is **no** direct solicitation contact (in-person or telephone or interactive electronic contact); however, the counter-argument is that this could be barratry because some participating law firms may be paying money for medical profiles or medical records and/or patient contact information to the Clearinghouse. These law firm payments, if substantial, could be misconstrued as payments for Clearinghouse contacting patients to seek permission for law firms to contact them. Where this breaks down is that there is no in-person or telephone contact with potential clients by Clearinghouse in which the patients' legal representation is sought by a law firm or an agent of a law firm. Whether the Shrader Firm decides to pay (and how much) to Clearinghouse requires the Firm to evaluate how much risk it is willing to undertake. My view that the risk appears low, although the risk will never be zero.

6. I offer an "unauthorized practice of law" cautionary note with respect to who or what is informing the patients that they may have legal claims. It is one thing to tell someone that their "medical profile" is "suggestive" of a potential legal claim and that they should speak

5

with legal counsel to determine that fact _versus_ telling a patient that he or she <u>definitely</u> has a legal claim and needs representation. I am assuming that those written communications would have to be carefully scripted—and enforced--to avoid saying too much or speaking too definitely. I think that this communication can be successfully navigated with strict enforcement, but the law firms will likely not know until it is too late that someone upstream at Clearinghouse (or one of its agents) was saying too much to potential clients, if some clients decided to reach out to Clearinghouse for more information or clarification after receiving a written communication about the possibility of legal claims. So, again, the importance of a written and enforced script is crucial for instances where Clearinghouse or a related entity or agent is contacted by patients/potential clients.

7. You asked whether, if Clearinghouse had in-house lawyers, could those in-house Clearinghouse lawyers advise patients about their potential legal claims without engaging in unauthorized practice of law? I believe that the answer is "no" since telling someone that they have a legal claim is the practice of law and Texas prohibits in-house lawyers for business entities from providing legal services to third parties. Under the Texas Supreme Court's opinion in _Hexter Title_ many years ago, an in-house lawyer can only provide legal services to the entity itself--notwithstanding the narrow exception created by the Texas Supreme Court more recently for insurance companies to use "staff counsel" to represent the companies' insureds. As noted above, it is fine for Clearinghouse, in a carefully-worded written communication, to inform patients that their diagnosis may mean that they could have a legal claim and that the patients should consult with an attorney of their choice or, under our latest scenario, they waive the HIPPA protections and provide a written authorization for law firms to contact them about potential legal representation.

8. **One conflicts scenario that is suggested by this arrangement is this**: _How will the lien resolution aspect work for the plaintiff's benefit if the law firm's contract disclaims any lien resolution responsibilities—when other law firms routinely attempt to resolve medical care liens as part of their case settlement services to the clients—and a third party lien company is involved? Who hires the third-party lien company? How does the Bank or other Lasorsa entity know that a client's case is about to settle or has settled?_

9. You and I have discussed this scenario and have concluded that the Shrader Firm could affirmatively disclaim, in its fee contract with any clients originated under this arrangement, that the Firm would handle any lien resolution matters. Instead, the Firm would provide its clients here with a list of reputable lien resolution companies that the clients can engage, on their own, or the clients may choose to negotiate directly with the Bank or other Lasorsa entity to resolve any liens. This affirmative disclaimer regarding no representation concerning lien resolution should be clear and definite in the Firm's fee contract so that there is no client dispute later than lien resolution was within the Firm's scope of representation.

10. In a prior conversation, I mentioned Texas Ethics Committee Opinion 681 (September 2018) that opines that there are six categories of "**matured legal or equitable interests**" that a lawyer or law firm is obligated to honor or protect from client interference (i.e., either the firm pays what is due to third parties holding these interests or it maintains disputed funds relating to these interests in its client trust account, pending resolution of any disputes between the

6

client and the third party). Those six interests are: **(1)** a statutory lien (such as a statutory hospital lien); **(2)** a judgment that adjudicates ownership or disposition of the funds in question; **(3)** a court order regarding the funds in question; **(4)** a written assignment conveying an interest in the funds in question; **(5)** a right of subrogation regarding the funds in question; or **(6)** a signed letter of protection or similar agreement formed to aid the lawyer in obtaining the funds in question, which promises payment upon collection. With respect to other third-party interests not included within the six categories discussed above, the law firm is not obligated to protect those interests from client interference. By the way, with respect to those six interests, the termination of the attorney-client relationship, according to Opinion 681, does **not** end the lawyer's obligation to protect these third-party interests.

11. You and I also discussed that any Lasorsa entities or agents, including the Clearinghouse, will have to act on their own to secure and deal with whatever lien rights they may have—and that the Shrader Firm will have no obligation—except as required by Texas Rule 1.14 or other law—to inform them that settlement funds have been received. In fact, the Shrader Firm will have an affirmative obligation **not** to share its client confidential information with third parties, such as the Lasorsa entities, unless the Shrader Firm's clients consent to disclosure or disclosure is required by Rule 1.14 or other law.

Please let me know if I have overlooked any material facts or if there are additional issues that need to be addressed.

Very truly yours,

James M. McCormack