In the Matter of the Arbitration between

Case Number: 01-22-0005-0289

Dalimonte Rueb Litigation Group, L.L.P. and
Gregory D. Rueb
-vs-
Ronald S. Lasorsa

## PARTIAL FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement

entered into between the above-named parties and dated March 19, 2019, and having been duly sworn, and having

duly heard the proofs and allegations of the Parties, and oral argument having been held via videoconference on May

8, 2023, hereby AWARD as follows:

### I. Case Summary

#### A. Parties

1. Greg Rueb ("Claimant Rueb") is an attorney admitted to practice law in California and the District of

Columbia. He is a partner in Dalimonte Rueb Litigation Group, LLP ("Claimant DRLG", together with Claimant

Rueb, the "Claimants"), a District of Columbia law firm that represents injured persons in mass tort lawsuits.

2. Ronald S. Lasorsa ("Respondent") is the Chief Executive Officer at Trident Legal Services, LLC ("Trident"),

a Florida company that raises funds for veteran-related litigation.

3. Claimants are represented by Andrew Solomon, Paul E. Summit, and Clark Freeman from Solomon &

Cramer LLP.

4. Respondent is appearing *Pro Se*.

#### B. Overview of the Dispute

5. In March 2018, Respondent, working through Trident, presented a term sheet to Claimants for a $41 million

credit facility (the "Transaction") with a company called Waterfall Asset Management ("Waterfall") to finance their

mass tort litigation docket. Under the terms of this Transaction, Trident would have been appointed case manager for

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 1 of 26

Claimants and compensated accordingly. However, the Transaction did not close. Respondent claimed that the Transaction ultimately fell through because Waterfall was uncomfortable with the regulatory and criminal history of certain individuals affiliated with Claimants. Respondent thus demanded compensation from Claimants for his efforts in negotiating the Transaction. Nevertheless, Claimants disputed Respondent's demands.

6. Claimants started looking elsewhere for funding and ultimately obtained financing from an affiliate of Curiam Capital LLC ("Curiam"), which was introduced to Claimants by Stifel, Nicolaus & Company, Inc. ("Stifel").

7. On March 4, 2019, Respondent, through counsel, threatened to sue Claimants. Respondent advised Claimants that litigation would result in the publication of embarrassing and damaging facts about Claimants and their affiliates. Respondent offered to settle his dispute under confidential terms.

8. On March 19, 2019, Respondent, Trident, Claimants, John Dalimonte, Gary Podell, Howard Berger, and Greg Goldberg executed a Settlement Agreement, Release, Confidentiality, and Non-Disparagement Agreement ("Settlement Agreement"), which lists several third-party beneficiaries. Under this Settlement Agreement, Claimants were required to pay the total sum of US$500,000 (five hundred thousand dollars) in exchange for a release of liability for any and all claims that Respondent may leverage against them. The parties were represented by counsel during the negotiation of the Settlement Agreement.

9. The Settlement Agreement contained a Non-Disclosure and Non-Disparagement Provision ("Confidentiality Clause") whereby Respondent explicitly agreed not to disclose any information or documents relating to the Claimants, nor make any disparaging or derogatory remarks about Claimants or their businesses, except as required by a regulatory or quasi-regulatory agency or judicial body. The Confidentiality Clause also required the Party receiving a subpoena or request for information from a governmental or quasi-governmental agency to promptly notify the other Party about the request. The Settlement Agreement also contained a liquidated damages clause, determining the amount due in compensation for a breach of the Confidentiality Clause. Finally, the Settlement Agreement determined that all disputes would be resolved by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules.

10. It is undisputed that Claimants made all payments required under the Settlement Agreement. It is also undisputed that Respondent subsequently published a series of derogatory statements concerning Claimants and their

affiliates after the Parties executed the Settlement Agreement. Respondent apparently filed attorney disciplinary complaints to the California, Arizona, and New York bar associations, alleging Claimants had, inter alia, engaged in malpractice and violations of securities laws. Respondent also apparently communicated with several news outlets leveraging these accusations against Claimants.

11. On December 1, 2022, Claimants filed a Demand for Arbitration before the American Arbitration Association (AAA). Claimants alleged that:

1) the Settlement Agreement is a valid and binding contract;

2) Respondent willfully and intentionally breached the Confidentiality Clause of the Settlement Agreement by filing attorney disciplinary complaints against Claimants;

3) Respondent willfully and intentionally breached the Confidentiality Clause of the Settlement Agreement by disparaging Claimants in communications with third parties.

4) Respondent has threatened to continue to breach the Confidentiality Clause of the Settlement Agreement by publishing derogatory remarks about Claimants and their affiliates.

5) Respondent has engaged in extortion under Florida Law.

12. Claimants requested the following relief in this Arbitration:

1) A temporary restraining order and preliminary injunction prohibiting Respondent, or any person under his control or at his direction, including any agents, from uttering statements about or concerning Claimants and the persons or entities identified in the Settlement Agreement as parties or third-party beneficiaries;

2) A temporary restraining order and preliminary injunction prohibiting Respondent, or any person under his control or at his direction, including any agents, from disclosing the Settlement Agreement or its terms, except as permitted under Section 9 of the Settlement Agreement;

3) A permanent injunction ordering Respondent, or any person under his control or at his direction, including any agents, from making disparaging statements or disseminating disparaging information about the Parties and Beneficiaries of the Settlement Agreement;

4) A permanent injunction ordering Respondent, or any person under his control or at his direction, including any agents, from disclosing the Settlement Agreement or its terms, except as permitted under Section 9 of the Settlement Agreement;

5) A mandatory injunction ordering Respondent to withdraw the complaints filed with any state bar or bar association concerning any of the Claimants or its affiliates, as well as identify any other violations of the Settlement Agreement and take appropriate remedial steps regarding them;

6) An award of $500,000 plus interest at the rate of 18% per annum, plus reasonable attorneys' fees, per Clause 13 of the Settlement Agreement.

13. On December 1, 2022, Claimants submitted an application for emergency relief ("Emergency Application"), prior to the constitution of this arbitration panel, pursuant to Rule 38 of the AAA's Commercial Arbitration Rules. Claimants requested an interim order requiring Respondent to immediately cease breaching the Settlement Agreement; to withdraw the bar complaints he lodged against Rueb and related attorneys; and to cease harassing, disparaging, threatening Claimants and other parties to the Settlement Agreement.

14. On December 6, 2022, the Emergency Arbitrator held a preliminary hearing on the Emergency Application. In attendance was Andrew Solomon, Paul Summit and Gregory Rueb (for a portion of the Preliminary Hearing) on behalf of Claimants; and Chris Czaplak and Ronald Lasorsa on behalf of Respondent.

15. On December 9, 2022, the Emergency Arbitrator issued a ruling on Claimants' Request for Emergency Relief based on Commercial Rule R-38(e) and Rule 65 of the Federal Rules of Civil Procedure. The Emergency Arbitrator found that Claimants sufficiently showed a likelihood a success on the merits, ruling that there is no dispute that the parties entered into the Settlement Agreement, and that Claimants performed its obligations thereunder, that the evidence submitted by Claimants indicates Respondent breached various provisions of the Settlement Agreement, and that Respondent's disparaging statements and publications have caused and will continue to cause damage to Claimants' goodwill and reputation. The Emergency Arbitrator also found that extreme or very serious damage will result from the denial of the Emergency Relief since Respondent will continue to make disparaging statements and comments regarding Claimants. Further, the Emergency Arbitrator ruled that the balance of equities weighs in favor of Claimants, given Respondent admitted that the imposition of the requested relief will not result in any harm to

him. Further, the Emergency Arbitrator ruled that the emergency relief served the public interest by encouraging parties to honor their contractual agreements. Moreover, to the extent Respondent sought to vindicate veterans, Respondent had already alerted bar associations and the SEC about his concerns. Finally, the Emergency Arbitrator ruled that Respondent and individuals under Respondent's control:

1) were prohibited from publishing any comments or statements that disparage the Claimants or that otherwise constitute a breach of Respondent's obligations under the Settlement Agreement;

2) to the extent they have posted or written any comments or statements that disparage Claimants or otherwise violate the Settlement Agreement, should immediately take them down so that they are no longer accessible;

3) should immediately cease and desist, and shall cause anyone under his control to cease and desist, engaging in or sending threatening communications to Claimants and/or their representatives;

4) to the extent that Respondent receives inquiries regarding past publications that disparage Claimants or otherwise violate the Settlement Agreement, should respond to such inquiries by stating, "I am prohibited from making any statements or comments regarding that matter" and shall say nothing further.

5) should immediately cease pursuing any complaints or investigations that disparage Claimants or that otherwise would violate the Settlement Agreement, including any complaints or investigations filed with bar associations.

16. On December 16, 2022, Respondent submitted a letter, contending that the Settlement Agreement is invalid for two reasons: Respondent had diminished capacity when it was executed, and the Settlement Agreement is contrary to public policy. Furthermore, Respondent initially claimed that his statements are excluded from the definition of confidential information because they are either publicly available, already in recipient's possession or available to recipient on a non-confidential basis before disclosure, lawfully received from a third party not bound by confidentiality obligations to opposing parties, or independently developed by the recipient without using the confidential information. Finally, Respondent argued that even if the Settlement Agreement were valid, he cannot be liable for violating the Confidentiality Clause since his statements are protected by Federal and New York State Whistleblower Laws.

17. On December 19, 2022, Claimants filed a Reply in Support of their Application for Emergency Relief, reaffirming that the Settlement Agreement does not violate New York's public policy, that Respondent's statements are not excepted from the Confidentiality Clause, that Claimants and their affiliates did not violate SEC Rule 506, and that Respondent cannot invoke the protection of Federal and New York Whistleblower status.

18. On January 7, 2023, the Emergency Arbitrator issued a Preliminary Injunction which superseded the Temporary Restraining Order. The Preliminary Injunction reiterated that Respondent and individuals under Respondent's control:

1) were prohibited from publishing any comments or statements that disparage the Claimants or that otherwise constitute a breach of Respondent's obligations under the Settlement Agreement;

2) should discontinue or delete, so they are no longer accessible, ongoing publications that violate the Settlement Agreement, including confidential or disparaging statements;

3) were not precluded from communicating directly with the SEC and state bar disciplinary authorities, provided that Respondent was precluded from making any statements to anyone other than employees of this authorities;

4) should cease and desist harassing, disparaging and threatening Claimants and their Affiliates;

5) to the extent that Respondent received inquiries regarding past publications that disparage Claimants or otherwise violate the Settlement Agreement, should respond to such inquiries by stating, "I am prohibited from making any statements or comments regarding that matter" and shall say nothing further.

19. The Emergency Arbitrator also denied Claimants' requests for a preliminary injunction directing Respondent to withdraw the complaints he lodged against Rueb and other related attorneys with state bar disciplinary authorities; and to direct Respondent to disclose any other activities Respondent has undertaken that violate the Settlement Agreement. The Decision of the Emergency Arbitrator has not been reversed in any respect and is considered law of the case.

20. On January 31, 2023, Daniel A. Schnapp was appointed as sole Arbitrator.

21. On March 29, 2023, Claimants submitted a Motion for Summary Disposition pursuant to Rule R-34 of the AAA Commercial Arbitration Rules, reiterating the request for relief set forth in the Demand for Arbitration.

22. On May 8, 2023, this Arbitrator held a final hearing where both Parties presented their respective cases.

23. In light of the aforementioned events, the following claims are at issue in this arbitration[1]:

1) Whether the Settlement Agreement is valid and enforceable;

2) Whether Respondent has breached the Confidentiality Clause of the Settlement Agreement;

3) Whether Claimants are entitled to the liquidated damages fixed in the Settlement Agreement, which amount to $500,000 plus interest at the rate of 18% per annum, plus reasonable attorneys' fees;

4) Whether Claimants are entitled to a permanent injunction barring Respondent making disparaging statements or disseminating disparaging information about any of the Claimants and other parties and beneficiaries to the Settlement Agreement;

5) Whether Claimants are entitled to a permanent injunction prohibiting Respondent from disclosing the Settlement Agreement or its terms, except as permitted under Section 9 of the Settlement Agreement;

6) Whether Claimants are entitled to a mandatory injunction ordering Respondent to withdraw the complaints filed with any state bar or bar association concerning any of the Claimants and other parties and beneficiaries to the Settlement Agreement and to delete or cause to be deleted any published disparaging statements concerning Claimants, and other parties and beneficiaries to the Settlement Agreement.

24. Respondent has not formally objected to the rulings of the Emergency Arbitrator in the Interim Awards mentioned above. These interim awards remain binding and shall be merged into this Final Award.

## II. Jurisdiction

25. According to Section 8 the Settlement Agreement, this dispute is subject to mandatory arbitration, administered by the American Arbitration Association:

> Arbitration. In the event of any future dispute between any of the Parties hereto, whether related to this Agreement or not, all Parties hereto agree that no suit may be commenced concerning such dispute. The sole method of resolving any such controversy or claim shall be by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be

---

[1] This tribunal does not take any position with respect to the underlying merits of Respondent's claims concerning Claimants or Claimants' affiliates' actions that Respondent has claimed were illegal or in bad faith but is only empowered to rule on the claims and defenses presented by the Parties to this arbitration as set forth herein.

entered in any court having jurisdiction thereof. Venue for such arbitration shall be in the City of New York. The arbitration proceeding shall be conducted on a strictly confidential basis and no Party may disclose any aspect of it, except as necessary to enforce an award or as required by a regulatory or quasi-regulatory agency or judicial body, subject then to the notice provisions of Section 10 of this Agreement.

## III. Merits

### 1. Validity of the Settlement Agreement

#### A. Summary of the Parties' Positions

##### a. Claimants' Position

26. Claimants allege that the Settlement Agreement and the Confidentiality Clause incorporated therein are valid and enforceable.[2] According to Claimants, federal public policy and New York public policy favor the settlement of private disputes and recognize the disputing parties' rights to shape their own solution to a controversy.[3] Claimants argue that, in tailoring this solution, parties may stipulate away statutory and even constitutional rights.[4] Claimants further argue that parties may implement confidentiality restrictions that restrain the dissemination of information and prohibit disparagement, despite competing concerns about free speech or public interest factors.[5] Therefore, in Claimants' view, a confidentiality clause is not invalid when it prevents a party from reporting ethical or legal violations or from republishing publicly available information.[6]

##### b. Respondent's Position

27. Respondent had not previously attempted to invalidate the Settlement Agreement, but now contends it is null and void.[7] First, Respondent argues that, at the time he negotiated and signed the Settlement Agreement, he had diminished capacity from grieving the loss of his son.[8] His diminished capacity rendered him unable to fully

---

[2] Claimants' Reply in Further Support of Application for Interim Relief, p. 5-7 (December 19, 2022).
[3] Id.
[4] Id.
[5] Id.
[6] Id.
[7] Affidavit of Ronald S. Lasorsa, p. 6-7 (April 6, 2023).
[8] Id.

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 8 of 26

comprehend the terms of the agreement and its consequences.[9] Since he lacked the capacity to enter into an agreement, the Settlement Agreement is invalid and therefore unenforceable.[10]

28. Second, Respondent contends that the Settlement Agreement's Confidentiality Clause is repugnant to public policy.[11] Respondent argues that the clause does not contain a carve-out for communications with public authorities regarding unethical or criminal behavior.[12] Respondent further contends that the requirement that a party notifies the opposing party before disclosing information requested by public authorities is considered a "restraint[] on communication" by the SEC.[13]

## B. Analysis

*Diminished Capacity*

29. A party's competency is presumed and the party asserting incapacity bears the burden of proving incompetence.[14] Sufficient admissible medical evidence must be proffered by the party in order to establish his or her claim of lack of capacity to contract.[15] Finally, when a party receives benefits under the agreement for prolonged period of time, he must be deemed to have ratified the agreement.[16]

30. Here, Respondent has not proffered any admissible medical evidence supporting his claim of incapacity to contract. When requested to submit any such evidence to meet his burden, Respondent advised this tribunal that he would "not dignify the Arbitrator's request to justify my diminished capacity."[17] Therefore, while the Respondent's loss is tragic, Respondent has not, as a matter of law, attempted to meet his burden of proof with regard to providing evidence concerning his lack of capacity to contract. In the absence of such evidence, Respondent ratified the Settlement Agreement, and has received the contractually required payments from Claimants since 2019, without

---

[9] Id.

[10] Id.

[11] Respondent's Response Letter, p. 4-6 (December 16, 2022).

[12] Id.

[13] Id.

[14] S.D. v. N.D., 27 Misc. 3d 1215(A), 910 N.Y.S.2d 765 (Sup. Ct. 2010).

[15] Mohrmann v. Lynch–Mohrmann, 24 A.D.3d 735, 736 (2005); Torsiello v. Torsiello, 188 A.D.2d 523, 524 (1992) (noting that claim of diminished capacity to contract is properly rejected where said claim is unsupported by evidentiary facts in admissible form).

[16] Torsiello v. Torsiello, 188 A.D.2d 523, 524, 591 N.Y.S.2d 472, 473 (1992).

[17] Email from Respondent to Eve Turner at AAA (May 8, 2023).

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 9 of 26

ever challenging the agreement's validity, and as he was represented by counsel during the negotiation and execution of the Settlement Agreement.

*Public Policy*

31. Courts have long favored and encouraged the fashioning of stipulations as a means of expediting and simplifying the resolution of disputes.[18] In disposing of such litigation, parties may stipulate away statutory, and even constitutional rights.[19] The strong public policy favoring settlement of disputed claims dictates that confidentiality agreements regarding such settlements not be lightly abrogated.[20] A settlement agreement which prohibits an individual from discussing or otherwise disseminating information about ethical and legal violations does not offend public policy.[21]

32. Respondent contends that the Settlement Agreement violated New York public policy because it supposedly prohibits Respondent from communicating with public authorities regarding unethical or criminal conduct. However, the Settlement Agreement expressly carves out these types of communications:

> Without limiting the foregoing, and for the purpose of explaining the intent of this agreement and the reason for the payments made hereunder, the Trident Parties acknowledge and agree that by accepting the payments they will remain absolutely silent, publicly and privately, about any and all aspects of the DRLG Affiliates and Related Parties **except in response to requests by governmental or quasi-governmental entities, and then, subject to the notice provisions of this section**.

33. Additionally, Claimants agree that Respondent remains free to communicate with public authorities regarding ethical or legal violations without violating the Settlement Agreement's Confidentiality Clause. Furthermore, the prenotification provision does not seek to prohibit Defendant from liaising with public authorities. It simply guarantees that Claimants will have an opportunity to take appropriate measures to challenge any

---

[18] Mitchell v. New York Hosp., 61 N.Y.2d 208, 214, 473 N.Y.S.2d 148, 461 N.E.2d 285.

[19] Matter of New York, Lackawanna & Western R.R. Co., 98 N.Y. 447, 453; Matter of Abramovich v. Board of Educ., 46 N.Y.2d 450, 456, 414 N.Y.S.2d 109, 386 N.E.2d 1077, cert. den., 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (waiver of due process right to a hearing); Matter of Sonenberg v. Fuller, 114 A.D.2d 677, 494 N.Y.S.2d 249 (waiver of due process and equal protection rights).

[20] In re New York Cnty. Data Entry Worker Prod. Liab. Litig., 162 Misc. 2d 263, 269, 616 N.Y.S.2d 424, 428 (Sup. Ct. 1994), aff'd, 222 A.D.2d 381, 635 N.Y.S.2d 641 (1995).

[21] Speken v. Columbia Presbyterian Medical Center, 304 A.D.2d 489, 490 (N.Y. App. Div. 2003).

Case 5:24-cv-00031-BO-RN    Document 18-4    Filed 05/28/24    Page 10 of 26

inappropriate subpoenas or requests for information. In conclusion, the Confidentiality Clause of the Settlement Agreement does not violate federal or New York Public Policy.

### 2. Violation of the Settlement Agreement

#### A. Summary of the Parties' Positions

##### a. Claimants' Position

34. Claimants argue that Respondent willfully and intentionally breached the Confidentiality Clause of the Settlement Agreement by disclosing it voluntarily in various attorney disciplinary complaints before the New York, California, Arizona, and District of Columbia bar associations.[22] On November 20, 2022, Respondent sent an email to the New York Appellate Division, which explicitly noted his violation of the non-disclosure agreement and understanding of the liquidated damaged clause, and which read as follows:[23]

> Whom It May Concern:
>
> As a matter of conscience end against the advice of counsel, I am intentionally violating a non-disclosure agreement that carries a minimum liquidated damages provision of $500,000 by submitting this bar complaint.
>
> I am taking this extraordinary measure to prevent an imminent but avoidable travesty of justice about to be perpetrated against the American taxpayer and the Veteran Community in the Camp Lejeune water contamination litigation.
>
> Based on my military pedigree, career on Wal Street, and verifiable track record in mass tort litigation finance, my experience and expertise are unmatched.
>
> I am uniquely qualified to do something about this, so I must, despite the risk to my financial well-being.
>
> As a result, I will publicly identify the folowing individuals for illegal and unethical activities.
>
> Attorney Justin Brass (NY Bar #4248530) employed at Stifel Institutional Group, 787 7th Avenue, 11th Floor, NY, NY 10019, telephone # 212-887-7777.
>
> Attorney J. Ross Wallin (NY Bar #3064375) employed at Curium Capital LLC, 767 Fifth Avenue, 9th Floor, NT NY 10153,

---

[22] Claimants' Statement of Claim, p. 7 (December 1, 2022).
[23] Id.

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 11 of 26

telephone # 646-446-2992

Attorney Greg Rueb (CA BAR #154589) of Dallmonte Rugg and Stoller 1990 N. California Blvd., 8th Floor, Walnut Creek, CA 94596, telephone # 833-443-7529

I intend to make these charges public to the Veteran community because I have a moral obligation to ensure that this misconduct does not affect them.

Unfortunately, I have reported this to multiple bar associations with zero response. After all, lawyers are incentivized to minimize consumer complaints no matter how egregious the lawyer's offenses are because lawyers protect lawyers.

I intend to highlight this mischief and then rely on the legal and regulatory process to show veterans that they need to be very discerning about their legal representation.

I refuse to allow lawyers to cover up for lawyers at the expense of veterans, and Veterans will know who to trust.

Authorities can find may documents at this Dropbox link - https://www.dropbox.cornisciffolqgeskdkkreecyds6970pt/hTdO&r ikey=cguooh622174dqsdogb58futo_

35. The complaints lodged in other state bars and bar associations mirror the one lodged before the New York Bar.[24] The complaints were accompanied by a letter from Respondent's attorney to the Respondent himself, where the former advises the latter that although he has "a good-faith basis to make a complaint to the New York (NY) Bar," "some of the basis for [his] complaint is derived from facts covered by the non-disclosure and non-disparagement provisions."[25] The letter from Respondent's attorney stated, among other things, that Howard Berger was permanently barred by the SEC and FINRA in 2013 for a "cherry picking" scheme, that John Spicer had a criminal history, and that Claimants and their affiliates used an inflated valuation provided by John Spicer to secure capital for a mass tort litigation docket assembled by Howard Berger.[26] The complaints were also accompanied by Respondent's demand letter to the Claimants, seeking compensation for the efforts Respondent employed towards the failed Transaction.[27] This letter eventually led to the execution of the Settlement Agreement.[28]

---

[24] Id. at 8-9.
[25] Claimants' Statement of Claim, Exhibit I (December 1, 2022).
[26] Id.
[27] Id.
[28] Id.

36. Claimants also allege that Respondent willfully and intentionally breached the Confidentiality Clause by disparaging Claimants in communications with third parties. On November 23, 2022, Respondent sent the following message to Claimants and third parties:

> Gentlemen - I must hand it to you, together you three idiots (Brass Rueb and Wallin) have given the SEC the hammer it has been looking for to require full disclosures on all third-party funding in the litigation finance industry.
>
> All three of you will be forever associated with this impending scandal and the increased disclosure requirements that will be required once your security fraud crimes and instances of legal malpractice have been revealed. I invite you both to read this slightly dated article to get a sense of the momentum building for transparency and full disclosure in the litigation finance asset class. - https://news.bloomberglaw.com/business-and-practice/litigation-funders-risk-disclosure-in-court-rules-gao-moves
>
> I'm sure given all your collective malfeasance; you can imagine all the law firms and hedge fund clients that are going to scatter once the SEC shines a light on groups like Stifel and Fortress.
>
> I promise that all three of you will be pariahs in the industry.
>
> The best part is that because you idiots have been caught red handed doing business with felons you have given me a gift. Specifically, I expect to participate in ten's if not hundreds of millions of dollars in monetary fines and penalties from some of the largest law firms in the country at your collective expense.
>
> Ross – I expect the SEC to look through you all the way to your multi-billion-dollar family office funder. That should be fun for you when you try to explain why the SEC is crawling up his ass. You may actually have to hand back that prestigious 2020 Global Leader in Legal Finance award.
>
> Greg – Howard Berger and Barbara Capasso are the reason I am going to make sure you lose both your CA and DC Bar cards. I distinctly remember when you told me that you believed Barbara Capasso's lies about me. Bad choice Greg, very bad choice.
>
> Sleep well Gentlemen. I will continue my campaign in the morning. You should know that I am going to present all these emails to the mediator and my marketing team to showcase you utter lack of cooperation.
>
> That way no one can accuse me of overreacting based on the devastating professional repercussions I am engineering on your behalf.

37. On October 13, 2022, Respondent appeared on a podcast hosted by DotCom Magazine whereby he once again leveraged accusations against Claimants.[29]

38. On December 5, 2022, after Claimants filed the Demand for Arbitration, Respondent issued a press release, disclosing that he filed multiple bar complaints against three attorneys "with the intent to secure justice for military veterans impacted by the water contamination at Camp Lejeune."[30] Respondent proclaimed, among other things, that

---

[29] Claimants' Statement of Claim, p. 13 (December 1, 2022).
[30] Victory Litigation Fund Press Release (December 5, 2022).

"Mass Tort Nexus is a consulting firm which is run by a convicted felon," and that he "intends to protect veterans from unscrupulous attorneys and predatory vendors who are currently perpetrating illegal and unethical activities."[31]

39. On December 29, 2022, Respondent sent an email to Claimants and third parties asserting, among other things, that "we veterans will not allow unscrupulous lawyers and predatory lenders to take advantage of us in this lawsuit."[32]

40. On March 2, 2023, Respondent revealed that he summarized his position in this arbitration proceeding in a public video uploaded to his website.[33] On the same day, Respondent emailed Congresswoman Kathy Castor of Florida and Congresswoman Anna Paulina Luna of Florida stating that he wished to "prevent [a] crime against American Citizens," allegedly perpetrated by "unscrupulous attorneys" involved in this arbitration proceeding.[34]

41. On April 22, 2023, Respondent emailed Claimants, this Arbitrator, the AAA, and a third party later identified as Andy Jacob, CEO of Dotcom Magazine. In this email, Respondent stated that he published his own Affidavit to his LinkedIn page, which was viewed by 600 visitors.[35] In the same email, Respondent also admitted to publicly disclosing the date of the status conference.[36]

42. On April 29, 2023, Respondent sent another email to Claimants, this Arbitrator, the AAA, and a third party whereby he remarks that Claimant Rueb's "beautiful bride" is a "trophy wife", that Claimant Rueb has "fake cases," among other things.[37]

### b. Respondent's Position

43. Respondent admitted in his correspondence with third parties, as well as during his oral arguments in the May 8th hearing, that he intentionally violated the Confidentiality Clause of the Settlement Agreement.[38] Respondent

---

[31] Id.
[32] Email from Respondent to David Richert (December 29, 2023).
[33] Email from Respondent to AAA (March 2, 2023).
[34] Email from Respondent to Congresswoman Kathy Castor (March 2, 2023); Email from Respondent to Congresswoman Anna Paulina Luna (March 2, 2023).
[35] Email from Respondent to Andrew Solomon (April 22, 2023).
[36] Id.
[37] Email from Respondent to Andrew Solomon and others (April 29, 2023).
[38] Claimants' Statement of Claim, Exhibit I (December 1, 2022).

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 14 of 26

claims this is part of a broader strategy to expose Claimants for their alleged unethical and criminal behavior, consequently damaging their business.[39]

## B. Analysis

44. The Confidentiality Clause of the Settlement Agreement expressly prohibits Respondent from disclosing any information or publishing, publicly or privately, any remarks about Claimants:

> Non-Disclosure and Non-Disparagement: The Trident Parties agree not to disclose or cause to be disclosed in any way, any information or documents relating to the DRLG Parties and DRLG Affiliates and Related Parties, including any trade secrets or proprietary information, that the Trident Parties obtained while working with or providing services to the DRLG Parties and the DRLG Affiliates and Related Parties. The Parties further agree not to make any disparaging or derogatory remarks, whether false or true, about any other Party, their businesses, their background, or their services except as required by a regulatory or quasi-regulatory agency or judicial body, and then subject to the notice provisions of this section. The Trident Parties' obligations under this provision shall extend to the DRLG Parties and the DRLG Affiliates and Related Parties. The DRLG Parties' obligations under this provision include taking all action necessary to ensure that the DRLG Affiliates and Related Parties make no disparaging or derogatory remarks, whether false or true, about the Trident Parties. If a Party receives a subpoena or request for information from a governmental (e.g., SEC or DOJ) or quasi-governmental (e.g., FINRA) agency seeking information about another Party, the receiving Party shall promptly provide notice to the subject Party about the request, provided such notice is permissible under the law. If a Party receives an inquiry from a third party or the press about another Party covered by this Agreement, the receiving Party shall make no comment. WITHOUT LIMITING THE FOREGOING, AND FOR PURPOSE OF EXPLAINING THE INTENT OF THIS AGREEMENT AND THE REASON FOR THE PAYMENTS MADE HEREUNDER, **THE TRIDENT PARTIES ACKNOWLEDGE AND AGREE THAT BY ACCEPTING THE PAYMENTS THEY WILL REMAIN ABSOLUTELY SILENT, PUBLICLY AND PRIVATELY, ABOUT ANY AND ALL ASPECTS OF THE DRLG AFFILIATES AND RELATED PARTIES except in response to requests by governmental or quasi-governmental entities, and then, subject to the notice provisions of this section.** The Trident Parties may discuss their involvement in this dispute in a global manner that in no way identifies any other Party solely for the purpose of explaining what may otherwise appear to be non-activity during the period in dispute (hereafter "Historical Information.").
> (emphasis added).

[39] Id.
AAA Case No. 01-22-0005-0289
US_ACTIVE\123848229\V-1

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 15 of 26

45. The Confidentiality Clause allows for one exception only, namely responses to requests from governmental or quasi-governmental entities.

46. Respondent admits that he intentionally disclosed confidential information and made disparaging remarks about Claimants to state bars, bar associations, and third parties to obtain revenge on Claimants for their alleged wrongdoings.[40] It is also patently clear that Respondent cannot avail himself of the carve-out included in the Confidentiality Clause. Respondent's disclosures and publications were not made in response to requests for information issued by public authorities.[41]

47. Given the facts outlined above, this tribunal finds that Respondent intentionally violated the Settlement Agreement's Confidentiality Clause by disclosing confidential information and publishing disparaging and derogatory remarks concerning Claimants to state bars, bar associations, and third parties, and he has admitted same.

### 3. Excuses for Violation of Settlement Agreement

#### A. Summary of the Parties' Positions

##### a. Claimants' Position

48. Claimants allege they did not violate SEC Rule 506, which disqualifies "bad actors" from participating in certain offerings.[42] First, Claimants contend that Rule 506 carves out disqualifying events that occurred before September 23, 2013. Since Berger and Ray's adverse events occurred before September 12, 2013, they are not disqualified from participating in the offerings addressed by this provision.[43] Second, Claimants argue that Curiam does not become a bad actor because of its relationship with Berger and Ray because their relationship does not fall under any of the categories enshrined in 17 C.F.R. § 230.506(d)(1).[44]

49. Moreover, Claimants state that Respondent cannot invoke whistleblower statues under federal law.[45] Under 17 C.F.R. 240.21F-17, no person may impede an individual from communicating with the SEC about a potential

---

[40] Claimants' Statement of Claim, Exhibit I (December 1, 2022).
[41] Id.
[42] Claimants' Reply in Further Support of Application for Interim Relief, p. 2-3 (December 19, 2022).
[43] Id.
[44] Id.
[45] Id. at 10.

securities law violation, including threatening to or enforcing a confidentiality agreement.[46] Claimants deny trying to stop Respondent from communicating with the SEC.[47]

50. Finally, Claimants argue that Respondent cannot invoke whistleblower status under New York law.[48] Claimants assert that Section 740 of New York Labor Law protects "employees" from retaliation for threatening to or disclosing actual or potential legal violations, or conduct that presents a danger to public health or safety.[49] Claimants argue that Respondent is neither their "employee" nor an "independent contractor" since Respondent never provided services to them or their affiliates.[50] Claimants also argue that under Section 740 of New York Labor Law, Respondent would only be able to report the alleged criminal or unethical conduct to supervisors or public bodies.[51] Respondent's disclosures and communications to third parties are not protected by Section 740 of the New York Labor Law.[52]

### b. Respondent's Position

51. Respondent argues that Claimant DRLG violated SEC Rule 506, which disqualifies "bad actors" from participating in certain types of offerings.[53] According to Respondent, Howard Berger managed the day-to-day operations of Legal Recovery Associates LLC ("LRA"), a part owner of Claimant DRLG.[54] Respondent claims that Howard Berger was permanently barred by the SEC and FINRA in 2013 for a "cherry picking" scheme.[55] DRLG, through LRA, hired Howard Berger to build their docket of cases.[56] Respondent maintains that after the Transaction failed, Claimant DRLG approached Curiam, an investment company subject to regulation by the SEC, to secure financing.[57] Respondent asserts that as part of their due diligence, Curiam retained the services of John Ray as a valuation agent.[58] Respondent claims that John Ray was convicted of felony armed robbery and aggravated assault

---

[46] Id. at 10.
[47] Id. at 10.
[48] Claimants' Reply in Further Support of Application for Interim Relief, p. 8-10 (December 19, 2022).
[49] Id.
[50] Id.
[51] Id.
[52] Id.
[53] Respondent's Response Letter, p. 1-3 (December 16, 2022).
[54] Id.
[55] Id.
[56] Id.
[57] Id.
[58] Id.

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 17 of 26

in 1981.[59] Respondent claims that Berger and Ray used an inflated valuation to secure capital for the mass tort litigation docket.[60]

52. Respondent further asserts that he cannot be liable for breach of the Confidentiality Clause in the Settlement Agreement because he is a whistleblower under the Dodd-Frank Act.[61] Respondent contends that 17 C.F.R. 240.21F-17 prohibits Claimants from threatening to enforce or enforcing a confidentiality agreement in order to prevent Respondent from reporting an actual or potential securities law violation.[62]

53. Finally, Respondent contends that he cannot be liable for breach of the Confidentiality Clause of the Settlement Agreement because he is a protected whistleblower under New York Law.[63] Respondent affirms that he was an "independent contractor" of Claimant DRLG and that his statements revealed a reasonable belief that Claimants had committed a securities law violation.[64] Respondent claims he made good faith efforts to report the violation of SEC Rule 506 to supervisors, including Claimant Rueb, without success.[65]

### B. Analysis

54. Respondent argues that he cannot be liable under the Confidentiality Clause of the Settlement Agreement because he is a protected whistleblower under the Dodd-Frank Act.[66] 17 C.F.R. 240.21F-17 establishes that "[n]o person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement."

55. Here, Claimants did not seek to enforce the Confidentiality Clause to stop Respondent from communicating with the SEC. In fact, Claimants specifically stated during the Status Conference that they did not consider communications with the SEC a violation of the Confidentiality Clause. Claimants understand that Respondent violated the Confidentiality Clause by disclosing confidential information and publishing disparaging statements to state bars, bar associations and third parties.[67] Communications with individuals or entities other than the SEC are

---

[59] Id.
[60] Id.
[61] Respondent's Response Letter, p.4-5 (December 16, 2022).
[62] Id.
[63] Id. at 5-6.
[64] Id. at 5-6.
[65] Id. at 5-6.
[66] Respondent's Response Letter, p.4-5 (December 16, 2022).
[67] Claimants' Motion for Summary Disposition, p. 2-19 (March 29, 2023).

not encompassed by Section 240.21F-17 of the Dodd-Frank Act, therefore this provision does not shield Respondent from liability for breaching the Confidentiality Clause.

56. Respondent also argues that he cannot be liable for breach of the Confidentiality Clause of the Settlement Agreement because he is a protected whistleblower under New York Law.[68] Section 740 of the New York Labor Law specifically prohibits an "employer" from taking any retaliatory action against an "employee," which encompasses individuals "who performs services for and under the control and direction of an employer for wages or other remuneration, including former employees, or natural persons employed as independent contractors to carry out work in furtherance of an employer's business enterprise who are not themselves employers." However, Respondent did not introduce any evidence that proves he performed services for Claimants in exchange for wages or other remuneration. Therefore, Respondent cannot claim whistleblower status under New York Labor Law to shield himself of liability for a violation of the Confidentiality Clause.

### 4. Relief Requested

#### 4.1. Liquidated Damages

##### A. Summary of the Parties' Positions

###### a. Claimants' Position

57. According to Claimants, Section 13 of the Settlement Agreement provided for liquidated damages in the event that Respondent breached the Confidentiality Clause.[69] Claimants assert that this Arbitrator should enforce the liquidated damages provision of the Settlement Agreement because Respondent has not carried its burden of proving that either that damages flowing from the breach of the confidentiality provision were readily ascertainable at the time the parties entered into the agreement or that the liquidated damages are conspicuously disproportionate to the foreseeable losses.[70]

58. Claimants argue that the damages caused by Respondent's breaches of the Confidentiality Clause are difficult or, in this case, impossible to estimate.[71] Claimants also argue that the liquidated damages provision in the Settlement

---

[68] Respondent's Response Letter, p.5-6 (December 16, 2022).
[69] Claimants' Motion for Summary Disposition, p.7, 20-22 (March 29, 2023).
[70] Id.
[71] Id.

Agreement is not grossly disproportionate to the actual damages suffered since the amount therein corresponds to total amount of the payments made to Respondent.[72] Claimants contend that restitution is an appropriate measures of damages for Respondent's repudiation of his promises under the Settlement Agreement.[73]

### b. Defendant's Position

59. Respondent has not specifically challenged the validity of the liquidated damages provision in the Settlement Agreement.

### B. Analysis

60. Clause 13 of the Settlement Agreement requires Respondent to pay liquidated damages if he violates the Confidentiality Clause:

> Liquidated Damages. The Parties agree that damage resulting from a breach of the confidentiality and non- disparagement provisions of this Agreement may be difficult or incapable of being ascertained or valued. In the event that the Trident Parties breach any such provision, they shall be liable, jointly and severally, to the affected DRLG Parties and DRLG Affiliates and Related Parties for liquidated damages equal to all monies paid under this Agreement plus interest at the rate of 18% per annum from the date of any breach to the date of payment, plus any reasonable attorney's fees incurred by the DRLG Parties and the DRLG Affiliates and Related Parties in proving such violation, in enforcing this Agreement, and in collecting damages, and the DRLG Parties would have no further obligation to make any payments under this Agreement. Nothing in this section limits the damages that the Trident Parties may seek for breach.

61. Whether a contractual provision is "an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances."[74] The burden is on the party seeking to avoid liquidated damages to show that the stated liquidated damages are, in fact, a penalty.[75] A liquidated damages clause is unenforceable in two circumstances: (1) if the damages flowing from a breach of the

---

[72] Id.

[73] Id.

[74] 172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc., 24 N.Y.3d 528, 536 (2014).

[75] P.J. Carlin Constr. Co. v. City of New York, 59 A.D.2d 847 (1st Dept. 1977); Wechsler v. Hunt Health Sys., 330 F. Supp. 2d 383, 413 (S.D.N.Y. 2004).

contract were easily ascertainable at the time of execution; or (2) if the damages fixed were "conspicuously disproportionate" to the probable losses.[76]

62. Respondent did not challenge the liquidated damages provision. The liquidated damages provision in the Settlement Agreement is valid and enforceable since the damages imposed from Respondent's future breach of the Confidentiality Clause could not be readily determined. At the time the Parties executed the Settlement Agreement, they had no way of knowing what specific confidential information would be disclosed or the content of disparaging and derogatory remarks. Even if they had, they could not have accurately predicted the financial impact resulting from this hypothetical breach. Furthermore, the amount provided in the liquidated damages clause is not grossly disproportionate to the probable losses since the amount mirrors the amount paid to Respondent pursuant to the Settlement Agreement. Respondent promised to stay silent about Claimants and their Affiliates in exchange for $500,000 (five hundred thousand dollars).[77] Since Respondent admitted that he violated the agreement, it is not unreasonable or disproportionate to make him remit the compensation he received.

### 4.2. Permanent Injunction

#### A. Summary of the Parties' Positions

##### a. Claimants' Position

63. Claimants assert that they are entitled to injunctive relief in the form of a permanent prohibitory injunction, restraining Respondent from disclosing the Settlement Agreement or its terms, as well as making disparaging statements about any of the DRLG Parties or the DRLG Affiliates and Related Parties.[78] Claimants argue there is no adequate remedy at law, since Respondent has admitted he does not have funds to pay for a monetary judgment.[79] Claimants further contend that they will suffer irreparable harm since Respondent has continuously stated he will not stop publishing derogatory remarks about Claimants.[80]

##### b. Respondent's Position

---

[76] Truck Rent-A-Center, 41 N.Y.2d at 425 (explaining that the "actual loss [must be] incapable or difficult of precise estimation" and the amount liquidated must bear "a reasonable proportion to the probable loss."); JMD Holding Corp. v. Cong. Fin. Corp., 4 N.Y.3d 373, 380 (2005).

[77] Section 10 of the Settlement Agreement.

[78] Claimants' Motion for Summary Disposition, p. 22-26 (March 29, 2023).

[79] Id.

[80] Id.

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 21 of 26

64. Respondent has not challenged the adequacy of a permanent injunction prohibiting him from disclosing information or making disparaging remarks about Claimants. In fact, he has stated he will continue to engage in this conduct even if this Arbitrator rules in Claimants' favor.[81]

### B. Analysis

65. To sufficiently plead a cause of action for a permanent injunction, a plaintiff must allege that there was a "violation of a right presently occurring, or threatened and imminent," that he or she has no adequate remedy at law, that serious and irreparable harm will result absent the injunction, and that the equities are balanced in his or her favor.[82] As to the balance of equities, Courts consider the benefits accorded to plaintiff and the hardships imposed on Respondent if the permanent injunction is granted.[83]

66. It is undisputed that Respondent is currently in violation of the Settlement Agreement and will continue violating the Confidentiality Clause if allowed to do so.[84] Claimants have also adequately pled that any remedies at law, including monetary damages, are inadequate and insufficient given Respondent's strenuous financial situation and refusal to pay for the costs of this arbitration. Furthermore, Claimants have sufficiently proved that irreparable harm will result if Respondent is allowed to disclose confidential information about the circumstances surrounding the Settlement Agreement, and to frequently and publicly publish derogatory statements about Claimants. Finally, the equities are patently in favor of granting the permanent injunction. While Claimants may suffer immensurable reputational damages in the absence of a restraint of Respondent's campaign, it is not an undue hardship for Respondent to abide by the terms of the Settlement Agreement he knowingly entered into and to refrain from speaking about Claimants publicly and privately, except in response to requests for information from public authorities.

### 4.3. Mandatory Injunction

#### A. Summary of the Parties' Positions

##### a. Claimants' Position

---

[81] Email from Respondent to Eve Turner at AAA (May 8, 2023).

[82] Caruso v. Bumgarner, 120 A.D.3d 1174, 1175, 992 N.Y.S.2d 102, 104 (2014).

[83] Atl. Specialty Ins. Co. v. Landmark Unlimited, Inc., 214 A.D.3d 472, 473, 186 N.Y.S.3d 14, 15 (2023); Halaby v. Denzak, 211 A.D.3d 1533, 1536, 181 N.Y.S.3d 807, 810 (2022).

[84] Email from Respondent to Eve Turner at AAA (May 8, 2023).

67. Claimants allege that they are entitled to a mandatory injunction ordering Respondent to withdraw the complaints filed with any state bar or bar associations concerning any of the DRLG Parties or DRLG Affiliates and Related Parties and to identify any other violations of the Settlement Agreement and to take appropriate remedial steps regarding them.[85]

### b. Respondent's Position

68. Respondent does not challenge Claimants' entitlement to a mandatory injunction.

### B. Analysis

69. A mandatory injunction is a directive of the court demanding that a person perform certain acts.[86] While injunctions are generally temporary in nature, it is true that mandatory injunctions usually provide the party with the relief sought as a final remedy.[87] It is for this reason mandatory injunctions are uncommon and considered a drastic remedy which should only be utilized where compelling circumstances require it.[88] Thus, where a party is engaged in unlawful conduct which is continuous, then a mandatory injunction is proper.[89] Moreover, where a party acts deliberately and intentionally, a mandatory injunction requiring the party to cease is likewise proper.[90]

70. Here, Respondent has intentionally, deliberately and continuously violated the Confidentiality Clause of the Settlement Agreement by disclosing confidential information to several state bars and third parties and by publishing derogatory statements about Claimants to third parties. Thus, Claimants are entitled to a mandatory injunction requiring Respondent to withdraw the complaints submitted to state bars, and to take remedial steps to delete any other disclosures or statements made in violation of the Confidentiality Clause.

### IV. Other Claims

---

[85] Claimants' Statement of Claim, p. 16 (December 1, 2022).

[86] In re New York Methodist Hosp., 25 Misc. 3d 648, 653, 885 N.Y.S.2d 392, 396 (Sup. Ct. 2009).

[87] Wyckoff Heights Medical Center v. Rodriguez, supra, citing Powlowski v. Wullich, 81 Misc.2d 895, 366 N.Y.S.2d 584 (Sup. Ct. Monroe County 1975).

[88] Wyckoff Heights Medical Center v. Rodriguez, supra, citing Lexington & Fortieth Corp. v. Callaghan, 281 N.Y. 526, 24 N.E.2d 316 (1939).

[89] Wyckoff Heights Medical Center v. Rodriguez, supra, citing Rosenthal v. Helfer, 136 Misc.2d 9, 516 N.Y.S.2d 1020 (Civ. N.Y. County 1987).

[90] Wyckoff Heights Medical Center v. Rodriguez, supra, citing Marcus v. Village of Mamaroneck, 283 N.Y. 325, 28 N.E.2d 856 (1940).

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 23 of 26

71. Claimants argued that Respondent's conduct constitutes extortion under Section 836.05 of Florida Law.[91] Since this provision is part of a criminal statute, this issue is not arbitrable.

72. Furthermore, Respondent submitted a counterclaim for unjust enrichment.[92] However, according to Rule 5 of the AAA Commercial Arbitration Rules, Respondent must pay a fee in order to submit a counterclaim. Rule 5 also determines that if the counterclaim does not meet the requirements for filing a claim, such as the payment of the fee, and the deficiency is not cured in time, the counterclaim may be returned to the filing party. Here, Respondent never paid the appropriate fee for filing the counterclaim for unjust enrichment. Because the counterclaim was not properly filed, the arbitrator has no jurisdiction to consider it.

**V.      Award**

I, Daniel A. Schnapp, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated March 19, 2019, and having been duly sworn, and having duly heard the proofs and allegations of the Claimants, represented by Andrew Solomon, Esq, and Respondent, appearing Pro Se, and oral argument having been held via videoconference on May 8th, 2023, hereby AWARD as follows:

1.  A permanent injunction ordering Respondent to refrain from making disparaging statements or disseminating disparaging information about any of the Claimants and other parties and beneficiaries to the Settlement Agreement;

2.  A permanent injunction ordering Respondent to refrain from disclosing the Settlement Agreement or its terms, except as permitted under Section 9 of the Settlement Agreement;

3.  A mandatory injunction ordering Respondent to withdraw the complaints filed with any state bar or bar association concerning any of the Claimants and other parties and beneficiaries to the Settlement Agreement and to delete or cause to be deleted any published disparaging statements concerning Claimants, and other parties and beneficiaries to the Settlement Agreement;

4.  An award of $500,000 plus interest at the rate of 18% per annum, plus reasonable attorneys' fees.

---

[91] Claimants' Statement of Claim, p. 14 (December 1, 2022).
[92] Affidavit of Ronald S. Lasorsa, p. 8-10 (April 6, 2023).

Case 5:24-cv-00031-BO-RN   Document 18-4   Filed 05/28/24   Page 24 of 26

## VI. Cost and Fees

### A. Summary of the Parties' Positions

#### a. Claimants' Position

73. Claimants allege that Section 23 of the Settlement Agreement allows them to recover reasonable attorneys' fees and costs.[93]

#### b. Respondent's Position

74. Respondent does not challenge Claimants' allegations that they are entitled to recover attorneys' fees and costs.

### B. Analysis

75. Section 23 of the Settlement Agreement establishes a party's right to recover attorneys' fees from the other party:

> If any Party to this Agreement brings an action or commences any proceeding, including arbitration, to enforce or interpret its provisions, the prevailing Party shall recover its reasonable attorneys' fees and other expenses incurred in connection with any such action or proceeding in addition to any other relief to which such party may be entitled.

76. Additionally, Rule 47 of the AAA Commercial Arbitration Rules determines that "[i]n the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate."

77. Claimants initiated this arbitration proceeding, therefore they will bear the costs of this arbitration, including the administrative fees and expenses of the American Arbitration Association, as well as the compensation and expenses of the arbitrator. Since Claimants prevailed in all their claims, Respondent shall reimburse Claimants for the amounts reasonably expended in attorneys' fees.

---

[93] Claimants' Motion for Summary Disposition, p. 22-26 (March 29, 2023).

78. The Claimants have 15 consecutive days from receipt of the Final Award to submit all invoices reflecting sums expended on attorney's fees. After the Tribunal reviews these invoices, it will notify the parties of the final amount to be paid by Respondent to Claimant as reimbursement for the amount spent on attorney's fees. Respondent will have 10 consecutive days from the receipt of the Tribunal's notice to pay the amount indicated in the Tribunal's notice

Except for an award of attorneys' fees and costs, which will be addressed in the Final Award, this Partial Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Jon 1, 2023
_____
Date

_____
Daniel A. Schnapp

I, Daniel A. Schnapp, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Partial Final Award.

June 1, 2023
_____
Date

_____
Daniel A. Schnapp