

July 5, 2017

***Via AAA E-File:***
AMERICAN ARBITRATION ASSOCIATION
CASE FILING SERVICES
1101 Laurel Oak Road, Suite 100
Voorhees, New Jersey 08043

> Re: Case No. _____; *AkinMears, LLP f/k/a AkinMears, G.P. vs. Alpha Law, et al*; In the American Arbitration Association

Dear Sir or Madam:

Pursuant to the instructions of the American Arbitration Association, please find enclosed the following documents:

- ***Commercial Arbitration Rules Demand for Arbitration;***

- ***Claimant, AkinMears, LLP f/k/a AkinMears, G.P.'s, Claim; and***

- ***Excerpted Arbitration Agreements governing this matter.***

If you have any questions or require any additional information, please feel free to contact our office.

Respectfully,

Jared I. Levinthal

JIL/nas
Enclosures

cc: ***Via E-Mail: rmartindale@mlgtx.com
and mikechhabra@gmail.com***
Richard Martindale
Michael Chhabra
ALPHA LAW, LLP
5335 Wisconsin Ave., N.W., Suite 440
Washington, D.C. 20015

*Via E-Mail: rmartindale@mlgtx.com*
*and mikechhabra@gmail.com*
Richard Martindale
Michael Chhabra
MARTINDALE VOIGHT, LLP
1250 24th Street N.W., Suite 300
Washington, D.C. 20037

*Via E-Mail: alazo@lazolaw.com*
LAW OFFICES OF ALBERT J. LAZO, P.A.
c/o Albert J. Lazo, Esq.
A Florida Corporation
201 Alhambra Circle, Suite 501
Coral Gables, Florida 33134

*Via E-Mail: m.a.sbaiti@gmail.com*
*And mikechhabra@gmail.com*
Mazin A. Sbaiti, Esq.
Michael Chhabra
SIGMA LAW FIRM, LLP
2101 L Street N.W., Suite 800
Washington, D.C. 20037

*Via E-Mail: mikechhabra@gmail.com*
Michael Chhabra
ALPHA LAW, LLP
5335 Wisconsin Ave., N.W., Suite 440
Washington, D.C. 20015

*Via E-Mail: rmartindale@mlgtx.com*
Richard Martindale
ALPHA LAW, LLP
5335 Wisconsin Ave., N.W., Suite 440
Washington, D.C. 20015

*Via E-Mail: m.a.sbaiti@gmail.com*
Mazin A. Sbaiti, Esq.
12720 Hillcrest Rd., Suite 1045
Dallas, Texas 75252

*Via E-Mail: rslasorsa@gmail.com*
Ronald Lasorsa
5920 NE 21st Way
Fort Lauderdale, Florida 33308

*Via E-Mail: iwjbravo@googlemail.com*
Ian Jones
7680 Universal Blvd., Suite 100
Orlando, Florida 32819

*Via E-Mail: william@myvoight.com*
William C. Voight
7680 Universal Blvd., Suite 100
Orlando, Florida 32819

*Via E-Mail: lyngJ40@aol.com*
Joseph E. Lyng
7680 Universal Blvd., Suite 100
Orlando, Florida 32819

*Via E-Mail: alazo@lazolaw.com*
Albert J. Lazo, Esq.
LAW OFFICES OF ALBERT J. LAZO, P.A.
A Florida Corporation
201 Alhambra Circle, Suite 501
Coral Gables, Florida 33134



*For Consumer or Employment cases, please visit* **www.adr.org** *for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Name of Respondent: See attached Claim, paragraphs 2-13 | Name of Representative (if known): |
|---|---|

| Address: See attached Claim, paragraphs 2-13 | Name of Firm (if applicable): |
|---|---|
| | Representative's Address: |

| City: See attached Claim, paragraphs 2-13 | State: | Zip Code: | City: | State: | Zip Code: |
|---|---|---|---|---|---|

| Phone No.: | Fax No.: | Phone No.: | Fax No.: |
|---|---|---|---|

| Email Address: See attached Claim, paragraphs 2-13 | Email Address: |
|---|---|

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

Claimant, AkinMears, sues for fraud and breach of contract. Please see attached Claim for additional details.

| Dollar Amount of Claim: $ $18,398,822.95 | Other Relief Sought:<br>☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs<br>☑ Punitive/ Exemplary ☐ Other |
|---|---|

| Amount enclosed: $ 10,839.88 | In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule |
|---|---|

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Per 9.12 of the Agreements, arbitrator(s) shall be selected by the Parties.

| Hearing locale: Harris County, Texas | (check one) ☐ Requested by Claimant ☑ Locale provision included in the contract |
|---|---|

| Estimated time needed for hearings overall:<br>hours or 5 days | Type of Business: Claimant: Law Firm<br>Respondent: Law Firms, Lawyers and Non-Lawyers |
|---|---|

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? No.

| Signature (may be signed by a representative) | Date: July 5, 2017 |
|---|---|
| Name of Claimant: AkinMears, LLP f/k/a AkinMears GP | Name of Representative: Jared I. Levinthal |
| Address (to be used in connection with this case) c/o Levinthal Wilkins | Name of Firm (if applicable): Levinthal Wilkins |
| | Representative's Address: 2323 S. Shepherd, Ste 1000 |

| City: | State: | Zip Code: | City: Houston | State: TX | Zip Code: 77019 |
|---|---|---|---|---|---|

| Phone No.: | Fax No.: | Phone No.: 713 275 9700 | Fax No.: 713 275 9701 |
|---|---|---|---|

| Email Address: | Email Address: Levinthal@LevinthalWilkins.com |
|---|---|

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.*

| | |
|---|---|
| AKINMEARS, LLP, F/K/A | § |
| AKINMEARS, GP | § |
| | § |
| Claimant, | § |
| | § |
| VS. | § |
| | § |
| ALPHA LAW LLP; | § |
| MARTINDALE VOIGHT LLP; | § |
| THE LAW OFFICES OF ALBERT J. | § |
| LAZO, P.A.; SIGMA LAW FIRM LLP; | § |
| MICHAEL CHHABRA; | § |
| RICHARD D. MARTINDALE, ESQ.; | § |
| MAZIN A. SBAITI, ESQ.; | § |
| RONALD LASORSA; IAN JONES; | § |
| WILLIAM C. VOIGHT; | § |
| JOSEPH E. LYNG; AND, | § |
| ALBERT J. LAZO, ESQ. | § |

CASE NO. _____

Respondents.

### CLAIMANT, AKINMEARS', CLAIM

Claimant, AkinMears, LLP, f/k/a AkinMears, GP, hereby files its Claim against Respondents, Alpha Law LLP, Martindale Voight LLP, The Law Offices of Albert J. Lazo, P.A., Sigma Law Firm LLP, Michael Chhabra, Richard D. Martindale, Esq., Mazin Sbaiti, Esq., Ronald Lasorsa, Ian Jones, William C. Voight, Joseph E. Lyng, and Albert J. Lazo, Esq., as follows:

**I.**
### PARTIES AND JURISDICTION

1. Claimant AkinMears, LLP f/k/a AkinMears, GP ("AkinMears") is a Texas limited liability partnership with its principal place of business in Houston, Texas.

2. Respondent, Alpha Law LLP, is a limited liability partnership organized under the laws of the District of Columbia. A true and correct copy of this Claim will be served on Alpha Law LLP, 5335 Wisconsin Ave, N.W., Suite 440, Washington, D.C. 20015, attention Richard

Martindale and Michael Chhabra and/or via email at rmartindale@mlgtx.com and mikechhabra@gmail.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

3.     Respondent, Martindale Voight LLP, is a limited liability partnership organized under the laws of the District of Columbia. A true and correct copy of this Claim will be served on Martindale Voight LLP, 1250 24th Street N.W., Ste. 300, Washington, D.C. 20037, attention Richard Martindale and Michael Chhabra and/or via email at rmartindale@mlgtx.com and mikechhabra@gmail.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

4.     Respondent, The Law Offices of Albert J. Lazo, P.A., a Florida Corporation, is a corporation organized under the laws of Florida. A true and correct copy of this Claim will be served on The Law Offices of Albert J. Lazo, P.A., a Florida Corporation, 201 Alhambra Circle, Suite 501, Coral Gables, Florida 3134, attention Albert J. Lazo, Esq. and/or via email at ALAZO@LAZOLAW.COM pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

5.     Respondent, Sigma Law Firm LLP, is a limited liability partnership organized under the laws of the District of Columbia. A true and correct copy of this Claim will be served on Sigma Law Firm LLP, 2101 L Street N.W., Suite 800, Washington, D.C. 20037, attention Mazin A. Sbaiti, Esq. and Michael Chhabra and/or via email at m.a.sbaiti@gmail.com and mikechhabra@gmail.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

6.     Respondent, Michael Chhabra, who owned a portion of Respondent Alpha Law LLP, Martindale Voight LLP, and Sigma Law Firm LLP, is an individual who resides in Weston,

Florida. A true and correct copy of this Claim will be served on Michael Chhabra at Alpha Law LLP, 5335 Wisconsin Ave, N.W., Suite 440, Washington, D.C. 20015, attention Michael Chhabra and/or via email at mikechhabra@gmail.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

7.      Respondent, Richard D. Martindale, Esq., who owned a portion of Respondent Alpha Law LLP and Martindale Voight LLP, is an individual who resides in Austin, Texas. A true and correct copy of this Claim will be served on Richard D. Martindale, Esq. at Alpha Law LLP, 5335 Wisconsin Ave, N.W., Suite 440, Washington, D.C. 20015, attention Richard Martindale and/or via email at rmartindale@mlgtx.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

8.      Respondent, Mazin A. Sbaiti, Esq., who owned a portion of Respondent Alpha Law LLP and Sigma Law Firm LLP, is an individual who resides in Dallas, Texas. A true and correct copy of this Claim will be served on Mazin A. Sbaiti, Esq. at 12720 Hillcrest Rd., Ste 1045, Dallas, Texas 75252 and/or via email at m.a.sbaiti@gmail.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

9.      Respondent, Ronald Lasorsa, who owned a portion of Respondent Alpha Law LLP, is an individual who resides in Fort Lauderdale, Florida. A true and correct copy of this Claim will be served on Ronald Lasorsa at 5920 NE 21st Way, Fort Lauderdale, Florida 33308 and/or via email at rslasorsa@gmail.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

10.      Respondent, Ian Jones, who owned a portion of Respondent Martindale Voight LLP, is an individual who resides in Orlando, Florida. A true and correct copy of this Claim will be served on Ian Jones at 7680 Universal Blvd., Ste 100, Orlando, Florida 32819 and/or via email

at iwjbravo@goolemail.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

11.　Respondent, William C. Voight, who owned a portion of Respondent Martindale Voight LLP, is an individual who resides in Orlando, Florida. A true and correct copy of this Claim will be served on William C. Voight at 7680 Universal Blvd., Ste 100, Orlando, Florida 32819 and/or via email at William@myvoight.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

12.　Respondent, Joseph E. Lyng, who owned a portion of Respondent Martindale Voight LLP, is an individual who resides in Orlando, Florida. A true and correct copy of this Claim will be served on Joseph E. Lyng at 7680 Universal Blvd., Ste 100, Orlando, Florida 32819 and/or via email at lyngJ40@aol.com pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

13.　Respondent, Albert J. Lazo, Esq., who owned Respondent The Law Offices of Albert J. Lazo, P.A., a Florida Corporation, is an individual who resides in Coral Gables, Florida. A true and correct copy of this Claim will be served on Albert J. Lazo, Esq., at The Law Offices of Albert J. Lazo, P.A., a Florida Corporation, 201 Alhambra Circle, Suite 501, Coral Gables, Florida 3134, and/or via email at ALAZO@LAZOLAW.COM pursuant to paragraph 9.09 Notices and 9.12 Arbitration of the Purchase Agreement between Claimant and Respondent.

14.　The American Arbitration Association has jurisdiction over this dispute pursuant to 9.12 Arbitration of the Purchase Agreements between Claimant and Respondents. Pursuant to 9.12 Arbitration of the Purchase Agreements:

> in the event that any dispute . . . between any of the Parties or claim by a Party against another Party arising out of or in relation to this Agreement or in relation to any alleged breach hereof cannot be resolved, such dispute or claim shall be finally determined by arbitration

in accordance with the rules then in force of the American Arbitration Association. The arbitration proceedings shall take place exclusively in Harris County, Texas . . . There shall be one arbitrator, as shall be agreed upon by the Parties in dispute, who shall be an individual skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. In the absence of such agreement, each Party in dispute shall select one arbitrator and the arbitrators so selected shall select a third arbitrator.

Claimant hereby invokes 9.12 <u>Arbitration</u>.

15.     Respondents Alpha Law LLP, Martindale Voight, The Law Offices of Albert J. Lazo, and Sigma Law Firm LLP, together, may be collectively referred to herein as "Sellers" while Respondents, Michael Chhabra, Richard D. Martindale, Esq., Mazin Sbaiti, Esq., Ronald Lasorsa, Ian Jones, William C. Voight II, Esq., Joseph E. Lyng, and Albert J. Lazo, Esq., may be collectively referred to herein as "Selling Partners."

## II.
## FACTS UNDERLYING DISPUTE

16.     AkinMears is a preeminent national law firm focusing its practice on pharmaceutical, defective product and medical device mass torts. Since 2000, the firm partners have primarily handled mass tort litigation, and have been involved in all aspects from advertising and intake to ethics and settlement. AkinMears was formed in 2009 and mainly handles mass tort advertising and client intake, and joint ventures with top tier litigation co-counsel throughout the nation. The lawyers at AkinMears have more than fifty (50) years of combined experience in pharmaceutical and medical device litigation, have assisted tens of thousands of injured individuals, and processed more than $1 billion in settlements.

17.     In September of 2011 among mounting evidence that transvaginal/pelvic mesh devices were causing catastrophic and permanent injuries to women, AkinMears began advertising for claimants. Most of these women were unaware that their implanted plastic mesh device was

AkinMears' Claim<br>Page 5 of 23

never approved by the FDA, was defective, and caused their horrific daily pain and problems; moreover, many of these women did not have an attorney in their family or know an attorney and had no access to the civil justice system. In total, tens of thousands of potential claimants contacted AkinMears about their defective mesh implants. After discussion, vetting and investigation, AkinMears and their associated co-counsel were able to help many of these women bring claims against the mesh manufacturers.

18.     As the mesh mass tort, and other mass torts developed, many new law firms with little to no experience began competing for mass tort cases, perhaps enticed by the alleged profits at the end of the rainbow. AkinMears has learned that many of these new firms do not fully understand the complex legal, business and client issues relating to mass torts nor the length of time (average projects take 48 months) and resources (pre-litigation and litigation costs can total many millions) needed to successfully complete such a project. Not surprisingly, AkinMears has found that some new firms are simply unable to fund the representation even though they signed clients with valid claims and these clients expect, and deserve, competent representation. For that reason, AkinMears began reaching out to the legal community to assist with mass tort dockets. In late 2014 and early 2015, AkinMears learned that the Sellers were experiencing some financial hardship and were looking to discuss referral, joint venture or transfer of their mass tort dockets.

### AKINMEARS PAYS $38,000,0000[1] FOR RESPONDENTS' MESH PRACTICES AND CLIENTS

19.     On July 6, 2015, after untold hours of negotiations, AkinMears entered into four virtually identical Purchase Agreements with Respondents. At their core, the Purchase Agreements memorialized AkinMears' purchase of 14,453 Confirmed and Valid Fee

---

[1] The agreed upon purchase price amounted to approximately $40,000,000 (of which $2,000,000 was "held back"). AkinMears, due to certain conditions, retained the $2,000,000 hold back, thereby resulting in a final purchase price of approximately $38,000,000.

Case 5:24-cv-00031-BO-RN    Document 20-1    Filed 07/08/24    Page 10 of 57

Agreements/Clients from the Respondents for $40,000,000 (at the price of $2,900.65 per valid Fee Agreement/Client) – – AkinMears purchased the pelvic mesh litigation practices of Alpha Law, Martindale Voight, The Law Offices of Albert J. Lazo and Sigma Law.

20.    Implicit, and later expressly stated, in each sale was Respondents' determination that selling their transvaginal/pelvic mesh practice to AkinMears was in their respective clients' best interest: "[w]e strongly believe your claim, if valid, will be settled far sooner and for a higher amount with AkinMears than with any firm we could have chosen for you.  That is why we recommend proceeding with AkinMears and believe this to be in your best interest. . . Having successfully represented thousands of injured claimants in dozens of pharmaceutical and medical device litigations, AkinMears has the experience to handle your claim successfully."

**AKINMEARS DEMANDED CERTAIN REPRESENTATIONS AND WARRANTIES FROM RESPONDENTS TO PROTECT AGAINST RISK OF LOSS.**

21.    Fundamental to AkinMears agreement to pay $40,000,000 to these Respondents were the following essential terms, each of which was memorialized in the Purchase Agreements, and each of which was meant to protect AkinMears from loss:

- **Compliance with D.C. Rules of Professional Conduct:** Respondents represented and warranted that they would each fully and completely comply with all requirements of the District of Columbia Rules (especially D.C. Rule of Professional Conduct 1.17, relating to the sale of a law practice or area of law practice).  This essential term guaranteed the legality of the acquisition, and also ensured the removal of other capable counsel from the transvaginal mesh marketplace, thereby increasing the odds that the Clients would not subsequently terminate AkinMears' representation and additional clients/claims would respond to AkinMears continued marketing efforts.  Finally, this representation provided assurance to AkinMears that Sellers were precluded from poaching AkinMears' Clients.

- **Confirmed and Valid Fee Agreements.** Respondents represented and warranted that all 14,453 Fee Agreements purchased by AkinMears were "valid, binding and enforceable" and were "in full force and effect and to the knowledge of Seller there has been no breach, violation or default under such agreements." Respondents further represented that a Fee Agreement was "Confirmed and

Valid" where the named Client entered into a duly executed Fee Agreement with said Client's valid contact information, and that said Client had not been marked rejected in the Seller's sales force platform. AkinMears required these guarantees to ensure that each of the 14,453 Clients procured actually existed.

- **Good Faith Efforts to Qualify Fee Agreements.** Respondents also represented and warranted that they would exercise "good faith" efforts to qualify each and every Client. AkinMears required this guarantee from Respondents to provide further assurance—over and above the diligence that could be performed in the short time period between contract execution and Closing—that all 14,453 Clients procured actually existed and possessed legitimate claims. This was an essential representation as AkinMears was concerned about certain rumors indicating that Sellers had obtained Clients from overseas call-centers. While Sellers vehemently denied the rumors when questioned by AkinMears, AkinMears demanded this representation to protect against the purchase of phantom Clients or illegitimate claims.

- **Selling Partners Agreement to "Stand Behind" Sellers' Reps and Warranties.** Finally, each Selling Partner agreed to "stand behind" the Sellers' representations and contractual obligations. AkinMears demanded this assurance so that, if need be, it could pursue personal liability against each Selling Partner, as $38,000,000 is a gargantuan sum of money.

22.     Respondents wholly failed to abide by these essential terms thereby causing AkinMears millions of dollars in losses. Of the original 14,453 Clients procured from Respondents, AkinMears was forced to abandon 2,857 Clients costing AkinMears, at a minimum, $8,287,157.05.

## RESPONDENTS VIOLATIONS OF D.C. RULE OF PROFESSIONAL CONDUCT 1.17, SALE OF LAW PRACTICE

23.     A bedrock principle of each Purchase Agreement, articulated throughout the Agreements, was Seller and Selling Partners guarantee that they were in full compliance with "all of the requirements of the District of Columbia Rules (including Rule 1.17) relating to the sale of a law practice or area of law practice." (2.04(b); 5.02 and 5.05(a)). D.C. Rule of Professional Conduct 1.17, Sale of Law Practice, provides, in relevant part that:

A lawyer or law firm may sell or purchase a law practice, or an area of law practice, including good will, if the following conditions are satisfied:

(a) ***The seller ceases to engage*** in the private practice of law, or ***in the area of practice that has been sold***, in the jurisdiction in which the practice has been conducted;

(b) The entire practice is sold to one or more lawyers or law firms or an entire area of practice is sold to one purchaser (either a solo practitioner or a single law firm);

(c) The seller gives a written notice to each of the seller's clients regarding:

(1) the proposed sale;
(2) the client's right to retain other counsel, to take possession of the file or of any funds or property to which the client is entitled; and
(3) the fact that the client's consent to the transfer to the purchasing lawyer or law firm of the client's files, of the representation and or any client funds held by the selling lawyer or law firm will be presumed if the client does not take any action or does not otherwise object within ninety (90) days of receipt of the notice.

***If a client cannot be given notice, the representation of that client may be transferred to the purchaser only upon entry of an order so authorizing by a court having jurisdiction. . .***

**Comment**

[5] . . .If an area of practice is sold and the lawyer remains in the active practice of law, the lawyer must cease accepting any matters in the area of practice that has been sold, either as counsel or co-counsel or by assuming joint responsibility for a matter in connection with the division of a fee with another lawyer. . .

[7] . . . Providing the purchaser access to client-specific information relating to the representation and to the file. . . requires client consent. The rule provides that before such information may be disclosed by the seller to the purchaser, the client must be given actual written notice of the contemplated sale, including the identity of the purchaser, and must be told that the decision to consent or make other arrangements must be made within 90 days.

24.     Respondents' agreement to be bound by this language provided multiple essential

assurances to AkinMears: first, each and every Client would receive "actual written notice" of the

sale, and if Sellers could not provide such notice, the only way the Client could be transferred was

by court order. Therefore, each Respondent guaranteed AkinMears that each and every one of the 14,453 Clients would receive actual, written notice of the sale, so each and every Client had to be legitimate individuals with real, valid contact information, otherwise, Sellers could not abide by the mandatory notice provision of D.C. Rule of Professional Conduct 1.17. Second, compliance with D.C. Rule of Professional Conduct 1.17 was as robust a non-compete/non-solicitation prohibition as AkinMears could desire.

25.    Moreover, when Respondents actually transferred all 14,453 Clients to AkinMears after the close of the Purchase Agreements, Respondents represented that either all of the Clients had been provided actual notice of the sale, or that Respondents had obtained a court order pursuant to D.C. Rule of Professional Conduct 1.17. The comments to D.C. Rule of Professional Conduct 1.17 expressly state: "[T]he rule provides that before such information may be disclosed by the seller to the purchaser, the client must be given actual written notice of the contemplated sale, including the identity of the purchaser, and must be told that the decision to consent or make other arrangements must be made within 90 days." Simply mailing 14,453 letters and counting 90 days from the post date is insufficient to transfer Clients under the D.C. Rules of Professional Conduct. However, based on information and belief, that is precisely what occurred.

**RESPONDENTS, IN VIOLATION OF D.C. RULE 1.17, FAILED TO PROVIDE ACTUAL WRITTEN NOTICE TO HUNDREDS OF CLIENTS AND REMAINED ACTIVE PLAYERS IN MESH LITIGATION**

26.    Now, after the passage of time, and limited transparency, Claimant is supremely confident that Respondents completely and totally failed to abide by D.C. Rule of Professional Conduct 1.17. Respondents could not possibly have provided actual written notice to all 14,453 Clients because, to this day, AkinMears has been completely unable to contact 1,444 Clients: in other words, from all indications, 1,444 of the 14,453 Clients literally do not exist (that is, these Clients are not merely non-responsive, they are non-existent). Respondents simply cannot

Case 5:24-cv-00031-BO-RN    Document 20-1    Filed 07/08/24    Page 14 of 57

establish that actual notice per D.C. Rule of Professional Conduct 1.17, was provided to these Clients. Consequently, these 1,444 Clients never should have been transferred to AkinMears as *"[i]f a client cannot be given notice, the representation of that client may be transferred to the purchaser only upon entry of an order so authorizing by a court having jurisdiction."*

27.    Respondents also failed to abide by D.C. Rule of Professional Conduct 1.17 because some of the Respondents continued to practice in the "area of practice that has been sold." More specifically, Alpha Law and its associated Selling Partners (Michael Chhabra, Richard D. Martindale, Mazin A. Sbaiti and Ronald Lasorsa) as well as William Voight, through Pegasus Law (or others), actively engaged in transvaginal mesh advertising as well as solicited AkinMears Clients. Respondent Michael Chhabra, on February 27, 2017, under oath, testified that Alpha Law, in July 2015, "stopped [accepting mesh cases] for a short period of time and then began accepting new clients again after they had paused."[2]

28.    Respondents failure to abide by D.C. Rule of Professional Conduct 1.17 is a material breach of the Purchase Agreements and has resulted in AkinMears sustaining millions of dollars in damages.

#### RESPONDENTS COMPLETE FAILURE TO CONVEY REAL CLIENTS AND CONFIRMED AND VALID FEE AGREEMENTS

29.    It goes without saying that fundamental to the Purchase Agreements was the existence of real, actual Clients, with real, legitimate claims. While AkinMears agreed to shoulder some risk in that not all Clients procured would ultimately yield a profitable claim, never did AkinMears believe it was buying non-existent Clients or phantom claims. To guard against such

---

[2] Respondent Michael Vincent Chhabra provided this sworn deposition testimony on February 27, 2017 in *In Re: American Medical Systems, Inc. Pelvic Repair Systems Product Liability Litigation.*

risk, in addition to requiring compliance with D.C. Rule of Professional Conduct 1.17, AkinMears was assured by Respondents of the following:

- Each Fee Agreement . . . is properly executed and delivered . . . and is valid, binding and enforceable (4.02);

- AkinMears was procuring Confirmed and Valid Fee Agreements: a Confirmed and Valid Fee Agreement was a Fee Agreement between Seller and the named clients therein, wherein the named client has fully executed and delivered the Fee Agreement, said client's contact information is provided, and such Fee Agreement has not been marked rejected in the Seller's sales force platform (1.01, p. 3); and,

- Seller used good faith efforts to qualify all of the Docket Interests (including Fee Agreements) for the Litigation in accordance with that certain script provided to Purchaser on June 24, 2015 (hereinafter referred to as the "Script."). . . No Client has provided notice to Seller of any disagreement or dispute relating to Seller's representation of Client. (4.09(a))

30.     Respondents completely and totally failed to abide by these representations. After innumerable attempts to contact each and every Client, to this day, 1,444 Clients have never responded to any communication from AkinMears (as well as to the alleged notice provided by Sellers). Put another way, ten percent (10%) of the Clients represented and warranted by Respondents to be "Confirmed and Valid", and purchased by AkinMears for $4,188,538.60 are non-existent.

**OVER 2000 CLIENTS TRANSFERRED EITHER DO NOT EXIST OR CLEARLY DO NOT QUALIFY AS A LEGITIMATE MESH PLAINTIFF (A BYPRODUCT OF SELLERS' ELECTION TO PURCHASE LEADS FROM OVERSEAS CALL-CENTERS, A FACT INTENTIONALLY HIDDEN FROM AKINMEARS)**

31.     These Respondents did not exercise good faith efforts to qualify well over 2,000 Clients in accordance with the Script ostensibly used by Respondents' interviewers during initial interview/intake calls with prospective leads. The Script requires the Sellers' interviewer to ask the following questions:

- "What type of implant did you have, a Trans-vaginal mesh, Bladder sling, or Trans-vaginal tape?" If the potential Client answered, "None of the above," the call should end and the potential Client rejected. Instead, hundreds of the Clients

transferred by Sellers to AkinMears did not meet this basic minimum criterion. That is, 454 Clients never even had mesh implanted.

- "Have you ever signed any documents, retainers, or agreements with an attorney or a law firm about this before?" If yes, the call should have ended. Yet, 170 Clients had retained other counsel before allegedly retaining Sellers (not to mention the 147 Clients that had dual representation) and AkinMears has been advised by certain Clients that they never retained Sellers.

- Extensive contact information had to be obtained. That simply did not occur as at least 1,444 Clients have never been contacted (by either Sellers, per D.C. Rule of Professional Conduct 1.17's mandatory notice, or by AkinMears in the months since procurement).

32. Based on information and belief, it was impossible for these Sellers to truthfully represent that they exercised good faith efforts to qualify all of the Clients for the Litigation in accordance with the Script because thousands of Clients were actually procured by Sellers from third party overseas call-centers (notwithstanding Sellers' protestations that they did not obtain a single Client from an overseas call-center). That is, Sellers obtained Clients from overseas call-centers – wherein Sellers had no involvement whatsoever in the initial procurement of same (and, amazingly, Selling Partner Michael Chhabra has conceded that almost half of the 75 overseas call-centers were terminated for engaging in fraud and otherwise employing improper tactics in retaining such leads, including coaching a lead on how to answer certain qualifying questions).[3] How these Sellers can represent and warrant that they used good faith efforts to qualify all of the Clients for the Litigation when half of the overseas call-centers that procured these very Clients were terminated because of fraud and improper conduct simply defies all credulity. More alarming is that these Respondents, who assured AkinMears that none of the Clients transferred were

---

[3] Respondent Michael Vincent Chhabra provided sworn deposition testimony to this effect on February 27, 2017 in *In Re: American Medical Systems, Inc. Pelvic Repair Systems Product Liability Litigation; see also* February 27, 2017 Deposition of Vineet Kumar Chhabra in *In Re: American Medical Systems, Inc. Pelvic Repair Systems Product Liability Litigation.*

obtained from overseas call-centers, knew of these improprieties well before the Purchase

Agreements were consummated, and elected to intentionally deceive AkinMears.

33.    Even absent the fraud and improper techniques employed by Sellers' overseas call-

centers, each—according to Respondent Chhabra—was purportedly tasked with asking the

fundamental qualifying "knock-out" questions, such as "do you have mesh" and "was it implanted

vaginally?" Respondent Chhabra has also admitted that Sellers "had no idea what exactly the

overseas call operator was saying" during the intake calls that resulted in retention.[4] It is axiomatic

that if Sellers were not part of the procurement of these Clients (and readily concede to not having

the slightest clue about what was said between the Client and overseas call-center intake agent),

they likewise cannot attest to the manner of procurement (Respondent Chhabra testified

accordingly explaining that simply because a Client recalled receiving a cold-call from a call center

or such Client was provided mis-information during an intake call from a call center, Sellers were

not responsible as "[y]ou don't know [who] made those calls.")[5] To the extent Respondents

dispute these allegations, they can produce the recordings of each and every such call as same were

purportedly recorded and maintained.

34.    As a result of Respondents' failure to exercise good faith efforts to qualify all of

the Clients, AkinMears suffered millions of dollars in damages.

**BUYER BEWARE: AKINMEARS CONSENTED TO CERTAIN CARVE-OUTS THAT WOULD REDUCE THE TOTAL NUMBER OF CLIENTS WHOSE CLAIMS WOULD BE PROSECUTED BY AKINMEARS, BUT NOT THE TOTAL PURCHASE PRICE, ULTIMATELY COSTING AKINMEARS $10,000,000**

35.    AkinMears' purchase of Respondents' pelvic mesh litigation practices for

$40,000,000 was not without risk. As to be expected, Respondents refused to insure or guarantee

---

[4] *Id.*
[5] *Id.*

that all 14,453 Fee Agreements/Clients purchased would result in a profit to AkinMears. For example, the Sellers refused to guarantee that any of the Clients would agree to prosecute their cases or that the medical records would even support such claims.[6] To memorialize these "Carve-Outs" the parties agreed that the $40,000,000 purchase price was not subject to discount or refund in the following explicitly defined circumstances:

- a Client subsequently notified AkinMears that she was electing not to pursue her claims (2.04(d)(i));

- upon further review of the medical records or other information from the Client, AkinMears subsequently determined that the case was unlikely to result in any recovery or settlement (or would otherwise be unprofitable)(2.04(d)(ii)); or,

- a Client was subject to duplicate representation (2.04(d)(iii)).

36.     These Carve-Outs resulted in 3,486 Clients (1,669 Clients elected to not pursue their claims; 1,670 Clients were rejected by AkinMears after medical review; and 147 Dual Representations) out of the 14,453 Clients purchased being abandoned by AkinMears post-purchase (the "Carve-Out Clients"). Based solely on the $2,900.65 AkinMears paid to acquire each and every one of the 14,453 Clients, AkinMears lost $10,111,665.90 as a result of these Carve-Out Clients (which these Respondents should be compelled to repay due to their fraud and abject failure to abide by their representations). To be clear: these 3,486 Carve-Out Clients were completely valueless to AkinMears.

37.     While AkinMears agreed to accept the calculated risk of losing a certain number of Clients to the "Carve-Outs," AkinMears never agreed to spend almost $40,000,000 to buy

---

[6] Pursuant to D.C. Rule 1.17, each Client had the opportunity to opt-out of the transfer of representation to AkinMears, but upon a failure to affirmatively opt-out after 90 days of receipt of actual written notice, said Client was deemed to have "opted-in" to the transfer. After the 90 day opt-out period, Respondents informed AkinMears that not one Client affirmatively opted-out of the transfer.

thousands of phantom clients and non-existent claims and welcome the Respondents back into the mesh game. To date, of the 14,453 Clients purchased, 6,343 (a staggering 44%) were valueless.

## IV.
## CAUSES OF ACTION

38.     For each and every cause of action sounding in tort contained herein, AkinMears affirmatively pleads and hereby invokes the discovery rule and/or fraudulent concealment to defer the accrual date of each respective statute of limitations. The tort based causes of action recited below did not accrue until the injuries caused by Respondents became discoverable. Respondents' wrongful acts and AkinMears' resulting injuries were inherently undiscoverable at the time they occurred. Furthermore, the evidence of AkinMears' injuries is objectively verifiable. The discovery rule, to the extent necessary, is therefore applicable.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract Against All Respondents)

39.     All preceding paragraphs are incorporated by reference.

40.     Each Purchase Agreements is a valid, binding, unambiguous contract.

41.     AkinMears fully performed under each Purchase Agreement.

42.     Each Respondent is in material breach of their Purchase Agreement with AkinMears. Respondents failed to abide by their contractual obligations for the reasons stated above.

43.     AkinMears has suffered millions of dollars in damages as a result of these Respondents' breaches of contract.

## SECOND CLAIM FOR RELIEF
### (Specific Performance: Indemnification Against All Respondents)

44.     All preceding paragraphs are incorporated by reference.

45.     Purchase Agreement 8.01(b) <u>Seller's and Selling Partners' Indemnity</u> obligates each Respondent "jointly and severally, to indemnify . . . Purchaser . . .from and against any and all . . . loss . . . and expenses (including reasonable attorneys' fees), arising out of (i) a breach of any of the representations and warranties made by Sellers or any Selling Partner to Purchaser under this agreement, [or] (ii) any breach of any covenant or obligation of Seller or any Selling Partner in the Agreement . . ."

46.     Purchase Agreement 9.13 <u>Remedies</u> provides that "[i]f any Party is in breach of any of the promises and covenants set forth in this Agreement, the aggrieved Party shall have the right, without in any way limiting any other legal or equitable remedy available to it, to specific performance of the Agreement . . ."

47.     AkinMears invokes the <u>Indemnity</u> and <u>Remedies</u> provisions of the Purchase Agreements and asks that this Honorable Panel enforce Purchase Agreement 8.01(b) and 9.13 and compel Sellers and Selling Partners, jointly and severally, to indemnify AkinMears for all losses incurred as a result of the numerous breaches of the representations, warranties, covenants and obligations of Sellers and Selling Partners under the Purchase Agreements.

### THIRD CLAIM FOR RELIEF
### (Fraud Against All Respondents)

48.     All preceding paragraphs are incorporated by reference.

49.     The elements of fraud are: (1) that the speaker made a material misrepresentation; (2) that he knew was false when he made it or that he made recklessly without any knowledge of its truth and as a positive assertion; (3) with the intent that the other party act upon it; (4) that the other party acted in reliance on the misrepresentation; and (5) suffered injury thereby.[7]     A

---

[7] *Italian Cowboy Partners Ltd. V. Prudential Ins. Co. of America*, 341 S.W.3d 323, 337 (Tex. 2011).

representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question."[8]

50.     Respondents made numerous misrepresentations to AkinMears, to induce AkinMears into executing the Purchase Agreements, including but not limited to the misrepresentations identified above.

51.     These Respondents knew at the time that their representations were made, that they were false and/or made with a reckless disregard for the truth. AkinMears relied on these misrepresentations and paid these Respondents $38,000,000. These misrepresentations caused AkinMears to sustain actual damages beyond mere contractual damages. Because of the Respondents' fraud, AkinMears is also entitled to exemplary damages.

## FOURTH CLAIM FOR RELIEF
### (Fraudulent Inducement Against All Respondents)

52.     All preceding paragraphs are incorporated by reference.

53.     Before execution of the Purchase Agreements and in the Purchase Agreements themselves, Respondents made many false representations of material fact, while knowing that they were false or while making them recklessly without any knowledge of the truth and as a positive assertion, and with the intent and effect of deceiving AkinMears and the intent and effect of AkinMears acting on the representations. These false representations were made in order to induce AkinMears to sign the Purchase Agreements and pay these Respondents $38,000,000.

54.     AkinMears reasonably and justifiably relied on the above misrepresentations

---

[8] *Id.*

55.     These false representations constitute fraud in the inducement. AkinMears was damaged by this fraudulent inducement in that it would not have entered into the Purchase Agreements but for the false representations and concealments by Respondents.

**FIFTH CLAIM FOR RELIEF**
**(Fraud by Nondisclosure Against All Respondents)**

56.     All preceding paragraphs are incorporated by reference.

57.     In the alternative/addition to other counts of fraud, these Respondents committed fraud by nondisclosure.

58.     The elements of fraud by nondisclosure are: (1) the respondent failed to disclose facts to the claimant; (2) the respondent had a duty to disclose those facts; (3) the facts were material; (4) the respondent knew the claimant was ignorant of the facts and the claimant did not have an equal opportunity to discover the facts; (5) the respondent was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the respondent intended to induce the claimant to take some action or refrain from acting; (7) the claimant relied on the respondent's nondisclosure; and (8) the claimant was injured as a result of acting without that knowledge.[9]

59.     Respondents actively concealed a past or existing material fact with the intent and effect of deceiving AkinMears as described above.

60.     The above false concealments damaged AkinMears because had AkinMears known the extent of Respondents concerns with the entities that actually procured the Clients being sold to AkinMears, AkinMears would not have accepted certain terms in the Purchase Agreement or would have elected to forego the transaction altogether.

---

[9] *Bright v. Addison*, 171 S.W.3d 588, 599 (Tex. App.—Dallas 2005, pet. denied).

## SIXTH CLAIM FOR RELIEF
### (Negligent Misrepresentation Against All Respondents)

61.     All preceding paragraphs are incorporated by reference.

62.     Pleading in the alternative, in the event that Respondents' misrepresentations and/or omissions described above were not made with the intent to deceive, they were made with reckless disregard for the truth and with negligence towards the truth.

63.     Each of the Respondents understood that AkinMears would be relying on their statements and representations (as well as omissions), and in fact, the representations and omissions at issue were directed towards AkinMears with the intent that AkinMears rely on them.

64.     AkinMears justifiably and reasonably relied on the statements and omissions and suffered significant financial injury as described herein as a result.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy and/or Assisting, Encouraging and/or Participating Against All Respondents)

65.     All preceding paragraphs are incorporated by reference.

66.     In Texas, parties involved in a conspiracy are responsible for the actions of their co-conspirators, and liability is extended throughout the entire conspiracy.[10] The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.[11]

67.     Respondents, in combination with one another, reached an agreement to defraud AkinMears out of millions of dollars. Respondents acted wrongfully (by defrauding AkinMears)

---

[10] *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983).
[11] *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Boales v. Brightor Builders, Inc.*, 29 S.W.3d 159, 164 (Tex. App.— Houston [14th Dist.] 2000, pet. denied).

and in concert with one another to unlawfully harm AkinMears, thereby causing damage to AkinMears.

## EIGHTH CLAIM FOR RELIEF
### (Constructive Trust Against All Respondents)

68.     All preceding paragraphs are incorporated by reference.

69.     Respondents, working in concert with one another, defrauded AkinMears out of millions of dollars.

70.     As a result of Respondents' chosen course of conduct, AkinMears requests that the Panel place every dollar received by any of these Respondents from AkinMears, or from the sale resulting from the Purchase Agreements that can be linked to AkinMears, in constructive trust.

## V.
## CONDITIONS PRECEDENT

71.     All conditions precedent to AkinMears' claims for relief, including presentment of attorneys' fees, have been performed, have been waived or have occurred.

## VI.
## DAMAGES

72.     In light of Respondents' conduct, AkinMears has directly and proximately suffered actual, special, and consequential damages, as well as lost profits that are within the jurisdictional limits of this Panel of an amount no less than $18,398,822.95.[12]  AkinMears is also entitled to recover punitive or exemplary damages pursuant to the Texas Civil Practice and Remedies Code and Texas common law.

---

[12] AkinMears reserves the right to amend this figure, and if it increases, pay the associated increase in filing fees per the AAA Commercial Arbitration Rules and Mediation Procedures, Administrative Fee Schedules, eff. July 1, 2016.

73.     As permitted under all applicable law, AkinMears seeks the recovery of all attorneys' fees incurred in connection with the prosecution of its claims. AkinMears seeks attorneys' fees pursuant to § 38.001 of the Texas Civil Practices & Remedies Code.

## VII.
## PRAYER

WHEREFORE AkinMears respectfully prays that judgment be entered in its favor against Respondents, joint and several, for all damages and amounts to which AkinMears is entitled, a constructive trust, any amounts allowable under law for pre-judgment interest, post-judgment interest, attorneys' fees, and court/arbitration costs; AkinMears also prays that court/arbitration costs and discretionary costs of this action be taxed against Respondents; AkinMears further prays for such further relief, at law or in equity, to which Claimant may show itself justly entitled.

Respectfully submitted,

LEVINTHAL • WILKINS, PLLC

By: */s/ Jared I. Levinthal*
        Jared I. Levinthal
        Texas State Bar No. 24002467
        levinthal@levinthalwilkins.com
        Bradley M. Kirklin
        State Bar No. 24046222
        kirklin@levinthalwilkins.com
        2323 S. Shepherd Dr., Suite 1000
        Houston, TX  77019
        (713) 275-9700 Telephone
        (713) 275-9701 Facsimile

**ATTORNEYS FOR AKINMEARS**

## CERTIFICATE OF SERVICE

I certify that on the 5th day of July 2017, a true and correct copy of the foregoing document was duly served on each Respondent per Purchase Agreement 9.09 and Schedule 4.01(b).

_/s/ Jared I. Levinthal_
Jared I. Levinthal

**PURCHASE AGREEMENT**

THIS PURCHASE AGREEMENT (this "<u>Agreement</u>") is entered into as of the 6th day of July, 2015 (the "<u>Effective Date</u>"), by and among AkinMears, G.P., a Texas general partnership (the "<u>Purchaser</u>"), Alpha Law LLP, a limited liability partnership organized under the laws of the District of Columbia ("<u>Seller</u>"), and each of the Selling Partners on the signature page hereto. The Purchaser, the Seller and the Selling Partners are sometimes hereinafter referred to collectively as the "<u>Parties</u>" and are each sometimes hereinafter referred to as a "<u>Party</u>".

**RECITALS:**

**WHEREAS,** in connection with its practice of law related to the Litigation, Seller is a Party to those certain Fee Agreements and Co-Counsel Agreements arising out of the Litigation pursuant to which Seller serves as counsel and is entitled to an interest for collected fees and right to any reimbursable expenses (including any Case Expenses) in each of the case dockets for which Seller has an interest in the Litigation, including those cases as reflected on <u>Schedule 4.09(a)</u> (collectively, the "<u>Docket Interests</u>"); and

**WHEREAS,** Seller, as permitted under and in compliance with the Model Rules and the District of Columbia Rules now desires to sell, assign and transfer all of its Docket Interests to Purchaser, and Purchaser, as permitted under and in compliance with the Texas Rules, desires to purchase Seller's Docket Interests and the Proceeds therefrom pursuant to the terms and conditions set forth in this Agreement; and

**WHEREAS,** contemporaneously on the date hereof, Purchaser is entering into other Purchase Agreements with Sigma Law Firm LLP, a limited liability partnership organized under the laws of the District of Columbia ("<u>Sigma</u>"), Martindale Voight LLP, a limited liability partnership organized under the laws of the District of Columbia ("<u>Martindale</u>"), and The Law Offices of Albert J. Lazo, P.A., a Florida corporation ("<u>Lazo</u>"), all of whom are also selling, assigning and transferring all of their docket interests related to the Litigation to Purchaser (collectively, the "<u>Other Agreements</u>"); and

**WHEREAS,** the Selling Partners will substantially benefit as a result of the transactions contemplated by this Agreement and each Selling Partner desires to stand behind the obligations of Seller as set forth in this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, agreements, representations and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINED TERMS**

1.01  <u>Definitions</u>. The following terms shall have the following meanings when used in this Agreement:

"<u>$</u>" or "<u>Dollars</u>" means United States Dollars.

| Purchaser: | AkinMears, G.P. |
| | 5847 San Felipe St., 45th Floor |

Purchaser:     AkinMears, G.P.
               5847 San Felipe St., 45th Floor
               Houston, Texas 77057
               Attn: Truett Akin
               Telephone No.: (281) 803-5750
               Email: akin@akinmears.com

Seller:        Alpha Law LLP
               5335 Wisconsin Avenue, N.W., Suite 440
               Washington, D.C. 20015
               Attn: Richard Martindale and Michael Chhabra
               Telephone No.: (888) 667-6112

Selling Partners:    Addresses as set forth on Schedule 4.01(b)

9.10    Further Assurances. Each Party covenants that at any time, and from time to time after the date hereof, it will execute such additional instruments and take such actions as may be reasonably requested by the other Parties to confirm or perfect or otherwise to carry out the intent and purposes of this Agreement, including, without limitation, complying with requests by another Party (at the sole cost and expense of the requesting Party unless such information otherwise was required to have been delivered to the requesting Party by the requested Party pursuant to the Transaction Document) for information necessary for tax compliance or other legal compliance.

9.11    Governing Law. The laws of the State of Texas will govern the interpretation, validity and effect of this Agreement without regard to the place of execution or the place of performance thereof, and the Parties agree that the state and federal courts situated in Harris County, Texas shall have personal jurisdiction over the Parties to hear all disputes arising out of this Agreement, subject to Section 9.12. This Agreement is performable in Harris County, Texas and, as such, the Parties agree that venue shall exclusively lie within the state or federal courts in Harris County, Texas to hear such disputes, subject to Section 9.12.

9.12    Arbitration. Except for matters covered by Section 5.01 (Preservation of Existence; Compliance with Laws), 5.02 (Ethics Compliance; Best Efforts), 5.03 (Pending Cases), 5.04 (Malpractice Coverage for Prior Acts), 5.05 (Non-Solicitation) and 9.13 (as it relates to specific performance), with respect to which a Party may elect to pursue any remedy available in law or in equity, including seeking injunctive or equitable relief, or seeking a restraining order, temporary injunction and/or permanent injunction (mandatory and/or inhibitory) to compel performance with this Agreement, in the event that any dispute (other than one that requires injunctive relief) between any of the Parties or claim by a Party against another Party arising out of or in relation to this Agreement or in relation to any alleged breach hereof cannot be resolved, such dispute or claim shall be finally determined by arbitration in accordance with the rules then in force of the American Arbitration Association. The arbitration proceedings shall take place exclusively in Harris County, Texas, or such other location as the Parties in dispute hereafter may agree upon in writing. There shall be one arbitrator, as shall be agreed upon by the Parties in dispute, who shall be an individual skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. In the absence of such agreement,

23

each Party in dispute shall select one arbitrator and the arbitrators so selected shall select a third arbitrator. In the event the arbitrators cannot agree upon the selection of a third arbitrator, such third arbitrator shall be appointed by the American Arbitration Association at the request of any of the Parties in dispute. The arbitrators shall be individuals skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. The decision rendered by the arbitrator or arbitrators shall be accompanied by a written opinion in support thereof. The decision of the arbitrator or arbitrators shall be final and binding upon the Parties in dispute without right of appeal. Judgment upon any such decision may be entered into in any court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the decision and an order of enforcement. Costs of the arbitration shall be assessed by the arbitrator or arbitrators against any or all of the Parties in dispute, and shall be paid promptly by the Party or Parties so assessed. Notwithstanding the foregoing, to the extent that a Party seeks injunctive or equitable relief, such Party shall have the option to pursue such claim directly with a court of competent jurisdiction in lieu of submitting such claim to arbitration.

9.13    Remedies. If any Party is in breach of any of the promises and covenants set forth in this Agreement, the aggrieved Party shall have the right, without in any way limiting any other legal or equitable remedy available to it, to specific performance of the Agreement, any and all damages resulting from the breach, and any attorneys' fees and costs incurred in bringing the action. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies at law or in equity or otherwise.

9.14    Multiple Counterparts. This Agreement may be executed in one or more counterparts (including electronically by means of portable document format (PDF) or facsimile signatures), each of which when executed and delivered shall be an original and all of which when executed shall constitute one and the same instrument and agreement. The Agreement shall be deemed executed in the State of Texas.

9.15    Confidentiality. Each Party agrees not to disclose the terms and contents of this Agreement to any Persons, except with the prior written consent of the other Parties, other than its respective accountants, financing partners, partners, attorneys, and tax advisors with a need to know the information contained herein, and then, only to the extent so necessary. Seller may disclose the existence of this Agreement to its Clients and Co-Counsel, but only to the extent necessary to comply with the Seller's obligations under this Agreement. Notwithstanding the foregoing, after Closing, Purchaser shall be permitted to make announcements concerning this Agreement and the transactions hereunder and communicate with employees, Clients and its Co-Counsel without the consent of Seller, to the extent in compliance with Applicable Laws.

9.16    Drafting. The Parties acknowledge that each was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against the Parties hereto because one is deemed to be the author thereof.

9.17    Counsel. The Parties hereto each state that they have read this Agreement carefully, that they have consulted with counsel regarding the terms and provisions of this Agreement (or have had the opportunity to consult with legal counsel and chosen not to do so),

24

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.P.,
a Texas general partnership

By: _____
Name: _____
Title: _____

SELLER:

Alpha Law LLP,
a Washington D.C. limited liability partnership

By: _____
Name: Richard D. Martindale
Title: Managing Partner

SELLING PARTNERS:

_____
Richard D. Martindale, Esq.

_____
Mazin A. Sbaiti, Esq.

_____
Michael Chhabra

_____
Ronald Lasorsa

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.R.,
a Texas general partnership

By: _____
Name: _____ Truett B. Akin IV
Title: _____ Partner

SELLER:

Alpha Law LLP,
a Washington D.C. limited liability partnership

By: _____
Name: _____
Title: _____

SELLING PARTNERS:

_____

Richard D. Martindale, Esq.

_____

Mazin A. Sbaiti, Esq.

_____

Michael Chhabra

_____

Ronald Lasorsa

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is entered into as of the 6th day of July, 2015 (the "Effective Date"), by and among AkinMears, G.P., a Texas general partnership (the "Purchaser"), Martindale Voight LLP, a limited liability partnership organized under the laws of the District of Columbia ("Seller"), and each of the Selling Partners on the signature page hereto. The Purchaser, the Seller and the Selling Partners are sometimes hereinafter referred to collectively as the "Parties" and are each sometimes hereinafter referred to as a "Party".

### RECITALS:

**WHEREAS,** in connection with its practice of law related to the Litigation, Seller is a Party to those certain Fee Agreements and Co-Counsel Agreements arising out of the Litigation pursuant to which Seller serves as counsel and is entitled to an interest for collected fees and right to any reimbursable expenses (including any Case Expenses) in each of the case dockets for which Seller has an interest in the Litigation, including those cases as reflected on Schedule 4.09(a) (collectively, the "Docket Interests"); and

**WHEREAS,** Seller, as permitted under and in compliance with the Model Rules and the District of Columbia Rules now desires to sell, assign and transfer all of its Docket Interests to Purchaser, and Purchaser, as permitted under and in compliance with the Texas Rules, desires to purchase Seller's Docket Interests and the Proceeds therefrom pursuant to the terms and conditions set forth in this Agreement; and

**WHEREAS,** contemporaneously on the date hereof, Purchaser is entering into other Purchase Agreements with Sigma Law Firm LLP, a limited liability partnership organized under the laws of the District of Columbia ("Sigma"), Alpha Law LLP, a limited liability partnership organized under the laws of the District of Columbia ("Alpha"), and The Law Offices of Albert J. Lazo, P.A., a Florida corporation ("Lazo"), all of whom are also selling, assigning and transferring all of their docket interests related to the Litigation to Purchaser (collectively, the "Other Agreements"); and

**WHEREAS,** the Selling Partners will substantially benefit as a result of the transactions contemplated by this Agreement and each Selling Partner desires to stand behind the obligations of Seller as set forth in this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, agreements, representations and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

### ARTICLE I
### DEFINED TERMS

1.01 Definitions. The following terms shall have the following meanings when used in this Agreement:

9.11     Governing Law.  The laws of the State of Texas will govern the interpretation, validity and effect of this Agreement without regard to the place of execution or the place of performance thereof, and the Parties agree that the state and federal courts situated in Harris County, Texas shall have personal jurisdiction over the Parties to hear all disputes arising out of this Agreement, subject to Section 9.12. This Agreement is performable in Harris County, Texas and, as such, the Parties agree that venue shall exclusively lie within the state or federal courts in Harris County, Texas to hear such disputes, subject to Section 9.12.

9.12     Arbitration.    Except for matters covered by Section 5.01 (Preservation of Existence; Compliance with Laws), 5.02 (Ethics Compliance; Best Efforts), 5.03 (Pending Cases), 5.04 (Malpractice Coverage for Prior Acts), 5.05 (Non-Solicitation) and 9.13 (as it relates to specific performance), with respect to which a Party may elect to pursue any remedy available in law or in equity, including seeking injunctive or equitable relief, or seeking a restraining order, temporary injunction and/or permanent injunction (mandatory and/or inhibitory) to compel performance with this Agreement, in the event that any dispute (other than one that requires injunctive relief) between any of the Parties or claim by a Party against another Party arising out of or in relation to this Agreement or in relation to any alleged breach hereof cannot be resolved, such dispute or claim shall be finally determined by arbitration in accordance with the rules then in force of the American Arbitration Association.  The arbitration proceedings shall take place exclusively in Harris County, Texas, or such other location as the Parties in dispute hereafter may agree upon in writing.  There shall be one arbitrator, as shall be agreed upon by the Parties in dispute, who shall be an individual skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute.  In the absence of such agreement, each Party in dispute shall select one arbitrator and the arbitrators so selected shall select a third arbitrator.  In the event the arbitrators cannot agree upon the selection of a third arbitrator, such third arbitrator shall be appointed by the American Arbitration Association at the request of any of the Parties in dispute.  The arbitrators shall be individuals skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute.  The decision rendered by the arbitrator or arbitrators shall be accompanied by a written opinion in support thereof.   The decision of the arbitrator or arbitrators shall be final and binding upon the Parties in dispute without right of appeal.  Judgment upon any such decision may be entered into in any court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the decision and an order of enforcement.  Costs of the arbitration shall be assessed by the arbitrator or arbitrators against any or all of the Parties in dispute, and shall be paid promptly by the Party or Parties so assessed.  Notwithstanding the foregoing, to the extent that a Party seeks injunctive or equitable relief, such Party shall have the option to pursue such claim directly with a court of competent jurisdiction in lieu of submitting such claim to arbitration.

9.13     Remedies.  If any Party is in breach of any of the promises and covenants set forth in this Agreement, the aggrieved Party shall have the right, without in any way limiting any other legal or equitable remedy available to it, to specific performance of the Agreement, any and all damages resulting from the breach, and any attorneys' fees and costs incurred in bringing the action. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies at law or in equity or otherwise.

9.14     Multiple Counterparts.  This Agreement may be executed in one or more counterparts (including electronically by means of portable document format (PDF) or facsimile

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.P.,
a Texas general partnership

By: _____
Name: _____
Title: _____

SELLER:

Martindale Voight LLP,
a Washington D.C. limited liability partnership

By: _William C. Voight II_____
Name: _William C Voight II_____
Title: _Managing Partner_____

SELLING PARTNERS:

_____
Richard D. Martindale, Esq.

_____
William C. Voight II, Esq.

_____
Michael Chhabra

_____
Ian Jones

_____
Joseph E. Lyng

**[SIGNATURE PAGE TO PURCHASE AGREEMENT]**

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.P.,
a Texas general partnership

By: _____
Name: _____ *Truett G. Aker IV*
Title: _____ *Partner*

SELLER:

Martindale Voight LLP,
a Washington D.C. limited liability partnership

By: _____
Name: _____
Title: _____

SELLING PARTNERS:

_____

Richard D. Martindale, Esq.

_____

William C. Voight II, Esq.

_____

Michael Chhabra

_____

Ian Jones

_____

Joseph E. Lyng

**[SIGNATURE PAGE TO PURCHASE AGREEMENT]**

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is entered into as of the 6th day of July, 2015 (the "Effective Date"), by and among AkinMears, G.P., a Texas general partnership (the "Purchaser"), The Law Offices of Albert J. Lazo, P.A., a Florida corporation (the "Seller"), and Albert J. Lazo, Esq. (the "Selling Partner"). The Purchaser, the Seller and the Selling Partner are sometimes hereinafter referred to collectively as the "Parties" and are each sometimes hereinafter referred to as a "Party".

## RECITALS:

**WHEREAS,** in connection with its practice of law related to the Litigation, Seller is a Party to those certain Fee Agreements and Co-Counsel Agreements arising out of the Litigation pursuant to which Seller serves as counsel and is entitled to an interest for collected fees and right to any reimbursable expenses (including any Case Expenses) in each of the case dockets for which Seller has an interest in the Litigation, including those cases as reflected on Schedule 4.09(a) (collectively, the "Docket Interests"); and

**WHEREAS,** Seller, as permitted under and in compliance with the Model Rules and the Florida Rules now desires to sell, assign and transfer all of its Docket Interests to Purchaser, and Purchaser, as permitted under and in compliance with the Texas Rules, desires to purchase Seller's Docket Interests and the Proceeds therefrom pursuant to the terms and conditions set forth in this Agreement; and

**WHEREAS,** contemporaneously on the date hereof, Purchaser is entering into other Purchase Agreements with Sigma Law Firm LLP, a limited liability partnership organized under the laws of the District of Columbia ("Sigma"), Martindale Voight LLP, a limited liability partnership organized under the laws of the District of Columbia ("Martindale"), and Alpha Law LLP, a limited liability partnership organized under the laws of the District of Columbia ("Alpha"), all of whom are also selling, assigning and transferring all of their docket interests related to the Litigation to Purchaser (collectively, the "Other Agreements"); and

**WHEREAS,** the Selling Partner will substantially benefit as a result of the transactions contemplated by this Agreement and the Selling Partner desires to stand behind the obligations of Seller as set forth in this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, agreements, representations and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I
## DEFINED TERMS

1.01    Definitions.  The following terms shall have the following meanings when used in this Agreement:

"$" or "Dollars" means United States Dollars.

Coral Gables, Florida 3134
Attn: Albert J. Lazo
Telephone No.: (888) 562-5615

9.10    Further Assurances.  Each Party covenants that at any time, and from time to time after the date hereof, it will execute such additional instruments and take such actions as may be reasonably requested by the other Parties to confirm or perfect or otherwise to carry out the intent and purposes of this Agreement, including, without limitation, complying with requests by another Party (at the sole cost and expense of the requesting Party unless such information otherwise was required to have been delivered to the requesting Party by the requested Party pursuant to the Transaction Document) for information necessary for tax compliance or other legal compliance.

9.11    Governing Law.  The laws of the State of Texas will govern the interpretation, validity and effect of this Agreement without regard to the place of execution or the place of performance thereof, and the Parties agree that the state and federal courts situated in Harris County, Texas shall have personal jurisdiction over the Parties to hear all disputes arising out of this Agreement, subject to Section 9.12. This Agreement is performable in Harris County, Texas and, as such, the Parties agree that venue shall exclusively lie within the state or federal courts in Harris County, Texas to hear such disputes, subject to Section 9.12.

9.12    Arbitration.    Except for matters covered by Section 5.01 (Preservation of Existence; Compliance with Laws), 5.02 (Ethics Compliance; Best Efforts), 5.03 (Pending Cases), 5.04 (Malpractice Coverage for Prior Acts), 5.05 (Non-Solicitation) and 9.13 (as it relates to specific performance), with respect to which a Party may elect to pursue any remedy available in law or in equity, including seeking injunctive or equitable relief, or seeking a restraining order, temporary injunction and/or permanent injunction (mandatory and/or inhibitory) to compel performance with this Agreement, in the event that any dispute (other than one that requires injunctive relief) between any of the Parties or claim by a Party against another Party arising out of or in relation to this Agreement or in relation to any alleged breach hereof cannot be resolved, such dispute or claim shall be finally determined by arbitration in accordance with the rules then in force of the American Arbitration Association. The arbitration proceedings shall take place exclusively in Harris County, Texas, or such other location as the Parties in dispute hereafter may agree upon in writing. There shall be one arbitrator, as shall be agreed upon by the Parties in dispute, who shall be an individual skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. In the absence of such agreement, each Party in dispute shall select one arbitrator and the arbitrators so selected shall select a third arbitrator. In the event the arbitrators cannot agree upon the selection of a third arbitrator, such third arbitrator shall be appointed by the American Arbitration Association at the request of any of the Parties in dispute. The arbitrators shall be individuals skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. The decision rendered by the arbitrator or arbitrators shall be accompanied by a written opinion in support thereof.  The decision of the arbitrator or arbitrators shall be final and binding upon the Parties in dispute without right of appeal. Judgment upon any such decision may be entered into in any court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the decision and an order of enforcement. Costs of the arbitration shall be assessed by the arbitrator or arbitrators against any or all of the Parties in dispute, and shall be paid promptly by

24

the Party or Parties so assessed. Notwithstanding the foregoing, to the extent that a Party seeks injunctive or equitable relief, such Party shall have the option to pursue such claim directly with a court of competent jurisdiction in lieu of submitting such claim to arbitration.

9.13    Remedies. If any Party is in breach of any of the promises and covenants set forth in this Agreement, the aggrieved Party shall have the right, without in any way limiting any other legal or equitable remedy available to it, to specific performance of the Agreement, any and all damages resulting from the breach, and any attorneys' fees and costs incurred in bringing the action. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies at law or in equity or otherwise.

9.14    Multiple Counterparts.    This Agreement may be executed in one or more counterparts (including electronically by means of portable document format (PDF) or facsimile signatures), each of which when executed and delivered shall be an original and all of which when executed shall constitute one and the same instrument and agreement. The Agreement shall be deemed executed in the State of Texas.

9.15    Confidentiality. Each Party agrees not to disclose the terms and contents of this Agreement to any Persons, except with the prior written consent of the other Parties, other than its respective accountants, financing partners, partners, attorneys, and tax advisors with a need to know the information contained herein, and then, only to the extent so necessary. Seller may disclose the existence of this Agreement to its Clients and Co-Counsel, but only to the extent necessary to comply with the Seller's obligations under this Agreement. Notwithstanding the foregoing, after Closing, Purchaser shall be permitted to make announcements concerning this Agreement and the transactions hereunder and communicate with employees, Clients and its Co-Counsel without the consent of Seller, to the extent in compliance with Applicable Laws.

9.16    Drafting.    The Parties acknowledge that each was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against the Parties hereto because one is deemed to be the author thereof.

9.17    Counsel.    The Parties hereto each state that they have read this Agreement carefully, that they have consulted with counsel regarding the terms and provisions of this Agreement (or have had the opportunity to consult with legal counsel and chosen not to do so), and that they have relied solely upon their own judgment without the influence of anyone in entering into this Agreement.

9.18    Schedules. The Parties agree that the schedules attached hereto may be amended, supplemented or updated prior to the Closing Date, by a writing agreed to and signed by the Parties.

**[REMAINDER OF PAGE INTENTIONALLY BLANK.
SIGNATURE PAGE FOLLOWS.]**

4997779v3

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.P.,
a Texas general partnership

By: _____
Name: _____
Title: _____

SELLER:

The Law Offices of Albert J. Lazo, P.A.
a Florida corporation

By: _____
Name:   Albert J. Lazo, Esq.
Title:   President

SELLING PARTNER:

_____
Albert J. Lazo, Esq.

**[SIGNATURE PAGE TO PURCHASE AGREEMENT]**

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.P.,
a Texas general partnership

By: _____
Name: _____ *Truett R. Akin IV*
Title: _____ *Partner*

SELLER:

The Law Offices of Albert J. Lazo, P.A.
a Florida corporation

By: _____
Name:  Albert J. Lazo, Esq.
Title: _____

SELLING PARTNER:

_____

Albert J. Lazo, Esq.

**[SIGNATURE PAGE TO PURCHASE AGREEMENT]**

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is entered into as of the 6th day of July, 2015 (the "Effective Date"), by and among AkinMears, G.P., a Texas general partnership (the "Purchaser"), Sigma Law Firm LLP, a limited liability partnership organized under the laws of the District of Columbia ("Seller"), and each of the Selling Partners on the signature page hereto. The Purchaser, the Seller and the Selling Partners are sometimes hereinafter referred to collectively as the "Parties" and are each sometimes hereinafter referred to as a "Party".

### RECITALS:

**WHEREAS,** in connection with its practice of law related to the Litigation, Seller is a Party to those certain Fee Agreements and Co-Counsel Agreements arising out of the Litigation pursuant to which Seller serves as counsel and is entitled to an interest for collected fees and right to any reimbursable expenses (including any Case Expenses) in each of the case dockets for which Seller has an interest in the Litigation, including those cases as reflected on Schedule 4.09(a) (collectively, the "Docket Interests"); and

**WHEREAS,** Seller, as permitted under and in compliance with the Model Rules and the District of Columbia Rules now desires to sell, assign and transfer all of its Docket Interests to Purchaser, and Purchaser, as permitted under and in compliance with the Texas Rules, desires to purchase Seller's Docket Interests and the Proceeds therefrom pursuant to the terms and conditions set forth in this Agreement; and

**WHEREAS,** contemporaneously on the date hereof, Purchaser is entering into other Purchase Agreements with Martindale Voight LLP, a limited liability partnership organized under the laws of the District of Columbia ("Martindale"), Alpha Law LLP, a limited liability partnership organized under the laws of the District of Columbia ("Alpha"), and The Law Offices of Albert J. Lazo, P.A., a Florida corporation ("Lazo"), all of whom are also selling, assigning and transferring all of their docket interests related to the Litigation to Purchaser (collectively, the "Other Agreements"); and

**WHEREAS,** the Selling Partners will substantially benefit as a result of the transactions contemplated by this Agreement and each Selling Partner desires to stand behind the obligations of Seller as set forth in this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, agreements, representations and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

### ARTICLE I
### DEFINED TERMS

1.01    Definitions.  The following terms shall have the following meanings when used in this Agreement:

"$" or "Dollars" means United States Dollars.

9.11    Governing Law.  The laws of the State of Texas will govern the interpretation, validity and effect of this Agreement without regard to the place of execution or the place of performance thereof, and the Parties agree that the state and federal courts situated in Harris County, Texas shall have personal jurisdiction over the Parties to hear all disputes arising out of this Agreement, subject to Section 9.12. This Agreement is performable in Harris County, Texas and, as such, the Parties agree that venue shall exclusively lie within the state or federal courts in Harris County, Texas to hear such disputes, subject to Section 9.12.

9.12    Arbitration.   Except for matters covered by Section 5.01 (Preservation of Existence; Compliance with Laws), 5.02 (Ethics Compliance; Best Efforts), 5.03 (Pending Cases), 5.04 (Malpractice Coverage for Prior Acts), 5.05 (Non-Solicitation) and 9.13 (as it relates to specific performance), with respect to which a Party may elect to pursue any remedy available in law or in equity, including seeking injunctive or equitable relief, or seeking a restraining order, temporary injunction and/or permanent injunction (mandatory and/or inhibitory) to compel performance with this Agreement, in the event that any dispute (other than one that requires injunctive relief) between any of the Parties or claim by a Party against another Party arising out of or in relation to this Agreement or in relation to any alleged breach hereof cannot be resolved, such dispute or claim shall be finally determined by arbitration in accordance with the rules then in force of the American Arbitration Association. The arbitration proceedings shall take place exclusively in Harris County, Texas, or such other location as the Parties in dispute hereafter may agree upon in writing. There shall be one arbitrator, as shall be agreed upon by the Parties in dispute, who shall be an individual skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute.  In the absence of such agreement, each Party in dispute shall select one arbitrator and the arbitrators so selected shall select a third arbitrator.  In the event the arbitrators cannot agree upon the selection of a third arbitrator, such third arbitrator shall be appointed by the American Arbitration Association at the request of any of the Parties in dispute.  The arbitrators shall be individuals skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. The decision rendered by the arbitrator or arbitrators shall be accompanied by a written opinion in support thereof.   The decision of the arbitrator or arbitrators shall be final and binding upon the Parties in dispute without right of appeal.  Judgment upon any such decision may be entered into in any court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the decision and an order of enforcement.  Costs of the arbitration shall be assessed by the arbitrator or arbitrators against any or all of the Parties in dispute, and shall be paid promptly by the Party or Parties so assessed.  Notwithstanding the foregoing, to the extent that a Party seeks injunctive or equitable relief, such Party shall have the option to pursue such claim directly with a court of competent jurisdiction in lieu of submitting such claim to arbitration.

9.13    Remedies.  If any Party is in breach of any of the promises and covenants set forth in this Agreement, the aggrieved Party shall have the right, without in any way limiting any other legal or equitable remedy available to it, to specific performance of the Agreement, any and all damages resulting from the breach, and any attorneys' fees and costs incurred in bringing the action. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies at law or in equity or otherwise.

9.14    Multiple Counterparts.  This Agreement may be executed in one or more counterparts (including electronically by means of portable document format (PDF) or facsimile

23

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.P.,
a Texas general partnership

By: _____
Name: _____
Title: _____

SELLER:

Sigma Law Firm LLP,
a Washington D.C. limited liability partnership

By: _____
Name: Mazin Sbaiti
Title: Managing Partner

SELLING PARTNERS:

_____
Mazin A. Sbaiti, Esq.

_____
Michael Chhabra

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

AkinMears, G.P.,
a Texas general partnership

By: _____
Name: _____
Title: _____

SELLER:

Sigma Law Firm LLP,
a Washington D.C. limited liability partnership

By: _____
Name: _____
Title: _____

SELLING PARTNERS:

_____
Mazin A. Sbaiti, Esq.

_____
Michael Chhabra

**[SIGNATURE PAGE TO PURCHASE AGREEMENT]**



PRESS RELEASE

# Seven Individuals Indicted for Conspiracy, Mail and Wire Fraud, and Identity Theft in Connection with Laswuit Against BP

Thursday, October 29, 2015

**For Immediate Release**

U.S. Attorney's Office, Southern District of Mississippi

Gulfport, Miss – Mikal C. Watts, 48, David Watts, 50, Wynter Lee, 37, of San Antonio, Texas, Gregory P. Warren a/k/a Greg Warren, 51, of Lafayette, Louisiana, Hector Eloy Guerra, 48, of Harlingen, Texas, Thi Houng Le a/k/a Kristy Le, 48, of Pascagoula, Mississippi, and Thi Hoaug Nguyen a/k/a Abbie Nguyen, 30, of Grand Bay, Alabama, were indicted on September 15, 2015 by a federal grand jury on 95 counts of Conspiracy, Mail and Wire Fraud, Identity Theft, and Aggravated Identity Theft, announced U.S. Attorney Gregory K. Davis and U.S. Secret Service Special Agent in Charge Craig Caldwell.

The indictment, unsealed today, alleges that the defendants conspired to defraud numerous victims from Mississippi, Louisiana, Texas, Alabama, and elsewhere, as well as the Gulf Coast Claims Facility and BP. As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create "clients" for anticipated litigation as a result of the Deepwater Horizon Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as plaintiffs represented by defendant Mikal C. Watts in

litigation related to the Deepwater Horizon/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted "Presentment Forms" to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

"The defendants in this case are accused of exploiting a disaster relief program set up to help those who were injured or suffered an economic loss as a result of the BP Oil spill – the worst environmental disaster in American history," said U.S. Attorney Davis. "The indictment alleges that the defendants carried out mail and wire fraud schemes using stolen identities of coastal residents in order to enrich themselves." Davis praised the outstanding investigative work of the U.S. Secret Service in their investigation of this complex case.

"This indictment represents the largest disaster fraud identity theft case to date, associated with the Deepwater Horizon Oil Spill Trust. This case highlights the Secret Service's investigative expertise in combatting some of the most sophisticated, prolific financial crimes over our 150 year history," said Craig S. Caldwell, Special Agent in Charge of the United States Secret Service Birmingham Field Office. "This investigation serves as a great example of the steps the Secret Service will undertake to relentlessly defend the Nation's financial infrastructure."

Conspiracy carries a maximum sentence of 5 years in prison and a $250,000 fine. Each count of Mail and Wire Fraud carries a maximum sentence of 20 years in prison and a $250,000 fine. Each count of Identity Theft carries a maximum sentence of 5 years in prison and a $250,000 fine. Each count of Aggravated Identity Theft carries a two year mandatory sentence and a $250,000 fine.

The defendants are scheduled to appear before U.S. Magistrate Judge John Gargiulo on Thursday, October 29, 2015 at 1:30 p.m. for their initial appearance and arraignment. Assistant U.S. Attorneys John Dowdy and Jerry Rushing are prosecuting the case for the government.

The public is reminded that an indictment is a formal charge that a defendant has committed a violation of the federal criminal laws. All defendants are presumed innocent unless and until proven guilty.

### 

If you believe you were a victim of identity theft in connection with this case or if you have any knowledge of fraudulent claims or schemes to obtain funds intended for the victims of the Deepwater Horizon Oil Spill, please contact the Gulf Coast Disaster Fraud Hotline at (877)NCDF GCF (623-3423).

"It pains me to see what the industry has become," said Bob Goldwater, who was among the first mass tort lawyers to use national advertising to find clients. "Unfortunately, fraud is becoming increasingly more prevalent. It stems from lawyers taking shortcuts and using newer marketing companies without properly vetting them or doing any due diligence."

Veterans advocates and lawyers also say the fake claims—and the time and effort to identify and weed them out—could dilute the empathy for legitimately ill victims and slow the process of compensating them.

"You've got people who are ripping off the government and the attorneys," said Mike Partain, 55, who was born on the base and developed breast cancer as an adult. "And in the end it's going to victimize the entire community, because people will look at us and wonder if we are real."



About 117,000 claims have been filed to the Navy so far.
Photo: Lance Cpl. Austin M. Livingston / DVIDS

### Coaching a Fake Claim

All claims must first be vetted by the Navy, which oversees the base. A Navy spokesman said it had received about 117,000 claims by mid-October and "is working diligently to identify potential fraud during the claims review process." He declined to elaborate.

But the government has projected it could receive hundreds of thousands of compensation claims—from anyone who spent at least 30 days on the base between 1953 and 1987—and that the payout could ultimately top $21 billion.

(A government filing Friday disclosed for the first time that paying all the claims filed to date would cost nearly $3.3 trillion.)

Some claimants will qualify for a settlement under an early resolution program announced last month. Thousands more are likely to end up in litigation in the Eastern District of North Carolina.

While court-approved settlements and judgments might take years to be distributed, lead-generators typically get paid up front for delivering potential clients, sometimes thousands of dollars for each name.

Demand for their services has grown in part because of a surge in litigation funding available to law firms. One consultant told Bloomberg Law that lenders by mid-year had committed nearly $2 billion to firms filing Camp Lejeune lawsuits.

Industry veterans understand "an influx of capital invites greed," said Brian Roth, CEO of Rocade Capital, a litigation funding firm. The key to preventing fraud in the industry, he said, is understanding the roles and backgrounds of all the parties.

"Where you have issues is when you have leads being marketed to multiple different buyers, you have call centers without oversight," Roth said.

One person who said they were randomly phoned and coached by a call-center employee on how to file a bogus Camp Lejeune claim said the coach provided a backstory to make them seem credible.

In recorded calls shared with Bloomberg Law, the coach explained to the would-be claimant the dates and cancer types they should cite, suggested excuses for being unable to provide medical records, and directed the person to say their father worked as a plumber at the North Carolina base and had a DD Form 214, a government document that proves military service.

At one point, the coach chided the would-be claimant for "goofing up" their responses after they had practiced them multiple times, the recording shows.

Tracking down the actual operators of the call centers can be difficult, and proving their practices violate some law even tougher, said Brandon Lewis, a forensic accountant who previously investigated call center fraud with the Arizona Attorney General's office.

"Even though it's predicated on fraud, they say, 'Hey we delivered you these leads,'" said Lewis. "The criminal prosecutors will start looking at this and say, 'Well, this is just real messy and it's not clear-cut.'"

The person who provided the recordings to Bloomberg Law asked not to be named out of privacy concerns.

They said the call came from an operation run by Revolts PI LLC, which was formed in March and listed as its address as an office in Sheridan, Wyo., that is commonly used to register businesses, according to state records.

(Home to what appears to be a single-story brick building, it has been cited as the registered address of approximately 88,000 other businesses, the Sheridan newspaper reported in 2021.)

The address was also listed on the company's website, which promised "top quality Camp Lejeune leads" as well as leads for other prominent personal injury cases, including lawsuits involving talc powder and the weed-killer Roundup.



# Mass Tort Legal Leads & Signed Retainers

The ultimate **MASS TORT** lead generation service. We provide high-converting, exclusive and ethical leads with signed retainers.'

**CONTACT US**

A page from the Revolts website.

Revolts employees or officials could not be reached for comment. No one answered calls to the phone number on the company's website or messages sent to email addresses on the LinkedIn resumes of two people claiming to be Revolts executives. Earlier this month, Revolts filed dissolution papers in Florida, records there show.

Lead-generating firms have long existed, but they've flourished amid the explosion of legal advertising and litigation funding. More than $145 million had been spent last year on legal advertising related to the Camp Lejeune litigation.

Good lead-generating companies do exist, but are hard to come by, said Alabama attorney Fob James IV.

"Most of them suck," James said. "And their leads are like fool's gold."

The practice also has entangled unsuspecting victims like Eileen Adamo, a western Pennsylvania widow whose husband, a Marine, died of kidney cancer in 2020.

Adamo said she received a call from a lead-generating company in March and she shared some information about her husband, Santo Adamo, who once was stationed at Camp Lejeune.

In October, a New York lawyer called and introduced himself as her attorney, Adamo said, and instructed her to file a claim on behalf of her deceased husband. When she told the attorney that she never signed up with a law firm, he insisted she had and emailed her paperwork that appeared to show her electronic signature, she said.

A lot of the information about her husband was incorrect, according to Adamo, who first posted her concerns about the call in a Facebook group for Camp Lejeune veterans and their relatives. 

"I said these documents are fraudulent. You need to destroy them," Adamo said.

She said the attorney agreed.

**'Protecting Your Law Firm'**

Watts is prominent among mass tort lawyers, and also has high-profile experience with false claims.

In 2015, he was among seven people charged with fabricating thousands of clients in a bid to collect payouts from the 2010 BP Deepwater Horizon oil spill in the Gulf of Mexico. Watts and four co-defendants were acquitted.

He said that experience has made him hyper-vigilant on the issue, and this month he hosted a session on the topic at a lawyers' conference in Las Vegas. (The twice-yearly event, called Mass Torts Made Perfect, draws personal injury lawyers from around the country; October's gathering also included appearances by Sting and Paris Hilton.)

In his session, titled "Client Acquisition: What You Need To Know About Protecting Your Law Firm," Watts outlined the money trail that starts with litigation funders, then travels from law firms to legal advertising companies to lead-generating companies and brokers and finally to call centers. He said his firm, Watts Guerra, spent months auditing all of the plaintiff leads referred by other lawyers, and determined "hundreds and hundreds" were bogus.

A Marine on his staff found names on the list of Camp Lejeune leads with identical and disqualifying problems: the parents of the claimants were dead, they did not live on the Marine base but visited during the summer, or they were too young at the time of exposure to remember anything except they drank the water.

Watts also said his firm's audit identified 105 call centers in India and other Asian countries tied to fake leads in mass tort cases including Camp Lejeune. Overseas call centers typically take advantage of cheaper labor and less regulation.

Watts said he shared his information with the US Justice Department and the FBI, but, in an interview, declined to elaborate. A representative of the FBI would not confirm or deny the existence of any investigation.

Watts, who has previously estimated his firm represents more than 200,000 mass tort clients, said that it continues to accept plaintiff referrals from other lawyers, but gives them deeper scrutiny. "We have held back all claims in all torts pending independent third party review," he said in an interview.

Marcari, the Virginia lawyer, said fake claims would slow down the filings and eventually the payout to victims, with the government already struggling to handle thousands of claims.

Vetting a Lejeune claim is time-consuming, as attorneys have to check information from decades ago, he said.

To contact the reporters on this story: Emily R. Siegel at esiegel@bloombergindustry.com; Kaustuv Basu in Washington at kbasu@bloombergindustry.com

To contact the editors responsible for this story: John P. Martin at jmartin1@bloombergindustry.com; Cheryl Saenz at csaenz@bloombergindustry.com

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
### CIVIL ACTION No.: 5:24-CV-00031-BO

| | | |
|---|---|---|
| Ronald S. Lasorsa | ) | **PROPOSED FINAL JUDGMENT ORDER** |
| Pro Se Plaintiff | ) | **FOR** |
| v. | ) | **APPOINTMENT AS** |
| | ) | **SETTLEMENT MASTER** |
| J. Edward Bell III, Esq. | ) | |
| Defendant. | | |

The Pro Se Plaintiff is awarded the following Final Judgement:

### Settlement Master

The Court appoints the Pro Se Plaintiff as the "Settlement Master" in the Camp Lejeune Water Litigation to achieve a more reasonable global settlement plan.

### Settlement Master Audit

The Settlement Master will audit all administrative claims filed with the Navy Tort Claims Unit as of 12 August 2024. The Settlement Master's audit will ingest and analyze all data present in the Rubris Crosslink litigation-management platform and the Navy JAG Corps Claims Management Portal to identify the plaintiff lawyers, legal service vendors, third-party funders, and broker-dealers responsible for the "conspiracy," "mail and wire fraud," and "identity theft" being perpetrated in the Court's jurisdiction.

The Settlement Master defines a "compliant" lawyer as a plaintiff lawyer with administrative claims who provides the Settlement Master the identities of all co-counsel partners, all parties that delivered claim origination services, all third-party funders who have a financial interest in the outcome of their administrative claims, all broker-dealers who participated in any third-party funding, the terms of any third-party funding agreements and the projected financial return any third-party funder expects to receive from their administrative claims. Any plaintiff lawyer not providing this information to the Settlement Master will be designated as a "non-compliant" lawyer.

The Settlement Master will attempt to contact each claimant using artificial intelligence technology to schedule in-person interviews to verify their identity through outbound telephone calls, email, and text communications. The Settlement Master will then deploy field agents to visit the physical home addresses of all claimants, notifying them of the Settlement Master's audit and verifying each claimant's identity by memorializing a digital copy of two forms of the claimant's government-issued identification. The Special Master's field agents will attempt to visit each claimant a maximum of THREE (3) times. If a field agent cannot contact a claimant after the third attempt, the Settlement Master will disqualify that administrative claim. Any claimant who cannot produce two forms of government-issued identification will have their administrative claim disqualified by the Settlement Master.

The Settlement Master will demand that any third-party funder that provided a loan to a compliant lawyer reveal the identities of all of their individual investors so that the Settlement Master may independently verify their true identities using industry-standard "know-your-client" and "anti-money laundering" (KYC/AML) procedures for accredited investors. The Settlement Master will then determine if any individual investor is associated with any sovereign wealth fund of American geopolitical adversaries. Should a third-party funder refuse to provide this information to the Settlement Master, that third-party funder's loans will be designated as "unenforceable" by the Settlement Master and without recourse to the compliant lawyer or the verified claimant.

Once all administrative claims have either been verified or disqualified, the Settlement Master will review each verified claimant's medical records and collate them by medical diagnosis and treatment codes in alignment with their Court-designated bellwether trial track. Once all verified administrative claims have been categorized, the Settlement Master will provide the Court with his findings to help achieve a more reasonable global settlement plan.

<u>Settlement Master Sum Certain Fees</u>

All compliant lawyers will pay for the Settlement Master's audit at a sum certain fee of FIVE THOUSAND DOLLARS ($5,000) per administrative claim filed. The Settlement Master's audit will be

2

conducted alphabetically. All funds must be paid in full THIRTY DAYS (30) before any audit services are rendered. Should a compliant lawyer fail to pay the Settlement Master's fee per the above-referenced conditions, the compliant lawyer will transition to a non-compliant lawyer, and their third-party funder's loans will be designated as "unenforceable" and without recourse to the verified claimant. The Settlement Master will then validate that non-compliant lawyer's administrative claims at his own expense. The Court will then assign the financial awards paid from those verified claims to the Settlement Master with a fee cap of either TWENTY PERCENT (20%) of the claimant's financial award or a fixed flat fee of FIFTY THOUSAND DOLLARS ($50,000) per claim, whichever amount is less.

### Settlement Master's Final Report and Qui Tam Prosecution

The Settlement Master will file a final report with the Court no later than NINETY DAYS (90) after the Settlement Master's audit is completed. The Settlement Master's final report will identify the number of administrative claims disqualified and the names of all non-compliant lawyers and their third-party funders, broker-dealers, and legal services vendors with more than THREE PERCENT (3%) of their administrative claims disqualified by the Settlement Master's audit. The Court will have exclusive jurisdiction over the Settlement Master's Qui Tam claim, previously filed on October 7, 2022, and all litigation will be adjudicated by jury trial in the United States District Court for The Eastern District of North Carolina, Western Division.

The Settlement Master will retain an independent special counsel to prosecute his qui tam claim against the parties identified as having the above-referenced pattern of disqualified administrative claims. If a monetary judgment is awarded due to successful qui tam litigation, the financial award will be split equally between the US Government and the Settlement Master.

**SO ORDERED. This _____ day of _____, 2024.**


_____

**Terrance W. Boyle**

**United States District Judge**

3

# Settlement Master Portal

## Description of the Data Processing, Data Access, and Data Protection

The Settlement Master will audit all administrative claims in the Camp Lejeune Water Litigation filed with the Navy Tort Claims Unit as of 12 August 2024. Utilizing US government-approved technology, this audit will identify those plaintiff lawyers engaging in "conspiracy," "mail and wire fraud," and "identity theft" and disqualify all meritless claims, thus ensuring the integrity of the litigation and achieving a more reasonable global settlement plan for the Court.

## SMP Transactional Data Processing

The Settlement Master Portal (SMP) is the core instrument used to identify, collate, and report the results of the Settlement Master's audit. The SMP utilizes the flexibility, scalability, and security of a modular design supported by the Microsoft Azure Cloud Platform. Contact management for all claimants will utilize Salesforce's government-approved Cloud Platform. In addition, Machine Learning (ML) / Generative AI (AI) is used for real-time processing and data analysis based on Large Language Data Modeling (LLM), Microservices, as well as Secrets Management (SM) for encryption at the individual data element level. Industry best practices are used for policy management, system Development Operations (DevOps), and maintenance. The SMP enforces role-based access and data retrieval utilizing secure encrypted processes for online and automated (API) access using private certification keys that ensure data integrity and security.

The authorized user roles include internal Settlement Master audit administration, the Court, the Department of Justice, and the Plaintiff Steering Committee. Data access and processing include technical tokenization (encrypted ID and timestamp) functionality that verifies users and stores the identification and the date/time whenever a data element is accessed, updated, or modified. Since 2018, the system has been integrated with the Department of Labor's O*Net platform without service interruptions or data breaches.

## SMP Partner Data Access

The SMP will ingest and analyze all data present in the Rubris Crosslink litigation-management platform and the Navy JAG Corps Claims Management Portal to identify the plaintiff lawyers and their legal service vendors with more than THREE PERCENT (3%) of their filed administrative claims disqualified by the Settlement Master's audit.

Once all administrative claims have either been verified or disqualified, the Settlement Master will review each verified claimant's medical records and collate them by medical diagnosis and treatment codes in alignment with Court-designated bellwether trial tracks. Once all verified administrative claims have been categorized, the Settlement Master will provide the Court with his findings to help achieve a more reasonable global settlement plan.

### SMP Data Store Protection

The SMP uses the Microsoft Azure Cloud platform as the foundation to execute a secure, scalable, and maintainable litigation-management portal. The SMP possesses both proven technology and highly defined governance to mitigate risk to the data and authorized users. The SMP also has intuitive usability and can quickly add functional upgrades. The SMP leverages the foundation of known and reliable products by building on Microsoft's and Salesforce's government-approved software. The SMP utilizes Microsoft's Azures Application Interface Technology (APIs) to interact with ecosystem partners, Azure Key Vault, and Kubernetes to ensure the SMP is encapsulated from outside interference while allowing exponential scalability. The Special Master's support staff will utilize Salesforce's Government Service product offering to capture and time/date stamp any interaction with the administrative claimant community during the entire process lifecycle from initial field agent outreach to verified administrative claim settlement.